Record No. 23-2608

_____

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

SUN VALLEY ORCHARDS, LLC,

*Appellant,*

v.

U.S. DEPARTMENT OF LABOR; UNITED STATES SECRETARY OF LABOR,

*Appellees.*

On Appeal from an Order of the United States District Court for the District of New Jersey in Case No. 21-cv-16625 Honorable Joseph H. Rodriguez

_____

## APPELLANT'S OPENING BRIEF

_____

Robert M. Belden
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321

Robert E. Johnson
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel: (703) 682-9320
Fax: (703) 682-9321

*Counsel for Appellant*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, Appellant Sun Valley Orchards, LLC does not have any parent corporation, nor is there any publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ............................................................ 2

STATEMENT OF ISSUES ................................................................. 3

RELATED CASES AND PROCEEDINGS ....................................................... 3

STATEMENT OF THE CASE ............................................................... 4

    A.    Sun Valley Orchards and the H-2A Program ..................................... 4

    B.    The Department of Labor Investigation ....................................... 6

    C.    The Department of Labor Adjudication ........................................ 9

        1.  The Administrative Law Judge Decision ................................... 10

        2.  The Administrative Review Board Decision ................................ 11

    D.    The District Court Decision ................................................ 12

SUMMARY OF ARGUMENT ................................................................ 14

STANDARD OF REVIEW ................................................................. 16

ARGUMENT ........................................................................... 17

I.    The Agency Adjudication Violated Article III And, By Extension,
The Seventh Amendment ............................................................. 17

    A.    The Award Implicates Sun Valley's Private Rights ........................... 18

        1.  Penalties Were Traditionally Imposed At Common Law ..................... 18

        2.  Back Wages Are A Traditional Common Law Remedy ........................ 20

        3.  The Agency's Claims Are Analogous To A Contract Action ................ 22

        4.  Confiscation Of Over Half A Million Dollars Implicates
Private Rights ........................................................... 24

B.    Particularly After *Jarkesy*, This Case Does Not Involve Public Rights .......................................................................27

    1.  Government Enforcement Does Not Automatically Implicate Public Rights ............................................. 28

    2.  This Case Does Not Fall Within Any Historical Public Rights Exception ............................................30

C.    Sun Valley Did Not Consent To Agency Adjudication By Contesting Liability In The Agency's Designated Forum.................35

II.    The Agency Acted Without Sufficient Congressional Authorization .......... 40

A.    No Statute Clearly Authorizes Agency Adjudication Here ...............41

B.    Agency Adjudication Requires Clear Congressional Authorization.................................................................. 44

III.    The Agency Proceedings Also Violated Provisions Applicable To The Executive Branch..............................................................47

A.    The ALJ Enjoyed Impermissible Protection From Removal ............. 48

B.    Sun Valley Was Not Required To Exhaust This Removal Challenge Before The Agency...........................................................50

IV.    The Award Is An Excessive Fine.................................................53

CONCLUSION...............................................................................57

COMBINED CERTIFICATIONS ......................................................58

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Atcheson v. Everitt*,
98 Eng. Rep. 1142 (K.B. 1775) ............................................................. 20

*Atlas Roofing Co. v. OSHRC*,
430 U.S. 442 (1977) .........................................................13, 29, 30, 46

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ............................................................. 24, 52, 56

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) .........................................................................47

*Calcraft v. Gibbs*,
101 Eng. Rep. 11 (K.B. 1792) ............................................................. 20

*Carr v. Saul*,
144 S. Ct 1352 (2021) ..........................................................................51

*CFTC v. Schor*,
478 U.S. 833 (1986) .............................................................................38

*Chauffeurs v. Terry*,
494 U.S. 558 (1990) ......................................................... 1, 14, 20, 21, 22

*Christ the King Manor, Inc. v. Secretary*,
730 F.3d 291 (3d Cir. 2013) .................................................................16

*Cirko v. Comm'r of Soc. Sec.*,
948 F.3d 148 (3d Cir. 2020) ...........................................................16, 51

*Collins v. Yellen*,
594 U.S. 220 (2021) .............................................................................52

*Cox v. Mundy*,
96 Eng. Rep. 267 (K.B. 1764) ............................................................. 20

*Crowell v. Benson*,
  285 U.S. 22 (1932) ................................................. 31, 45

*Decker Coal Co. v. Pehringer*,
  8 F.4th 1123 (9th Cir. 2021) ................................. 48, 49

*Dep't of State v. Muñoz*,
  144 S. Ct. 1812 (2024) ................................................. 34

*Enron Power Mktg., Inc. v. Luzenac Am., Inc.*,
  No. 05-cv-9244, 2006 WL 2548453 (S.D.N.Y. Aug. 31, 2006) .......................... 23

*Ex parte Bakelite Corp.*,
  279 U.S. 438 (1929) ................................................. 31

*FERC v. Powhatan Energy Fund, LLC*,
  286 F. Supp. 3d 751 (E.D. Va. 2017) ................................................. 43

*Free Enterprise Fund v. PCAOB*,
  561 U.S. 477 (2010) ................................................. 48, 50

*Gonzales v. Raich*,
  545 U.S. 1 (2005) ................................................. 34

*Granfinanciera, SA v. Nordberg*,
  492 U.S. 33 (1989) ................................................. 27, 29

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002) ................................................. 21

*Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Pension Plan*,
  24 F.3d 1491 (3d Cir. 1994) ................................................. 47

*Hubbard v. EPA*,
  982 F.2d 531 (D.C. Cir. 1992) ................................................. 21

*In re Tribune Media Co.*,
  902 F.3d 384 (3d Cir. 2018) ................................................. 38

*In re Universal Mktg., Inc.*,
  459 B.R. 573 (Bankr. E.D. Pa. 2011) ................................................. 38

*Int'l Union v. Keystone Consol. Indus., Inc.*,
   793 F.2d 810 (7th Cir. 1986) ............................................23

*K & R Contractors, LLC v. Keene*,
   86 F.4th 135 (4th Cir. 2023)..............................................52

*Kronholm v. FDIC*,
   915 F.2d 1171 (8th Cir. 1990) ...........................................36

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
   103 F.4th 748 (10th Cir. 2024)......................................49, 50

*Lloyd Sabaudo v. Elting*,
   287 U.S. 329 (1932) ......................................................33

*Lucia v. SEC*,
   138 S. Ct. 2044 (2018) ...............................................48, 52

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
   59 U.S. 272 (1856) ...............................................17, 26, 31

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
   458 U.S. 50 (1982)........................................................23

*Newell Recycling Co. v. EPA*,
   231 F.3d 204 (5th Cir. 2000)............................................55

*NFIB v. DOL*,
   595 U.S. 109 (2022)......................................................47

*Oceanic Steam Navigation Co. v. Stranahan*,
   214 U.S. 320 (1909) ..................................................32, 33

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
   584 U.S. 325 (2018) ..................................................18, 27

*PF Sunset Plaza, LLC v. HUD*,
   60 F.4th 692 (D.C. Cir. 2023)...........................................36

*Porter v. Califano*,
   592 F.2d 770 (5th Cir. 1979) ...........................................56

*Rogers v. Exxon Research & Engineering Co.*,
    550 F.2d 834 (3d Cir. 1977)................................................................21

*SAS Inst., Inc. v. Iancu*,
    138 S. Ct. 1348 (2018) ...............................................................42

*SEC v. Jarkesy*,
    144 S. Ct. 2117 (2024).................................................. *passim*

*SEC v. Jarkesy*,
    34 F.4th 446 (5th Cir. 2022) .............................................. 39, 45, 49

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)...............................................................53

*Stearns v. United States*,
    22 F. Cas. 1188 (C.C.D. Vt. 1835) (No. 13,341) ...............................20

*Stern v. Marshall*,
    564 U.S. 462 (2011) ...........................................................17, 19, 20

*Texas v. Biden*,
    No. 2:21-CV-067-Z, 2021 WL 4552547 (N.D. Tex. July 19, 2021) ...................56

*Tull v. United States*,
    481 U.S. 412 (1987)........................................................... 19, 22

*United States ex rel. Smith v. Gilbert Realty Co.*,
    840 F. Supp. 71 (E.D. Mich. 1993)............................................54

*United States v. Bajakajian*,
    524 U.S. 321 (1998) .......................................................... 53, 54

*United States v. Duell*,
    172 U.S. 576 (1899)............................................................ 31

*United States v. Gates*,
    25 F. Cas. 1263 (S.D.N.Y. 1845) ............................................ 20

*United States v. Jicarilla Apache Nation*,
    564 U.S. 162 (2011)........................................................... 31

*United States v. Kruse*,
  101 F. Supp. 2d 410 (E.D. Va. 2000) ....................54

*Waldrop v. S. Co. Servs.*,
  24 F.3d 152 (11th Cir. 1994) ....................21

*Wellness International Network, Inc. v. Sharif*,
  575 U.S. 665 (2015) ....................37, 38

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ....................47

## CONSTITUTIONAL PROVISIONS

U.S. CONST., art. III, § 2, cl. 1 ....................17, 26

U.S. CONST., amend. 7 ....................17

N.C. CONST., art. XIV (1776) ....................26

N.H. CONST., art. XX (1783) ....................26

PA. CONST., art. XI (1776) ....................26

## STATUTES

5 U.S.C. § 301 ....................41

5 U.S.C. § 702 ....................2

5 U.S.C. § 706(2) ....................17, 52

5 U.S.C. § 1202(d) ....................48, 49

5 U.S.C. § 7521 ....................48, 52

8 U.S.C. § 1188(b)(2)(A) ....................42

8 U.S.C. § 1188(e) ....................42

8 U.S.C. § 1188(g)(2) ....................13, 15, 41

8 U.S.C. § 1324a ....................35, 41

8 U.S.C. §§ 1324b ............................................................ 42

8 U.S.C. § 1324c(d) ........................................................ 42

16 U.S.C. § 823b ............................................................ 43

28 U.S.C. § 1291 .............................................................. 2

28 U.S.C. § 1331 .............................................................. 2

28 U.S.C. § 2461(a) ........................................................ 44

Judiciary Act of 1789, § 9, 1 Stat. 73 ............................ 26

## Rules and Regulations

20 C.F.R. § 655.122(a) ...................................................... 8

20 C.F.R. § 655.122(i) ....................................................... 9

20 C.F.R. § 655.122(q) ...................................................... 5

29 C.F.R. Part 501 ........................................................... 23

    29 C.F.R. § 501.0 ......................................................... 23

    29 C.F.R. § 501.19(b) .......................................... 10, 19

    29 C.F.R. § 501.22 ....................................................... 36

    29 C.F.R. § 501.32(c) ................................................... 36

    29 C.F.R. § 501.33(a) ................................................... 36

    29 C.F.R. § 501.33(d) ................................................... 36

    29 C.F.R. § 501.42(a) ................................................... 12

80 Fed. Reg. 9482 (Feb. 23, 2015) .................................. 7

85 Fed. Reg. 13186 (Mar. 6, 2020) ................................ 12

88 Fed. Reg. 65040 (Sept. 20, 2023) ............................... 5

89 Fed. Reg. 33898 (Apr. 29, 2024) ...................................................32

Fed. R. App. P. 4(a)(1)(B) .............................................................. 2

## Other Authorities

Kent Barnett, *Against Administrative Judges*,
    49 U.C. Davis L. Rev. 1643 (2016) ...........................................10

William Baude, *Adjudication Outside Article III*,
    133 Harv. L. Rev. 1511 (2020) ................................................25

David J. Bier, Cato Institute Policy Brief, *H-2A Visas for Agriculture:
The Complex Process for Farmers to Hire Agricultural Guest Workers*
(Mar. 10, 2020), https://perma.cc/XZ4K-E7QD ...............................5

Declaration of Independence (U.S. 1776) ...............................25

DHS, U.S. Citizenship and Immigration Services, H-2A Temporary
    Agricultural Workers, H-2A Program Process,
    https://perma.cc/5GFU-PHH3 ...........................................5

DOL, Office of Inspector General, *Wage and Hour Division Needs to
Strengthen Management Controls for Back Wage Distributions* (Mar. 2015),
https://perma.cc/M3JR-NEQU ...........................................7

DOL, Wage and Hour Compliance Action Data,
    https://enforcedata.dol.gov/views/data_catalogs.php ...................... 4

Federalist No. 78 .............................................................56

Magna Carta (1215) .........................................................25

Jennifer L. Mascott, *Constitutionally Conforming Agency Adjudication*,
    2 Loy. Univ. Chi. J. Regul. Compliance 22 (2017) ...............................25

Second Continental Congress, Declaration of
The Causes and Necessity of Taking Up Arms (1775) .......................25

1 St. George Tucker, Blackstone's Commentaries,
    Editor's App. 358 (1803) ................................................25

Va. Declaration Of Rights § 11 (1776)........................................................26

Christopher J. Walker and David T. Zaring, *The Right to Remove in Agency Adjudication*, 85 Ohio State L. J. 1 (2024)...........................................................39

**INTRODUCTION**

In this administrative penalty proceeding, employees of the Department of Labor served as both prosecutor and judge—ultimately imposing over half a million dollars in liability on a family farm. Following the Supreme Court's decision in *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), that Award violates Article III. Agency adjudication "concentrate[s] the roles of prosecutor, judge, and jury in the hands of the Executive Branch," which is "the very opposite of the separation of powers that the Constitution demands." *Id.* at 2139.

Like *Jarkesy*, this case involves an award of penalties. This case is therefore squarely controlled by *Jarkesy*'s holding; *Jarkesy* held that Article III adjudication is required if cases involve the "stuff of the traditional actions at common law," and that rule applies to penalties because "civil penalties are a type of remedy at common law that could only be enforced in courts of law." *Id.* at 2129, 2132 (cleaned up). Back wages, the other relief awarded by the Agency, is likewise a "traditional form of relief offered in the courts of law." *Chauffeurs v. Terry*, 494 U.S. 558, 570 (1990) (cleaned up). Whatever scope *Jarkesy* may leave for agency adjudication, these penalties and back wages fall outside it.

The Fifth Circuit's initial opinion in *Jarkesy* offered two additional reasons for vacating the SEC adjudication in that case. Both apply equally here: First, the

Fifth Circuit held that agency adjudication requires clear authorization from Congress—something the Agency cannot point to here. And, second, the Fifth Circuit held that ALJ removal protections violate Article II. The Supreme Court left both holdings undisturbed, *see* 144 S. Ct. at 2127-28, and this Court should follow the Fifth Circuit on both scores.

Finally, the liability imposed here separately violates the Excessive Fines Clause. The Agency imposed hundreds of thousands of dollars in liability without any finding of harm to the workers, leading to an Award that is grossly disproportionate. At a minimum, that constitutional issue should have been decided after a *de novo* hearing, rather than on a closed agency record.

## JURISDICTIONAL STATEMENT

The Agency issued its final decision on May 27, 2021, Appx028, and Sun Valley timely sued under the Administrative Procedure Act ("APA") on September 8, 2021, Appx105. *See* 5 U.S.C. § 702. The District Court had jurisdiction under 28 U.S.C. § 1331.

The District Court issued a final order and judgment dismissing Sun Valley's claims on July 27, 2023, Appx003, and Sun Valley timely appealed on September 1, 2023, Appx001. *See* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Whether adjudication before DOL's in-house agency judges violated Article III and, by extension, the Seventh Amendment (Appx014-016; *see also* Doc. 19-1 at 11-25; Doc. 22-1 at 8-18);

2.      Whether Congress has sufficiently authorized DOL to impose penalties and back wages through adjudication before in-house agency judges (Appx016-017; *see also* Doc. 19-1 at 25-27; Doc. 22-1 at 29-34);

3.      Whether DOL agency judges enjoy impermissible dual-layer good-cause protection from removal, and whether Sun Valley was required to exhaust this removal claim (Appx017-018, 020-022; *see also* Doc. 19-1 at 30-32; Doc. 22-1 at 19-21, 25-29);

4.      Whether DOL violated the Excessive Fines Clause by imposing hundreds of thousands of dollars in liability without a finding of harm (Appx026-027; *see also* Doc. 19-1 at 39-40; Doc. 22-1 at 39-40).

## RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously, and Sun Valley is not aware of any related cases or proceedings.

## STATEMENT OF THE CASE

### A.    Sun Valley Orchards and the H-2A Program

Sun Valley Orchards is a family farm in Swedesboro, New Jersey, owned and operated by two brothers—Joe and Russell Marino. Appx065. During the times relevant to this appeal, the farm grew vegetables, including peppers, squash, cucumbers, and asparagus. Appx113.[1] Vegetable farming is a labor-intensive process, as the crop must be picked by hand, and the farm relied on seasonal agricultural workers. Appx065, 119.

In 2015, the farm decided for the first time to participate in the H-2A program, which allows farms to legally employ immigrant seasonal workers. Appx065. The Marinos had previously avoided the H-2A program because they had heard horror stories about aggressive enforcement against participating farms. Appx119-120. Those concerns are backed up by statistics, with total annual H-2A related penalties increasing from $57,900 in 2006 to $5.9 million in 2013.[2] Nonetheless, the Marinos

_____

[1] Sun Valley has since shut down farming operations, in part because of the burdens created by DOL's heavy-handed enforcement. *See* Jason Nark, *Selling the Farm: Why One South Jersey Farmer Decided to Call it Quits*, Phil. Inquirer (Aug. 27, 2022), https://bit.ly/3LWoBTF. The case continues because the corporate entity remains liable for the penalties and back wages imposed by DOL.

[2] *See* DOL, Wage and Hour Compliance Action Data, https://enforcedata.dol.gov/views/data_catalogs.php.

felt they had no choice, as they were finding it increasingly difficult to meet the farm's labor needs out of the domestic labor pool.

To hire workers through the H-2A program, the Marinos (with help from a consultant) filled out a DOL form describing the nature of the work to be performed. Appx179. The form, DOL Form 790, is referred to as a job order. The job order includes information about things like work hours, Appx192, how meals will be provided, Appx193, the type of work, Appx194, and hourly pay, Appx195. The terms of the job order form a contract with the workers. *See* 20 C.F.R. § 655.122(q) ("the work contract at a minimum will be the terms of the job order").

After DOL approves the job order, the application to participate in the H-2A program is processed by a different agency—the Department of Homeland Security.[3] The employer submits another form to DHS, Form I-129, and federal law "provides the Secretary of Homeland Security with exclusive authority to approve or deny H-2 nonimmigrant visa petitions after consultation with the appropriate agencies of the Government." 88 Fed. Reg. 65040, 65045 (Sept. 20, 2023).

---

[3] *See* DHS, U.S. Citizenship and Immigration Services, H-2A Temporary Agricultural Workers, H-2A Program Process, https://perma.cc/5GFU-PHH3; *see also* David J. Bier, Cato Institute Policy Brief, *H-2A Visas for Agriculture: The Complex Process for Farmers to Hire Agricultural Guest Workers* (Mar. 10, 2020), https://perma.cc/XZ4K-E7QD.

Sun Valley hired 96 workers through the H-2A program for the 2015 growing season, plus an additional 51 domestic workers. Appx052.[4] All the workers were supervised by Augustin Hernandez, an employee who had worked at Sun Valley for 27 years. Appx057. Hernandez's father previously worked at the farm, his son worked at the farm driving a bus, and his wife worked in the farm's kitchen feeding the workers. *Id.*

B.    **The Department of Labor Investigation**

In July 2015, an inspector from DOL spent two days at Sun Valley, inspecting the premises and speaking with workers. Appx102, 120. At that time, the inspector said nothing to the Marinos to raise any concerns, and he did not suggest that they change any practices. *Id.* However, nearly a year later, the Agency issued a letter imposing hundreds of thousands of dollars in liability—including back wages incurred during the period between the inspection and the letter. Appx149. The Agency cited the following issues:

---

[4] Workers at the farm were paid $11.29/hour, Appx180, compared to the then-prevailing minimum wage of $8.38/hour, Appx119.

1. <u>Kitchen Access</u>: The Agency imposed $198,450 in penalties and $128,285 in back wages[5] because the farm offered workers a meal plan that diverged from the job order. Appx072-073. The job order stated that workers would be provided kitchen access to cook their own meals. Appx193. In fact, however, Hernandez's family cooked meals in exchange for a weekly fee. Appx063-064. None of the workers asked to use the kitchen, Appx060, and the Marinos told Hernandez to accommodate workers' requests, Appx058. But, given the size of the kitchen and its use for the meal plan, DOL found no access was provided. Appx060.

Apart from the discrepancy with the job order, there has never been any suggestion that there was anything improper about this meal plan. DOL regulations allow farms to provide meal plans for seasonal workers, and during the relevant period DOL regulations capped the cost of meal plans at $83.02 per week. 80 Fed. Reg. 9482 (Feb. 23, 2015). Hernandez charged below that amount—between $75 and $80 weekly. Appx063. Nor has there been any finding that workers were opposed to the meal plan or even that it would have been cheaper for them to cook their own meals.

---

[5] Back wages are paid to the Agency, *see* Appx150, but in theory the Agency passes them onto workers. In practice, that does not always happen. *See* DOL, Office of Inspector General, *Wage and Hour Division Needs to Strengthen Management Controls for Back Wage Distributions* (Mar. 2015), https://perma.cc/M3JR-NEQU.

The Agency's penalty and back wages calculations were based on the full number of workers at the farm—both H-2A and domestic workers. Appx072-073. The Agency reasoned that liability should be imposed for both classes of workers because federal law forbids discrimination between domestic and H-2A workers. *See* Appx088; 20 C.F.R. § 655.122(a).

2. <u>Beverage Sales</u>: The Agency also imposed over $80,000 in back wages because Hernandez purchased beverages at Sam's Club and re-sold them to workers, Appx089-090, and the Agency cited these beverage sales as an additional basis for the $198,450 in penalties assessed for the meal plan, Appx073. Workers were under no obligation to purchase beverages from Hernandez—although there was a factual dispute about whether free water was sometimes unavailable in the fields—and there was no finding that Hernandez charged unreasonable prices.[6] The Agency, however, reasoned that these sales were inappropriate because they reduced take-home pay below the wage promised in the job order. Appx087-089. Here, too, the Agency sought back wages for both H-2A and domestic workers. Appx154.

3. <u>Early Termination</u>: The Agency next imposed $142,728.22 in back wages, plus another $2,700 in penalties, related to a group of workers who left the farm

---

[6] Testimony regarding the price of beverages ranged from 75 cents to $1.50. Appx064.

before the end of the season. Appx095-096.[7] The job order included a term, required by DOL regulations, under which Sun Valley "guarantee[d] to offer employment for the hourly equivalent of 3/4 of the workdays of the total specified period during which the work contract and all amendments thereof are in effect." Appx203; *see also* 20 C.F.R. § 655.122(i). The job order also made an exception to that guarantee if workers quit or were fired for cause. Appx205. A group of workers left before the season ended; Sun Valley maintained that they quit, but DOL maintained that they were fired without cause and were owed back wages under the three-fourths guarantee.

4. <u>Farm Conditions</u>: Finally, the Agency imposed $7,500 in penalties related to the provision of transportation to the fields, primarily because the farm allowed workers to drive without U.S. driver's licenses. Appx077. The Agency also imposed $3,600 in penalties related to conditions in the dormitories, such as torn screens on windows. Appx076.

## C.    The Department of Labor Adjudication

The letter imposing penalties and back wages stated that Sun Valley had to request a hearing before an agency judge if it wanted to contest the Award. Appx150.

---

[7] The Agency assessed two $1,350 penalties, one for the early departure and another for related paperwork. Appx048.

The letter stated that "[i]f a request for a hearing is not received … the determination of the Administrator shall become the ***final and unappealable*** Order of the Secretary." *Id.* (emphasis added).

Sun Valley timely requested a hearing, and the case was assigned to an Administrative Law Judge ("ALJ"). Appx157. The ALJ was a DOL lifer: She began working at DOL not long after law school, and, apart from a one-year stint as an ALJ at the Social Security Administration, she worked at DOL her entire career—nearly 30 years.[8] The ALJ held a four-day hearing in July 2017. Appx050.

### 1. *The Administrative Law Judge Decision*

On October 28, 2019, the ALJ sustained the Agency's assessment in all material respects. Appx049.

First, the ALJ affirmed the $198,450 penalty for the kitchen issue. Appx091. In doing so, the ALJ did not attempt to independently decide the appropriate penalty. Instead, she concluded that the penalty "was reasonable, because [the Administrator] reviewed each of the mitigation criteria at 29 C.F.R. § 501.19(b)." *Id.*

---

[8] *See* Resume of ALJ Timlin (at page 109), https://perma.cc/UD4J-UAWH. Agencies often launder hires of ALJs through the Social Security Administration to "avoid the [Office of Personnel Management] hiring process." Kent Barnett, *Against Administrative Judges*, 49 U.C. Davis L. Rev. 1643, 1674 n.205 (2016). Doing so "permits the hiring agency more control over hiring." *Id.*

The ALJ also affirmed the back wages for the kitchen issue. Although Sun Valley argued that there was no harm to the workers, the ALJ reasoned that "[a] material change to the terms of [the] contract necessarily provides 'harm' to both the workers' reliance on the H-2A program to ensure that their rights are protected, as well as the overall integrity of the program itself." Appx088. The ALJ likewise upheld the back wages for the beverage sales, although the ALJ adjusted the amount slightly to $64,960. Appx089-090.

The ALJ next affirmed the assessment of $142,728.22 in back wages related to the early departure of some workers. The ALJ assessed credibility and found, on that basis, that the workers were fired. *See* Appx092 (finding that "Joseph Marino's testimony, compared to the employees, lacks credibility").

Finally, the ALJ affirmed the comparatively smaller assessment of penalties for conditions on the farm. Appx098-100. Here, the ALJ did modify the Award in one respect: The ALJ found that the evidence did not support a $450 penalty for an unclean mattress. Appx100.

### 2. *The Administrative Review Board Decision*

Agency regulations provide that an employer who wishes to contest liability must appeal an ALJ decision to another body of administrative judges—the

Administrative Review Board ("ARB"). *See* 29 C.F.R. § 501.42(a). ARB judges are also agency employees. *See* 85 Fed. Reg. 13186 (Mar. 6, 2020).

The ARB affirmed. Appx048. The ARB affirmed the penalties and back wages for the meal plan and beverage sales, finding it irrelevant whether these alleged violations caused harm. Appx041 ("The deductions were unlawful because they were not disclosed, not because they provided a profit."), Appx042 ("[W]hether providing a meal plan instead of cooking facilities would affect any of the workers' decisions to work for Respondent is irrelevant."), Appx043 (affirming back wages for the beverage sales even though "the regulations generally do not require H-2A employers to provide soft drinks to its workers"). The ARB affirmed liability for the early departure, reasoning that the "ALJ's credibility determination is substantial evidence." Appx046. And the ARB affirmed the assessment of penalties for conditions on the farm. Appx048.

The ARB's decision is the final decision of the Agency. *See* 85 Fed. Reg. at 13186-87.

### D.    The District Court Decision

Sun Valley sought review under the APA, Appx110, and the District Court dismissed, Appx003.

The District Court rejected Sun Valley's claim that agency adjudication violated Article III. Appx014-016. The District Court cited *Atlas Roofing Co. v. OSHRC*, 430 U.S. 442 (1977), for a broad view of agency power and concluded that "[b]ecause this matter is based on Sun Valley's violation of DOL's regulations, derives from a federal regulatory scheme under the federal government's immigration related powers, and is integrally related to a particular Federal Government action, the enforcement action is adjudicated outside Article III." Appx015-016. In a footnote, the District Court also held that Sun Valley "impliedly consented" to agency adjudication by contesting liability in agency court. Appx016.

The District Court also rejected Sun Valley's claim that the adjudication was not authorized by statute. Appx017. The District Court relied on the "plain language" of 8 U.S.C. § 1188(g)(2). *Id.* The District Court, however, did not find that Section 1188(g)(2) expressly authorized adjudication; instead, the District Court reasoned that its silence on the mode of adjudication meant that "the Secretary could have just decided to impose such penalties" with no process whatsoever. *Id.* The District Court apparently concluded that, if the Agency could "impose" penalties without process, it could also adjudicate them.

Next, the District Court rejected Sun Valley's claim that ALJs enjoy impermissible removal protections. The District Court first held that Sun Valley was

barred from raising this claim because it did not raise it before the Agency. Appx017-018. Then the District Court held that the claim failed on the merits because the Secretary of Labor is not insulated from removal, even though the Secretary can remove ALJs only with assent from members of the Merit Systems Protection Board—who absolutely are insulated from removal. Appx020-021.

Finally, the District Court rejected Sun Valley's claim under the Excessive Fines Clause. The District Court reasoned that the penalties are "not grossly disproportionate … when the sum is less than legally permissible" and when DOL has imposed even larger penalties in other cases. Appx027.

## SUMMARY OF ARGUMENT

**I.** The Award should be vacated because the penalties and back wages implicate Sun Valley's private rights and, therefore, had to be adjudicated in an Article III court. *Jarkesy* holds that adjudication implicates private rights if it involves "the stuff of the traditional actions at common law." *SEC v. Jarkesy*, 144 S. Ct. 2117, 2132 (2024) (marks and citation omitted). That test is satisfied here because "civil penalties are a type of remedy at common law that could only be enforced in courts of law," *id.* at 2129 (cleaned up), and because "the remedy of back pay back" is likewise "legal in nature," *Chauffeurs v. Terry*, 494 U.S. 558, 573 (1990) (cleaned up). If there could be any doubt, the point is confirmed by the fact that the

Agency's claims are analogous to breach of contract, as well as by the fact that the Agency is demanding over half a million dollars in private property.

The District Court's contrary conclusion—that this case implicates "public" rights properly adjudicated in agency courts—cannot survive *Jarkesy*. The Court in *Jarkesy* emphasized that the public rights doctrine must be grounded in specific historical practice, with "pains to justify the application of the exception in [a] particular instance by explaining that it flowed from centuries-old rules." 144 S. Ct. at 2134. There is no "centuries-old" tradition of agency judges imposing fines and back wages based on terms and conditions of employment. Nor can the Award be upheld on grounds of consent, as the District Court suggested in a footnote; Sun Valley did not "consent" by defending itself in the Agency's designated forum.

**II.** The Award should also be vacated for the separate reason that agency adjudication was not authorized by statute. The statute relied on by the Agency, 8 U.S.C. § 1188(g)(2), is silent on the topic of where adjudication should occur. The statute authorizes the Agency to "impose" penalties and "seek" other relief, but it says nothing about where challenges to such remedies should be heard.

When it comes to agency adjudication, statutory silence is not good enough. The Fifth Circuit—in an alternate holding that the Supreme Court in *Jarkesy* left undisturbed—held that agency adjudication requires clear authorization. And that

makes sense, given the constitutional issues at play. Even the Supreme Court's most expansive articulation of the "public rights" doctrine assumed that Congress made a deliberate choice to authorize adjudication outside Article III. Congress made no such choice here.

**III.** Precisely because agency adjudication fits so oddly in our constitutional structure, the adjudication here also violated structural provisions applicable to the Executive Branch—as the ALJ was improperly protected from removal by two layers of good-cause protection. There is a circuit split on this issue, but this Court should follow the Fifth Circuit's decision in *Jarkesy* finding a violation. Further, contrary to the District Court's opinion, this Court's decision in *Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 153 (3d Cir. 2020), establishes that Sun Valley was not required to exhaust this structural constitutional challenge.

**IV.** Finally, the Agency violated the Excessive Fines Clause by imposing hundreds of thousands of dollars in liability without any finding of harm to the workers. At a minimum, this constitutional claim should have been decided after a hearing, rather than on a cold administrative record.

## STANDARD OF REVIEW

The District Court's decision rejecting Sun Valley's APA claims is reviewed *de novo* on appeal. *See, e.g.*, *Christ the King Manor, Inc. v. Secretary*, 730 F.3d 291, 305

(3d Cir. 2013). This Court assesses the underlying agency action under the APA standard, under which courts shall "hold unlawful and set aside" agency action that is, *inter alia*, "not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2).

## ARGUMENT

### I. The Agency Adjudication Violated Article III And, By Extension, The Seventh Amendment.

Article III vests the judicial branch with authority to adjudicate "***all*** Cases in Law and Equity" arising under federal law. U.S. CONST., art. III, § 2, cl. 1 (emphasis added). Congress and the Executive therefore cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856). The Seventh Amendment, meanwhile, guarantees the right to trial by jury "in Suits at common law." U.S. CONST., amend. 7. The right to a judicial forum under Article III is broader than the jury right—as it extends beyond the common law to equity and admiralty—but, at a minimum, Article III and the Seventh Amendment work together to guarantee an impartial judge and jury in all cases that involve "'the stuff of the traditional actions at common law.'" *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (citation omitted). This case falls comfortably

within that core category of actions that must be tried in the Article III courts, where the Seventh Amendment jury right may be preserved.

A.   The Award Implicates Sun Valley's Private Rights.

To implement Article III's guarantee of an independent judicial forum, courts have identified a category of "private" rights that must be adjudicated in Article III courts. *See*, *e.g.*, *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018). In its most recent decision to address this category, the Supreme Court explained that a "hallmark that we have looked to in determining if a suit concerns private rights is whether it is made of the stuff of the traditional actions at common law." *Jarkesy*, 144 S. Ct. at 2132 (marks and citation omitted). "If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights." *Id.* Applying that precedent here, the Award implicates Sun Valley's private rights.

1. *Penalties Were Traditionally Imposed At Common Law.*

The Agency here imposed hundreds of thousands of dollars in penalties, and, after *Jarkesy*, there can be no question that those penalties implicate Sun Valley's private rights.

*Jarkesy* itself involved penalties. The Court explained that the case posed "a straightforward question: whether the Seventh Amendment entitles a defendant to

a jury trial when the SEC seeks civil penalties against him for securities fraud." 144 S. Ct. at 2127. And the Court found that question resolved by *Tull v. United States*, 481 U.S. 412, 422 (1987), which held that "civil penalties are a type of remedy at common law that could only be enforced in courts of law." *Jarkesy*, 144 S. Ct. at 2129 (cleaned up) (quoting *Tull*). Given that history, *Jarkesy* held that "the remedy is all but dispositive." *Id.* at 2129.[9] Because civil penalties were historically imposed by juries in the common law courts, they implicate private rights.

The underlying statutory basis for the penalties is beside the point. In *Tull*, for example, the government sought penalties under the Clean Water Act—a statutory scheme with no common law analogue—but the penalties were legal in nature because "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law." 481 U.S. at 422. Statutory penalties were imposed at common law through an "action in debt," and that was true "under a variety of

---

[9] *Jarkesy* also explained that "only courts of law issued monetary penalties to punish culpable individuals," and it concluded that the SEC's penalties were punitive in nature. 144 S. Ct. at 2129 (marks and citation omitted). The same reasoning applies here. *Jarkesy* surveyed the statutory factors considered by the agency when imposing penalties and explained that those factors "concern culpability, deterrence, and recidivism." *Id.* Likewise here. *See* 29 C.F.R. § 501.19(b) (listing penalty factors, including history of violations, gravity of the violation, "good faith," and commitment to future compliance).

statutes." *Id.* at 421.[10] As a result, as *Jarkesy* underscored, the "statutory nature of the claim was not legally relevant." 144 S. Ct. at 2129. Likewise here.

### 2. *Back Wages Are A Traditional Common Law Remedy.*

The Agency's assessment of back wages also separately implicates Sun Valley's private rights, as back wages are a traditional common law remedy.

The Supreme Court addressed this issue, and held that back wages arise at common law, in *Chauffeurs*, 494 U.S. at 570-71. The question there was whether an employer was entitled to a jury trial in a case seeking "backpay and benefits" as a remedy for a union's breach of its duty of fair representation. *Id.* at 570. The Court held that a jury trial was required, as "an action for money damages was the traditional form of relief offered in the courts of law." *Id.* (cleaned up); *see also Jarkesy*, 144 S. Ct. at 2129 ("money damages are the prototypical common law remedy"); *Stern*, 564 U.S. at 489 ("liability of one individual to another" is a matter

_____

[10] *See, e.g.*, *Atcheson v. Everitt*, 98 Eng. Rep. 1142, 1147 (K.B. 1775) (imposition of a penalty "is as much a civil action, as an action for money had and received"); *see also Calcraft v. Gibbs,* 101 Eng. Rep. 11, 11 (K.B. 1792) (jury trial on action for "a penalty under the game laws"); *Cox v. Mundy*, 96 Eng. Rep. 267, 267 (K.B. 1764) (jury trial for action "for a penalty incurred by having foreign lace in her house"). This tradition remained in place through the nation's early history. *See, e.g.*, *Stearns v. United States*, 22 F. Cas. 1188, 1192 (C.C.D. Vt. 1835) (No. 13,341) ("Actions for penalties are civil actions, both in form and in substance."); *United States v. Gates*, 25 F. Cas. 1263, 1266 (S.D.N.Y. 1845) ("Ordinarily mere statutory penalties are to be sued for and recovered by action of debt.").

of "private right" (marks and citation omitted)). Backpay damages are quintessential legal relief.

Other cases are in accord. For instance, *Rogers v. Exxon Research & Engineering Co.*, 550 F.2d 834, 838 (3d Cir. 1977), held that a claim for back wages required a jury trial, as a "suit for damages consisting of back wages arising out of the breach of an employment agreement is a routine contract action" and "[t]he fact that the right to recover wages is granted not by common law but by statute does not change the essential nature of the case."[11] *See also Waldrop v. S. Co. Servs.*, 24 F.3d 152, 158 (11th Cir. 1994) ("it has long been the general rule that back wages are legal relief"); *Hubbard v. EPA*, 982 F.2d 531, 534 (D.C. Cir. 1992) ("back pay essentially pays the plaintiff for the economic losses suffered as a result of the employer's wrong").

The reasoning of these cases is particularly apt here. *Chauffeurs* stated that back wages might be equitable if "restitutionary," such as "disgorgement of improper profits." 494 U.S. at 570 (marks and citation omitted); *but see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213-14 (2002) (rejecting attempt to recharacterize damages as "restitution"). But no such rationale could apply here. To the contrary, the Agency deemed any profit to Sun Valley irrelevant; when Sun

---

[11] *Rogers* was overruled on other grounds by *Smith v. Jos. Schlitz Brewing Co.*, 584 F.2d 1231 (3d Cir. 1987).

Valley argued that it did not profit, the ARB held that the "deductions were unlawful because they were not disclosed, not because they provided a profit." Appx041. The Agency imposed back wages for the meal plan and non-alcoholic beverages equal to the full amount charged—far outstripping any possible profit. And Sun Valley also would not "disgorge" profits by paying workers who departed early for hours they never worked. These payments are damages, not restitution, because they consist of "wages and benefits [the workers] would have received." *Chauffeurs*, 494 U.S. at 570-71.

>    3.  *The Agency's Claims Are Analogous To A Contract Action.*

The Court can end the analysis there. In *Jarkesy*, the nature of the relief awarded was "all but dispositive," 144 S. Ct. at 2129, and the same should be true here. *See also Tull*, 481 U.S. at 421 ("characterizing the relief sought is more important than finding a precisely analogous common-law cause of action" (marks omitted)). Still, *Jarkesy* also discussed the substantive nature of the claims—which, the Court observed, resembled common law fraud. *See, e.g.*, 144 S. Ct. at 2130. That part of the *Jarkesy* opinion also supports Sun Valley, as the Agency's claims are analogous to a breach-of-contract action.

Almost the entirety of the Agency's case rests on a breach-of-contract theory. The claim for the early departure of some employees is a straightforward breach-of-

contract action for "the hours promised in their contract[s]," Appx092, and the ALJ likewise concluded that the meal and beverage deductions gave rise to "[a] material change to the terms of [the workers'] contract," Appx088. *See also* Appx033 ("the assessment ... provided them their contractual right to the wage promised in the job orders"). Moreover, the administrative hearing provisions under which the Agency proceeded are expressly labeled provisions for the "Enforcement of Contractual Obligations for Temporary Agricultural Workers." 29 C.F.R. Part 501; *see also* 29 C.F.R. §§ 501.0 ("The regulations in this part cover the enforcement of all contractual obligations ... applicable to the employment of H-2A workers and workers in corresponding employment."). The job order constitutes a contract, and the agency action was brought to enforce its terms.

Contract claims lie at the core of Article III. *See, e.g., N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71-72 (1982) (contract action "obviously" requires Article III adjudication); *Int'l Union v. Keystone Consol. Indus., Inc.*, 793 F.2d 810, 817 (7th Cir. 1986) (agencies cannot "wield[ ] Article III power in determining the contract rights between private parties"); *Enron Power Mktg., Inc. v. Luzenac Am., Inc.*, No. 05-cv-9244, 2006 WL 2548453, at *15 (S.D.N.Y. Aug. 31, 2006) ("contract claims traditionally have been resolved by jury trial"). If any case involves

the traditional stuff of the common law, it is a case to enforce the terms of an employment contract.

The government will presumably respond by pointing out differences between the claims here and traditional contract claims, but *Jarkesy* holds that such differences are beside the point. The Supreme Court highlighted differences between federal securities fraud and traditional common law fraud; among other things, just as the Agency imposed liability on Sun Valley without requiring a showing of harm to workers, "[c]ourts have also not typically interpreted federal securities fraud to require a showing of harm." 144 S. Ct. at 2131. Such differences were irrelevant in *Jarkesy*, and the same is true here.

### 4. Confiscation Of Over Half A Million Dollars Implicates Private Rights.

Stepping back, the above analysis is confirmed by a more basic observation. The Agency here imposed over half a million dollars in liability, demanding significant private property. That implicates private rights, as "[p]rivate rights encompass the three absolute rights, life liberty and property." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 198 (2023) (Thomas, J., concurring) (cleaned up).

This equation of private rights with life, liberty, and property is confirmed by the interplay of Article III and the Due Process Clause. *See Jarkesy*, 144 S. Ct. at 2145 (Gorsuch, J., concurring). "[B]ecause it was 'the peculiar province of the judiciary'

to safeguard life, liberty, and property, due process often meant *judicial* process." *Id.* (quoting 1 St. George Tucker, Blackstone's Commentaries, Editor's App. 358 (1803)).[12] A demand for half a million dollars affects the core right to private property and, consequently, requires a trial in a real court with a real judge.

The historical record confirms this link between deprivation of private property and the right to judicial process. Magna Carta provided that "[n]o free man shall be … stripped of his rights *or possessions* … except by the lawful judgment of his equals or by the law of the land." Magna Carta cl. 39 (1215).[13] Later, one of the colonists' grievances against King George III was that he had "depriv[ed] us of the accustomed and inestimable privilege of Trial by Jury, in cases affecting both life *and property*." Second Continental Congress, Declaration of The Causes and Necessity of Taking Up Arms (1775) (emphasis added).[14]

---

[12] *See also* William Baude, *Adjudication Outside Article III*, 133 Harv. L. Rev. 1511, 1542 (2020) ("The deprivation of life, liberty, and property generally requires judicial process and therefore judicial power."); Jennifer L. Mascott, *Constitutionally Conforming Agency Adjudication*, 2 Loy. Univ. Chi. J. Regul. Compliance 22, 45 (2017) ("Cases involving … deprivations or transfers of life, liberty, or property constitute a 'core' of cases that … must be resolved by Article III courts.").

[13] *Available at* U.K. National Archives, Magna Carta, https://bit.ly/3QmErdB.

[14] *See also* The Declaration of Independence, ¶ 20 (U.S. 1776) (faulting the King for "depriving us, in many cases, of the benefits of Trial by Jury").

Around the same time, the Virginia Declaration of Rights declared that "in controversies ***respecting property*** … the ancient trial by jury is preferable to any other and ought to be held sacred." VA. DECLARATION OF RIGHTS § 11 (1776) (emphasis added).[15] Then, shortly after the enactment of the Constitution, the First Congress provided that the Article III courts would have "exclusive original cognizance … of ***all suits for penalties*** and forfeitures incurred, under the laws of the United States." Judiciary Act of 1789, § 9, 1 Stat. 73, 76-77 (emphasis added). Against that backdrop, it is difficult to imagine that the Framers would have approved imposition of half a million dollars in liability outside the Article III courts.

The text of Article III further confirms that this deprivation of property requires judicial process—even if some part of the Award might somehow be viewed as equitable. After all, the judicial power extends beyond the common law to cases "in Equity." U.S. CONST., art. III, § 2, cl.1; *see also Murray's Lessee*, 59 U.S. at 284 (Congress cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit … in equity"). Deprivation of property requires

---

[15] Other founding-era state constitutions similarly linked the jury right to property rights. *See, e.g.*, PA. CONST., art. XI (1776) ("controversies respecting property"); N.C. CONST., art. XIV (1776) ("controversies at law, respecting property"); N.H. CONST., art. XX (1783) ("controversies concerning property").

judicial process. And that is all the more true here, given the analogy between the Agency's claims and traditional claims at common law.

B.    Particularly After *Jarkesy*, This Case Does Not Involve Public Rights.

Alongside the private rights category, the Supreme Court has identified a category of "public" rights that can be adjudicated in agency courts. *See*, *e.g.*, *Oil States*, 584 U.S. at 334. Because these categories are mirror images, the above analysis suffices to demonstrate ***both*** that these claims are matters of private right and ***not*** public right. *See Jarkesy*, 144 S. Ct. at 2135-36. The Supreme Court in *Jarkesy* drew this principle from *Granfinanciera*—citing that case for the rule that if a case involves "traditional legal claims" then the "public rights exception [does] not apply"—and underscored: "*Granfinanciera* effectively decides this case." 144 S. Ct. at 2135-36 (citing *Granfinanciera, SA v. Nordberg*, 492 U.S. 33, 52-56 (1989)) (cleaned up). So too here. This case involves traditional legal claims, and that alone "effectively decides this case."

Nonetheless, the government below argued—and the District Court agreed—that this case implicates public rights. After *Jarkesy*, those arguments must be rejected. *Jarkesy* repudiated the kind of sweeping claims advanced by the government and explained, instead, that the public rights category is narrow; the "public rights exception is, after all, an ***exception***." 144 S. Ct. at 2134 (emphasis in

original). Courts must give "close attention to the basis for each asserted application of the doctrine," and the "presumption is in favor of Article III courts." *Id.* (cleaned up). The Court identified some historically grounded categories of public rights, but none fit this case, and the government cannot point to the kind of historical precedent required to sustain agency adjudication here.

### 1. Government Enforcement Does Not Automatically Implicate Public Rights.

The District Court reasoned broadly that, "[b]ecause this matter is based on Sun Valley's violations of DOL's regulations, derives from a federal regulatory scheme under the federal government's immigration related powers, and is integrally related to a particular Federal Government action, the enforcement action is adjudicated outside Article III." Appx016. This reasoning was in line with the government's pre-*Jarkesy* litigation position, under which enforcement of federal regulatory schemes necessarily implicated public rights. After *Jarkesy*, that position is no longer tenable.

In *Jarkesy*, the Supreme Court rejected the government's broad theory of regulatory power. *See* 144 S. Ct. at 2136. Citing *Granfinanciera* for the proposition that the government "cannot conjure away the Seventh Amendment by mandating that traditional legal claims be taken to an administrative tribunal," *id.* (cleaned up), the Court rejected the argument that federal enforcement implicates public rights:

> The object of this SEC action is to regulate transactions between private individuals interacting in a pre-existing market. To do so, the Government has created claims whose causes of action are modeled on common law fraud and that provide a type of remedy available only in law courts. This is a common law suit in all but name. And such suits typically must be adjudicated in Article III courts.

*Id.* So too here. The Agency regulates interactions between private employers and employees; it has created claims modeled on common law breach of contract; and it has awarded remedies traditionally available in common law courts. Such a suit must be adjudicated in the Article III courts.

In reaching this conclusion, the Supreme Court declined to follow *Atlas Roofing Co. v. OSHRC*, 430 U.S. 422 (1977), a key case relied on by the District Court below. *See* Appx015-016. Language in *Atlas Roofing* reflects a broader view of public rights, but *Jarkesy* disapproved that language as "a departure from our legal traditions." 144 S. Ct. at 2138 n.4; *see also id.* at 2153 (Gorsuch, J., concurring) ("*Atlas Roofing*'s view of public rights stands as an outlier in our jurisprudence—with no apparent support in original meaning, at odds with prior precedent, and inconsistent with later precedent as well."). The Court even noted the possibility that "*Tull* and *Granfinanciera* effectively overruled *Atlas Roofing.*" *Id.* at 2137 (majority opinion). The Court did not reach that question, but it specifically highlighted the fact that Justice White—the author of *Atlas Roofing*—himself raised that possibility. *Id.* at 2137 n.3 (citing *Granfinanciera*, 492 U.S. at 79). To the extent

that *Atlas Roofing* could be read to allow agency adjudication here—notwithstanding that this case involves private rights traditionally adjudicated in common law courts—it is inconsistent with *Tull*, *Granfinanciera*, and *Jarkesy* and is no longer good law.[16]

Ultimately, *Jarkesy* found no need to address whether *Atlas Roofing* is still good law, as it instead narrowly construed that opinion as confined to its specific facts. *See* 144 S. Ct. at 2137-38. Specifically, the Court observed that *Atlas Roofing* involved claims that were "self-consciously novel" and brought along "no common law soil." *Id.* at 2137. The opposite is true here, for all the reasons set out above.

### 2. This Case Does Not Fall Within Any Historical Public Rights Exception.

Contrary to the government's sweeping theory, *Jarkesy* explained that the public rights category must be narrowly tied to specific actions that "historically could have been determined exclusively by the executive and legislative branches." 144 S. Ct. at 2132 (cleaned up). The Court thus explained that past public rights cases involved "historic categories of adjudications" in areas where "the political branches had traditionally held exclusive power" and where there was "an unbroken

---

[16] While this Court has no authority to overrule *Atlas Roofing*, no overruling is necessary considering the Supreme Court's intervening opinions. *See Jarkesy*, 144 S. Ct. at 2137 n.3. Nonetheless, Sun Valley also preserves for further review the argument that *Atlas Roofing* should be formally overruled.

tradition—long predating the founding—of using these kinds of proceedings." *Id.* at 2132-33. Those exceptions must be defined narrowly, with "pains to justify the application of the exception in [a] particular instance by explaining that it flowed from centuries-old rules." *Id.* at 2134.

None of the historical categories identified in *Jarkesy* fits the Award. This is not an action to "enforce payment of balances due from receivers of the revenue." 144 S. Ct. at 2132 (quoting *Murray's Lessee*, 59 U.S. at 278). Nor does this case involve "assessment of tariffs," *id.* at 2133 (citing *Ex parte Bakelite Corp.*, 279 U.S. 438 (1929)), "relations with Indian tribes," *id.* (citing *United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011)), "patent rights," *id.* (citing *United States v. Duell*, 172 U.S. 576 (1899)), "administration of public lands" or "public benefits such as payments to veterans," *id.* (citing *Crowell v. Benson*, 285 U.S. 22 (1932)).[17]

Finally, this is not a case where "Congress … prohibit[ed] immigration by certain classes of persons and enforce[d] those prohibitions with administrative penalties." *Jarkesy*, 144 S. Ct. at 2132-33 (citing *Oceanic Steam Navigation Co. v.*

---

[17] As a practical matter, *Jarkesy*'s recognition of an exception for public benefits is significant. Of the 1,931 ALJs employed by the federal government, over 1,655 are employed by the Social Security Administration. *See* Office of Personnel Management, Federal ALJs By Agency, https://perma.cc/2A7UY5S9 (data as of March 2017). Hundreds more are employed for other benefits claims. *Id.* The *Jarkesy* decision leaves this predominant use of ALJs undisturbed.

*Stranahan*, 214 U.S. 320 (1909)). After all, while it is true that liability here was imposed in connection with the H-2A program, that liability is not based on "immigration by certain classes of persons" and instead focuses on compliance with a contract for labor on a farm that affected H-2A workers and domestic workers alike (including penalties and back wages awarded with respect to 51 domestic workers with no connection to the H-2A program). *See* Appx088. Moreover, liability was imposed by DOL, an agency that is not charged with enforcement of immigration laws; the immigration-related portion of the H-2A program is overseen by DHS, while DOL's role focuses on the domestic labor market. *See*, *e.g.*, 89 Fed. Reg. 33898, 33899 (Apr. 29, 2024).[18] Particularly reading the historical exception narrowly—as *Jarkesy* requires—it does not fit.

Comparison with *Oceanic Steam*, the case cited by *Jarkesy* to illustrate this exception, is instructive. There, federal law made it unlawful to "bring to the United States any alien afflicted with a loathsome or with a dangerous contagious disease" and authorized a fine payable "to the collector of customs of the customs district in which the port of arrival is located." 214 U.S. at 332. To collect that fine, federal law

_____

[18] The fundamentally domestic nature of the allegations is confirmed by the fact that this administrative proceeding was consolidated with a related case against Hernandez under another statute—the Migrant and Seasonal Worker Protection Act—that applies to domestic workers. *See* Appx159, 161.

made payment a condition of issuing "clearance papers" to the ship to re-cross the border. *Id.* In other words, *Oceanic Steam* involved a fine for bringing certain classes of persons across the border that was itself imposed and collected at the border as a condition of the ship departing across the border. That case provides no support for administrative adjudication of a fine imposed based on the terms and conditions of employment at a farm.

*Lloyd Sabaudo v. Elting*, 287 U.S. 329 (1932), cited by the District Court, is similarly distinct. Like *Oceanic Steam*, it involved a prohibition on "immigration by certain classes of persons," 144 S. Ct. at 2132-33, specifically "any alien afflicted with … a loathsome or dangerous contagious disease." 287 U.S. at 331. The fines were imposed at Ellis Island after "the examining physicians of the Health Department certified to [the alien's] diseased condition or disability." *Id.* at 332-33. And, as in *Oceanic Steam*, the fine was payable "to the collector of customs of the customs district," *id.* at 331, and was collected as a condition of "clearance" for the ship to re-cross the border, *id.* at 333 & n.1. In other words, the fine was imposed at the border, based on the importation of persons across the border, as a condition of departure across the border. That case has nothing to say about fines imposed on a domestic farm based on issues like kitchen access or beverage sales.

The District Court did not engage in this type of careful historical analysis, as it issued its decision before *Jarkesy* was issued, and it instead suggested that "immigration," broadly conceived, "is a matter that falls within the doctrine." Appx015. Approval of such a broad "immigration" exception would disregard *Jarkesy*'s warning that the public rights exception must be applied with "close attention to the basis for each asserted application of the doctrine." 144 S. Ct. at 2134. There is a long history of plenary executive control over the admission of aliens at the border, *see Dep't of State v. Muñoz*, 144 S. Ct. 1812, 1823 (2024), and a limited reading of *Oceanic Steam* and *Lloyd Sabaudo* thus goes at least some way to align those decisions with the kind of "centuries-old" historical practice that *Jarkesy* requires. 144 S. Ct. at 2134. By contrast, there is no similar tradition of executive officials unilaterally imposing fines or back wages based on the types of labor issues here. A broad "immigration" exception that encompassed kitchen access and beverage sales would be untethered to historical practice.

Such a broad "immigration" exception would also cause the "exception [to] swallow the rule," just as *Jarkesy* warned against. 144 S. Ct. at 2134. Much as the government can conjure up chains of causation to connect almost anything to interstate commerce, *see Gonzales v. Raich*, 545 U.S. 1 (2005), it is not hard to see how the government could connect myriad areas of domestic affairs to movement of

persons across the border. Consider this case: The Agency imposed liability not just for Sun Valley's H-2A workers but ***also*** for 51 domestic workers. Appx088. By that logic, anyone employed by the hundreds of thousands of employers who participate in various federal visa programs could fall within the public rights exception. Nor is that the limit. If some connection to the immigration system is all that is required, then every employer qualifies; after all, every employee must complete I-9 paperwork to demonstrate that he or she is legally authorized to work. *See* 8 U.S.C. § 1324a(a)(1)(B), (b).[19] If an agency merely needs to identify some link between domestic conduct and immigration, the rule announced in *Jarkesy* will have no teeth at all. But that is not the law.

  C. <u>Sun Valley Did Not Consent To Agency Adjudication By Contesting Liability In The Agency's Designated Forum.</u>

  In addition to addressing the merits of Sun Valley's Article III claims, the District Court dropped a footnote suggesting (without real analysis) that Sun Valley "impliedly consented to a non-Article III adjudication" by litigating in the Agency's

---

[19] This is no mere hypothetical: In other ongoing litigation, the government is currently arguing that the mere fact that I-9 paperwork is related to immigration is enough to bring paperwork violations involving the I-9 form within the public rights exception. *See* Def's Supp. Br., *ProCraft Masonry, LLC v. DOJ*, No. 23-cv-393 (N.D. Okla. Aug. 14, 2024), D.E. 48 at 2.

courts. Appx016 n.6. That too was error. Sun Valley did not consent to agency adjudication by contesting liability in the Agency's designated forum.

DOL regulations are clear that an employer targeted for civil penalties ***must*** contest the penalties by requesting an administrative hearing. "***Any person*** desiring review of a [civil penalty determination], ***including judicial review***, shall make a written request for an administrative hearing." 29 C.F.R. § 501.33(a) (emphasis added). The notice of assessment of penalty must inform the target of the penalty "that in the absence of a timely request for a hearing, the determination of the WHD Administrator shall become final and unappealable." *Id.* § 501.32(c). Thus, "unless an administrative appeal is properly filed," the "determination shall take effect." *Id.* § 501.33(d). And, once the determination takes effect, "the amount of the penalty must be received by the WHD Administrator within 30 days." *Id.* § 501.22. In other words, a target of a penalty proceeding has two options: either contest the penalty in an administrative hearing or pay. [20]

The Agency's determination letter reiterated the point. The letter stated that, "[y]ou have a right to request a hearing on the determination that any or all of the

---

[20] *See*, *e.g.*, *PF Sunset Plaza, LLC v. HUD*, 60 F.4th 692, 697 (D.C. Cir. 2023) (court could not review agency penalty where party did not request an agency hearing and where statute provided that penalty would therefore be "final and unappealable"); *Kronholm v. FDIC*, 915 F.2d 1171, 1174 (8th Cir. 1990) (same).

violations occurred," and "when a request for a hearing is filed … the matter is referred to the Chief Administrative Law Judge." Appx150. "If a request for a hearing is not received within the time specified, the determination of the Administrator shall become the final and unappealable Order of the Secretary." *Id.* Again, Sun Valley was given two choices. It could either contest the fines in an administrative hearing or it could pay.[21]

This case therefore has nothing in common with cases where courts have found implied consent to a non-Article III forum. In *Wellness International Network, Inc. v. Sharif*, 575 U.S. 665 (2015), the Supreme Court held that a litigant can consent to adjudication in a non-Article III court, but it also spelled out the conditions under which such consent will be valid: "It bears emphasizing," the Court stated, "that a litigant's consent—whether express or implied—must still be knowing and voluntary," and the "key inquiry is whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case." *Id.* at 685 (cleaned up). Thus, "notification of the right to refuse

---

[21] Similarly, once the ALJ issued a decision, Sun Valley was required to seek further review before the Administrative Review Board. *See* 29 C.F.R. § 501.42(a) ("A respondent, WHD, or any other party wishing review, ***including judicial review***, of the decision of an ALJ must, within 30 calendar days of the decision of the ALJ, petition the ARB to review the decision.") (emphasis added).

adjudication by a non-Article III court is a prerequisite to any inference of consent."
*Id.* There was no such notification here—because there ***was*** no "right to refuse"—
and thus there can be no valid consent.

The District Court's footnote cited *CFTC v. Schor*, 478 U.S. 833 (1986), but
that case is distinct. There, the party challenging administrative adjudication had
"the option of having the common law counterclaim against him adjudicated in a
federal Article III court" but "chose to avail himself" of an administrative forum.
*Id.* at 850. That reasoning does not apply here, where Sun Valley defended itself in
the forum designated by the Agency under threat that failure to litigate in that forum
would extinguish any defense.

The other case cited by the District Court, *In re Tribune Media Co.*, 902 F.3d
384 (3d Cir. 2018), also is not to the contrary. There, a bankruptcy claimant impliedly
consented to the jurisdiction of the bankruptcy courts by filing a claim and litigating
without objection. *Id.* at 394-95. That holding necessarily rests on a conclusion that
the claimant had (and was made aware of) the right to refuse consent, as required by
*Wellness International*, 575 U.S. at 685, and in that respect it is notable that
bankruptcy courts have developed procedures to process objections to ensure that
the Article III right is appropriately preserved. *See, e.g.*, *In re Universal Mktg., Inc.*,
459 B.R. 573, 578-79 (Bankr. E.D. Pa. 2011). By contrast, Sun Valley had no right to

refue consent, and DOL had no procedure in place to honor any objection.[22] Sun Valley did not "consent" to agency courts by defending itself in the mandatory forum designated by the agency.

*    *    *

Finally, a note about the remedy for this Article III violation. If ***any*** portion of the Award had to be adjudicated in an Article III court, then the proper remedy is to vacate not just that part of the Award but also all other parts based on the same underlying facts. This is clear from *Jarkesy*: The award there included both penalties and disgorgement, and the Court vacated the entire award based on its analysis of the penalties. *See* 144 S. Ct. at 2127-28. The Fifth Circuit below explained that no separate analysis of the disgorgement remedy was required because both remedies were imposed based on the same facts. 34 F.4th 446, 454 (5th Cir. 2022). Here, the penalties mostly correspond to back wages, and vice versa:

---

[22] Some commentators have urged agencies to adopt a procedure under which litigants could "remove" cases from agency courts to the Article III courts, but that procedure does not currently exist. *See* Christopher J. Walker and David T. Zaring, *The Right to Remove in Agency Adjudication*, 85 Ohio State L. J. 1, 12 (2024).

| Underlying Facts | Back Wages | Penalty |
|---|---|---|
| Meal Plan | $128,285 | $198,450[23] |
| Beverage Sales | $73,932.61 | |
| Early Departure | $142,728.22 | $2,700 |
| Transportation and Housing Conditions | X | $10,650 |

*See* Appx048. And some factual issues—such as whether Hernandez acted as an agent—cut across multiple portions of the Award. *See* Appx084-86. A holding that just part of the Award violates Article III would require further detailed analysis to determine what other parts of the Award depend on the same facts. But no such hair-splitting should be required, as the *entire* Award violates Article III.

## II.    The Agency Acted Without Sufficient Congressional Authorization.

The violation of Article III is sufficient to resolve this case. *See Jarkesy*, 144 S. Ct. at 2127-28 (declining to reach alternate claims under Article II and nondelegation principle given decision under Article III). However, it is not the only problem with the Award. In addition to violating Article III, the adjudication also lacked sufficient congressional authorization. While Congress has authorized DOL to adjudicate all manner of cases, no statute authorizes agency adjudication here. At best, the relevant statute is silent. Yet, particularly given the constitutional issues in play, clear authorization should be required.

---

[23] *See* Appx073 (explaining that this penalty was assessed "for undisclosed meals and drinks").

## A.   No Statute Clearly Authorizes Agency Adjudication Here.

The statute that the Agency has cited to support its authority to adjudicate is

8 U.S.C. § 1188(g)(2):

> The Secretary of Labor is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under this section.

However, while that statute authorizes a variety of remedies to "assure employer compliance with terms and conditions of employment," nothing in the statute contemplates that those remedies will be adjudicated in administrative courts. The authorization to "seek" relief says nothing about where such relief should be sought, and the authorization to "impose" penalties likewise says nothing about where challenges to penalties should be decided. On its face, the provision is silent about the topic of agency adjudication.[24]

When it wants to, Congress knows how to explicitly authorize agency adjudication. *See, e.g.*, 8 U.S.C. §§ 1324a (specifying use of ALJs in cases involving

---

[24] Similarly, while the District Court pointed to statutory language authorizing the Secretary of Labor to "prescribe regulations for the government of his department" and "the distribution and performance of its business," 5 U.S.C. § 301, that language says nothing about administrative adjudication. While the Agency can allocate "its business" as it sees fit, the antecedent question is whether adjudication of these claims is part of the "business" of the Agency in the first place.

unlawful employment of aliens), 1324b(e)-(j) (cases involving unlawful discrimination against aliens), 1324c(d) (cases involving document fraud). Particularly relevant here, Congress expressly authorized the use of ALJs in proceedings to exclude an employer from participating in the H-2A program because of alleged violations like the ones at issue here. *See* 8 U.S.C. § 1188(e). That provision does not apply here, as the Agency has not sought to exclude Sun Valley from the H-2A program.[25] But the existence of those parallel statutory provisions shows that Congress knows exactly how—when it wishes—to authorize use of agency judges. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018). Congress used no such language here.

The mere provision that the Secretary may "impose" penalties does not suggest that penalties should be adjudicated in agency courts. After all, an agency "imposes" penalties when its enforcement staff determines that penalties are due. DOL's own statements in this case illustrate the point: When the Agency sent Sun Valley its initial determination letter, that letter stated that "sanctions/remedies ***are being imposed*** for the H-2A violations found at this time." Appx150 (emphasis added). The ALJ's decision likewise repeatedly stated that penalties and back wages

---

[25] Presumably because that would require proof the violations were "substantial." 8 U.S.C. § 1188(b)(2)(A)

were "imposed" by enforcement officials. *See*, *e.g.*, Appx073 (the "Administrator imposed … CMPs"); Appx088 (the "Administrator … imposed a … back pay requirement").[26] Given that the Agency itself refers to its determination letter as "imposing" liability, Section 1188(g)(2)'s statement that the Agency can "impose" penalties can easily be read to authorize the initial decision to assess penalties, while saying nothing at all about where those penalties should be contested.[27]

As for back wages, the statute says nothing at all. The statute says that the Agency can "seek … injunctive relief and specific performance," but that language does not include back wages. *See supra* pp. 20-22 (explaining that back wages are legal, not equitable). And even if that language could be read to encompass back

---

[26] *See also* Appx098 (referencing "the Administrator's decision to impose a … CMP"); Appx100 ("Administrator imposed … CMPs"); Appx101 ("CMP the Administrator imposed").

[27] Other provisions confirm that it is entirely cogent to say that a penalty may be imposed by agency enforcement personnel but adjudicated in the Article III courts. For instance, when the Federal Energy Regulatory Commission imposes penalties, federal law provides that the agency may "assess such penalty, by order" but that agency must subsequently "institute an action in the appropriate district court of the United States for an order affirming the assessment" and that the "court shall have authority to review *de novo* the law and the facts." 16 U.S.C. § 823b; *see also FERC v. Powhatan Energy Fund, LLC*, 286 F. Supp. 3d 751, 761-64 (E.D. Va. 2017) (detailing this statutory scheme).

wages, the authorization to "seek" relief does not remotely suggest that the agency should "seek" relief in its own in-house courts.

B.   Agency Adjudication Requires Clear Congressional Authorization.

The District Court acknowledged the statute's silence on the mode of adjudication, as it read the statute to allow the "Secretary [to] have just decided to impose such penalties" without any process at all. Appx017. The District Court, however, treated this silence as authorization—apparently reasoning that the power to impose penalties without process includes the power to adjudicate them. This was error. Before an agency takes on the traditional role of the Article III courts, the agency should at a minimum point to clear authorization from Congress.

To begin, this requirement of clear authorization is supported by statute. In 28 U.S.C. § 2461(a), a background provision of federal law, Congress expressly provided, "Whenever a civil ... penalty ... is prescribed for the violation of an Act of Congress without specifying the mode of recovery or enforcement thereof, it may be recovered *in a civil action*." (emphasis added). Congress has thus provided a clear background rule for how penalties should be adjudicated when a statute provides for penalties without specifying a mode of procedure—and, in doing so, made clear that Article III remains the default.

The Fifth Circuit also adopted a requirement for clear authorization in its initial *Jarkesy* decision. The Fifth Circuit explained that, while Article III and the Seventh Amendment typically require a real court and jury, "in some special circumstances **Congress** has the power to assign to agency adjudication matters traditionally at home in Article III courts." 34 F.4th at 461 (emphasis in original). That decision is uniquely a prerogative of the legislative branch: Within the limits set by Article III and the Seventh Amendment, "'the mode of determining' which cases are assigned to administrative tribunals 'is completely within congressional control.'" *Id.* (quoting *Crowell*, 285 U.S. at 50). "Such a decision—to assign certain actions to agency adjudication—is a power that Congress uniquely possesses." *Id.* at 462. Before an agency can adjudicate cases that could otherwise be assigned to the Article III courts, it must thus point to clear statutory authorization.

The Supreme Court left this part of the Fifth Circuit's decision undisturbed—meaning that it remains on the books and, to hold otherwise, this Court would need to split with the Fifth Circuit. *See* 144 S. Ct. at 2127-28. Indeed, the lack of congressional authorization here is if anything more egregious than in *Jarkesy*. In *Jarkesy*, Congress **had** authorized the SEC to adjudicate fraud cases in-house; the problem was that Congress had **also** authorized the SEC to seek judicial relief and thus had given SEC the power to choose the forum. *See* 34 F.4th at 462. The

delegation of that choice to the SEC violated the nondelegation principle. *See id.* Here, by contrast, Congress has not clearly authorized the Agency to adjudicate this case at all. The problem nonetheless remains the same: If vague statutory language is sufficient to allow agency adjudication, it leaves the choice of forum in the hands of the agency, allowing the agency to unilaterally choose to adjudicate outside Article III. Because that choice is uniquely one for Congress, vague or ambiguous authorization cannot be enough.

Even *Atlas Roofing*, the case that represents the high-water mark of the Supreme Court's approval for agency adjudication, held in its very first sentence that "***Congress*** may create a new cause of action in the Government for civil penalties enforceable in an administrative agency." 430 U.S. at 444 (emphasis added). References to the power of Congress appear throughout the decision. *See id.* ("Congress concluded"); *id.* at 448 ("Congress is free"); *id.* at 450 ("does not prohibit Congress"); *see also id.* at 451, 455, 456, 457, 460. To allow an agency to unilaterally decide to adjudicate penalties outside of Article III would thus be a step even beyond *Atlas Roofing*—a case that *Jarkesy* labeled "a departure from our legal traditions." 144 S. Ct. at 2138 n.4.

In a series of recent cases, the Supreme Court has underscored that certain types of decisions require a "clear statement" before an agency can claim power that

otherwise would rest in the legislature. *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023); *see also West Virginia v. EPA*, 597 U.S. 697 (2022); *NFIB v. DOL*, 595 U.S. 109 (2022). Those cases involve decisions of "deep economic and political significance." *Biden*, 143 S. Ct. at 2375. But that same principle must apply with equal force to decisions about the right to an independent judge and jury—a right that "is of such importance and occupies such a firm place in our history and jurisprudence that any seeming curtailment of the right has always been and should be scrutinized with the utmost care." *Jarkesy*, 144 S. Ct. at 2128 (cleaned up). After all, the principle at issue—dubbed the major questions doctrine—is ultimately about preventing "one branch of government arrogating to itself power belonging to another." *Biden*, 143 S. Ct. at 2373. Such separation of powers concerns are doubly implicated in this case, where the Agency's unilateral decision to employ agency judges implicates ***both*** the prerogatives of Congress and Article III.[28]

### III. The Agency Proceedings Also Violated Provisions Applicable To The Executive Branch.

The agency adjudication in this case separately violated structural provisions that govern the Executive Branch, as the ALJ enjoyed impermissible dual-layer

---

[28] This need for clear statutory authorization also finds support in cases holding that "statutory penalty provisions are construed strictly" against the government. *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Pension Plan*, 24 F.3d 1491, 1505 (3d Cir. 1994).

protection from removal under *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010).

So, while the ALJ did not enjoy life tenure or the salary protections mandated by

Article III, the ALJ was simultaneously ***too*** protected from removal to fit within

Article II. In this respect, the ALJ was neither fish nor fowl—reflecting the uneasy

status of administrative adjudication within our constitutional structure. The

District Court erred by rejecting this claim as well.

A.    The ALJ Enjoyed Impermissible Protection From Removal.

To ensure unified Presidential control over the Executive Branch, the

Supreme Court has held that officers who exercise "significant executive power"

can be protected by at most one layer of good cause removal. *See Free Enter. Fund*,

561 U.S. at 513-14. The Agency's ALJs run afoul of this holding. There is no real

question that ALJs exercise significant executive power. *See Lucia v. SEC*, 138 S. Ct.

2044, 2053 (2018). And ALJs enjoy dual-layer protection from removal because

ALJs can only be removed for good cause, 5 U.S.C. § 7521(a), (b), and good cause

must be found by members of the Merit Systems Protection Board ("MSPB"), who

are themselves removable only for good cause, 5 U.S.C. § 1202(d).

There is a circuit split on this issue. The District Court cited the Ninth

Circuit's decision in *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1134 (9th Cir. 2021),

which rejected a removal challenge to ALJs. *See also Leachco, Inc. v. Consumer Prod.*

*Safety Comm'n*, 103 F.4th 748, 764 (10th Cir. 2024) (following *Decker Coal*). But on the other side of the ledger, the Fifth Circuit in *Jarkesy* held that removal restrictions on ALJs are unconstitutional. *See* 34 F.4th at 464-65. The Supreme Court granted certiorari to review the Fifth Circuit's removal ruling but did not reach the question—leaving the ruling undisturbed. *See* 144 S. Ct. at 2127-28.

The District Court relied on the fact that the Secretary of Labor enjoys no protection from removal, Appx021, and the government may seize on that to argue that *Jarkesy* is distinct because there the SEC Commissioners were removable only for good cause. But this overlooks the fact that the Secretary may remove ALJs only with approval of the MSPB—whose members absolutely are insulated by a requirement of good cause. 5 U.S.C. § 1202(d). The Fifth Circuit in *Jarkesy* was clear that this mattered—expressly stating that "the MSPB is part of the mix as well." 34 F.4th at 465. While the ALJs in *Jarkesy* were insulated by three layers of good cause protection (for the ALJs, the Commissioners, and the MSPB), the Fifth Circuit held that the result would be the same even if one of those layers was removed. *See id.* That holding applies squarely here.

This Court should follow the Fifth Circuit. Courts that have upheld removal restrictions on ALJs have placed significant weight on the fact that ALJs exercise "a purely adjudicatory function." *Decker Coal*, 8 F.4th at 1133; *see also Leachco*, 103

F.4th at 764. But the fact that executive officers adjudicate does not make them any less a part of the Executive Branch; after all, executive officers can only ***constitutionally*** adjudicate questions that "historically could have been determined exclusively by the executive and legislative branches." *Jarkesy*, 144 S. Ct. at 2132 (cleaned up). The Supreme Court has held that the Executive Branch must be accountable to the President—who, after all, exercises unique responsibility to ensure that the law is faithfully executed. *See Free Enter. Fund*, 561 U.S. at 496-97. If that kind of unified executive control is incompatible with the adjudicatory functions of ALJs, the solution is not to bend the constitutional structure to accommodate ALJs. Rather, the solution is to move those adjudicatory functions to Article III—where, as explained above, they properly belong.

B. <u>Sun Valley Was Not Required To Exhaust This Removal Challenge Before The Agency.</u>

In addition to rejecting this claim on the merits, the District Court held that Sun Valley was required to exhaust this claim and, thus, "forfeited" it by not raising it before the agency judge. Appx018. However, exhaustion is not required for this type of constitutional claim.[29]

---

[29] The government only raised exhaustion as a defense to Sun Valley's claims under Article II. *See* Doc. 22-1 at 19-21. The doctrine therefore is not at issue with respect to Sun Valley's other claims.

This Court has held that "exhaustion is generally inappropriate where a claim serves to vindicate structural constitutional claims like Appointments Clause challenges." *Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 153 (3d Cir. 2020). While the claim here involves removal, rather than appointment, there is no reason why a different rule should prevail. After all, removal issues, like appointment issues, involve "structural constitutional claims … which implicate both individual constitutional rights and the structural imperative of separation of powers." *Id.* at 153; *see also id.* at 156-57. As in *Cirko*, the government's interest in requiring exhaustion is "negligible, at best," given that "constitutional questions … are outside the agency's competence and expertise" and the agency "is not empowered to grant effective relief." *Id.* at 157-58 (cleaned up). There "is little legitimate governmental interest in requiring exhaustion here." *Id.* at 159.

The District Court cited *Carr v. Saul*, 144 S. Ct 1352 (2021), as contrary authority, but in fact *Carr* confirms the point. *Carr* affirmed *Cirko*'s holding that litigants in Social Security adjudications need not exhaust Appointments Clause challenges and, in doing so, held that "agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise." 141 S. Ct. at 1360; *see also id.* at 1361 (courts do not require exhaustion where that would be "futile," such as when

"adjudicators [] are powerless to grant the relief requested"). Far from suggesting that exhaustion is required, *Carr* confirms it is not.

*     *     *

This removal violation also requires vacatur. *See* 5 U.S.C. § 706(2)(B); *Lucia*, 138 S. Ct. at 2055 (holding that vacatur is the proper remedy for structural violation involving ALJ). Several courts have relied on *Collins v. Yellen*, 594 U.S. 220 (2021), to hold that vacatur is not appropriate absent a specific factual showing that a litigant in an agency adjudication was prejudiced by removal restrictions. *See K & R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023). But this overreads *Collins*, which analyzed a different statutory scheme and held that, absent a showing of prejudice, the removal violation did not "strip the Director of the power to undertake the other responsibilities of his office." 594 U.S. at 258 n.23. In other words, in *Collins* the Court found no reason to think that Congress would have wanted the statutory scheme to flounder just because the removal protections were invalid. By contrast, protection from removal is an integral part of the statutory scheme creating ALJs, *see* 5 U.S.C. § 7521, and it seems unlikely that Congress would want ALJs to adjudicate monetary liability absent that protection. *See Axon Enter.*, 598 U.S. at 189 (explaining removal challenge would "prevent ALJs … from exercising ***any power***, unless they lose their double-for-cause tenure protection").

The removal issue here is therefore inseparable from ALJs' broader authority to perform the powers of their office and requires vacatur.

## IV. The Award Is An Excessive Fine.

Over half the liability in this case was imposed based on the kitchen issue: $198,450 in penalties and $128,285 in back wages. Despite assessing hundreds of thousands of dollars in liability for this violation, however, the Agency never made any finding that it caused harm to the workers. The amount charged for the meal plan was within limits set by DOL's own regulations, *see supra* p. 7, and there was no finding that workers paid more for meals than they would have paid if granted kitchen access. The assessment of hundreds of thousands of dollars without ***any*** finding of harm to the workers violates the Excessive Fines Clause.

In resolving this claim, the District Court should have compared the amount of liability imposed to the actual (negligible) harm to the workers. After all, a significant disparity between a penalty and underlying harm violates the Excessive Fines Clause. *See United States v. Bajakajian*, 524 U.S. 321, 337 (1998) ("If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional."); *cf. State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("In practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due

process."). In this case, the extraordinary penalty imposed is many multiples of any plausible estimate of the actual harm, is "extremely harsh and unjust," and cannot be constitutionally justified. *United States ex rel. Smith v. Gilbert Realty Co.*, 840 F. Supp. 71, 74-75 (E.D. Mich. 1993) (finding that per-occurrence penalty, magnified by large number of violations, was constitutionally excessive); *see also United States v. Kruse*, 101 F. Supp. 2d 410, 414 (E.D. Va. 2000) (same).

The District Court's contrary conclusion erred, first, by disregarding the assessment of back wages and focusing solely on the civil penalties. Appx026-027. Typically, of course, the Excessive Fines Clause would not apply to back wages. But the back wages here were not tied to a showing of harm to the workers, and, instead, were justified by the Agency on the theory that "[a] material change to the terms of [the] contract necessarily provides 'harm' to both the workers' reliance on the H-2A program to ensure that their rights are protected, as well as the overall integrity of the program itself." Appx088. That rationale is not about compensation and is, instead, focused on deterrence. And liability imposed to deter future wrongdoing is an Eighth Amendment fine. *Bajakajian*, 524 U.S. at 329.

Second, even putting that aside, the District Court erred by failing to compare the size of the penalties imposed to the actual harm suffered by the workers. The District Court reasoned, instead, that the penalties were reasonable because the

Agency's regulations would have allowed it to impose even larger penalties. Appx027. This logic is entirely circular: Regulatory penalties are constitutional because they are authorized by regulation. Under that logic, so long as an agency followed its own regulations, a civil monetary penalty would *never* violate the Eighth Amendment. That cannot be the law.

The District Court's logic—under which penalties are constitutional so long as they are authorized—is doubly inappropriate when it comes to penalties whose amount is set by regulation rather than statute. When penalties are set by statute, courts do sometimes reason that it is appropriate to afford some deference to Congress's determination of the appropriate penalty. *See*, *e.g.*, *Newell Recycling Co. v. EPA*, 231 F.3d 204, 210 (5th Cir. 2000). But such reasoning is inappropriate when the amount of a fine is set by an agency. The Executive Branch should not be allowed to investigate, prosecute, adjudicate, and then also determine the reasonableness of the penalty all in the same case.

In resolving this claim under the Excessive Fines Clause, moreover, the District Court erred by denying Sun Valley any opportunity to introduce evidence

beyond the four corners of the administrative record.[30] After all, courts reviewing agency action "have allowed the introduction of extra-record evidence on constitutional claims" because "a court reviewing the constitutionality of agency action must make 'an independent assessment of a citizen's claim of constitutional right.'" *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552547, at *3 (N.D. Tex. July 19, 2021) (quoting *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979)). And that makes sense, as the adjudication of constitutional claims is properly the role of the Article III courts—not agency judges. *See*, *e.g.*, *Axon Enter.*, 598 U.S. at 195. Particularly when it comes to constitutional claims, the judiciary stands as a bulwark to protect individual rights. *See* FEDERALIST NO. 78. The judiciary cannot serve that role if its enforcement of the Excessive Fines Clause occurs only on a closed record built by an agency judge.

---

[30] Sun Valley requested an opportunity to introduce evidence on this point in its Complaint, and Sun Valley preserved that request in its dispositive motion. *See* Doc. 19-1 at 2 n.1. The District Court disposed of this request when it granted the government's cross-motion to dismiss.

## CONCLUSION

The judgment below should be reversed.

Dated: September 6, 2024

                        Respectfully submitted,

                        <u>s/ Robert E. Johnson</u>

                        Robert E. Johnson
                        INSTITUTE FOR JUSTICE
                        16781 Chagrin Blvd. #256
                        Shaker Heights, OH 44120
                        Tel: (703) 682-9320
                        Fax: (703) 682-9321
                        rjohnson@ij.org

                        Robert M. Belden
                        INSTITUTE FOR JUSTICE
                        901 N. Glebe Rd., Ste. 900
                        Arlington, VA 22203
                        Tel: (703) 682-9320
                        Fax: (703) 682-9321
                        rbelden@ij.org

                        *Counsel for Appellant*

## COMBINED CERTIFICATIONS

1.  <u>Bar Membership</u>: Pursuant to Local Rule 28.3(d), Robert E. Johnson and Robert M. Belden are members of the bar of the U.S. Courts of Appeals for the Third Circuit.

2.  <u>Word Count</u>: This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,934 words.

3.  <u>Typeface</u>: This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in size 14-pt Equity A.

4.  <u>Identical Briefs</u>: Pursuant to Local Rule 31.1(c), counsel certifies that the text of the electronic brief and the text of the hardcopy briefs are identical.

5.  <u>Virus Scan</u>: Pursuant to Local Rule 31.1(c), counsel certifies that a virus scan was run on the electronic copy of the brief using McAfee Antivirus software.

6.  <u>Service</u>: On September 6, 2024, this brief was served through the Court's CM/ECF system on counsel for all parties to be served.

s/ Robert E. Johnson