No. 23-2608

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

SUN VALLEY ORCHARDS, LLC
Plaintiff-Appellant,
v.

UNITED STATES DEPARTMENT OF LABOR AND
UNITED STATES SECRETARY OF LABOR,

Defendants-Appellees.

———————————

On Appeal from the U.S. District Court for the District of New Jersey,
No. 1:21-cv-16625 (Hon. Joseph H. Rodriguez)

———————————

**FEDERAL DEFENDANTS' ANSWERING BRIEF**

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

JOSHUA M. SALZMAN
DANIEL AGUILAR
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5432*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION.................................................................1

STATEMENT OF THE ISSUES.................................................................. 2

STATEMENT OF THE CASE .................................................................. 3

I.    Statutory and Regulatory Background.................................................. 3

II.    Factual Background and Prior Proceedings.................................................. 9

    A.    Sun Valley's Participation in the H-2A Visa Program ............... 9

    B.    Enforcement Proceedings.........................................................12

    C.    District Court Proceedings .......................................................16

SUMMARY OF ARGUMENT .................................................................. 20

STANDARD OF REVIEW .................................................................. 23

ARGUMENT.................................................................. 23

I.    Congress Constitutionally Regulated Agricultural Work
by Foreign Nationals and Authorized the Secretary to
Adjudicate Violations.......................................................... 23

    A.    Article III and Seventh Amendment Framework.................... 24

    B.    Receiving Federal Permission to Hire and Import
Foreign Nationals to Work Within the United States
Is a Matter of Public Rights ...................................................... 26

II.    Congress Authorized the Secretary to Adjudicate
Violations of the H-2A Program and to Order Civil Penalties
and Back Wages ....................................................................41

III.   Sun Valley Failed to Preserve Its Removal Challenge, Which Fails on the Merits .............................................................. 47

    A.   Congress Constitutionally Provided that ALJs May Be Removed for "Good Cause" ...................................................... 49

    B.   Sun Valley Fails to Demonstrate Any Prejudice from the Challenged Removal Restrictions............................................ 56

IV.   The Civil Penalties and Back Pay Orders Were Commensurate with Sun Valley's Violations............................................................. 57

CONCLUSION........................................................................................ 63

COMBINED CERTIFICATIONS

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*AFL-CIO v. Dole,*
    923 F.2d 182 (D.C. Cir. 1991) .................................................................. 32

*Arizona v. United States,*
    567 U.S. 387 (2012) .................................................................. 24, 26, 27

*Arriaga v. Florida Pacific Farms, LLC,*
    305 F.3d 1228 (11th Cir. 2002) .................................................................. 13

*Atlas Roofing Co. v. Occupational Safety and Health Review Commission,*
    430 U.S. 442 (1977) .................................................................. 29

*Austin v. Shalala,*
    994 F.2d 1170 (5th Cir. 1993) .................................................................. 40

*Calcutt v. FDIC,*
    37 F.4th 293 (6th Cir. 2022) .................................................................. 47, 53, 57
    *rev'd on other grounds* 598 U.S. 623 (2023) .................................................................. 47

*Camp v. Pitts,*
    411 U.S. 138 (1973) (per curiam) .................................................................. 43, 44

*Carr v. Saul,*
    593 U.S. 83 (2021) .................................................................. 48

*CFPB v. Law Offices of Crystal Moroney, P.C.,*
    63 F.4th 174 (2d Cir. 2023) .................................................................. 56

*CFPB v. National Collegiate Master Student Loan Trust,*
    96 F.4th 599 (3d Cir. 2024) .................................................................. 22, 56

*CFTC v. Escobio,*
    833 F. App'x 768 (11th Cir. 2020) (per curiam) .................................................................. 58

*Cirko ex rel. Cirko v. Commissioner,*
    948 F.3d 148 (3d Cir. 2020) .................................................................. 48

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ................................................................ 24

*Collins v. Yellen,*
   594 U.S. 220 (2021) ................................................................ 56

*Commodity Futures Trading Commission v. Schor,*
   478 U.S. 833 (1986) ................................................................ 25

*Community Financial Services Association of America, Ltd. v. CFPB,*
   51 F.4th 616 (5th Cir. 2022) .................................................... 57

*Crowell v. Benson,*
   285 U.S. 22 (1932) .............................................. 21, 25, 26, 40

*Decker Coal Co. v. Pehringer,*
   8 F.4th 1123 (9th Cir. 2021) ...................................... 47, 53, 55

*Department of Homeland Security v. Thuraissigiam,*
   591 U.S. 103 (2020) ................................................................ 38

*Department of State v. Muñoz,*
   144 S. Ct. 1812 (2024) ............................................................ 37

*Edmond v. United States,*
   520 U.S. 651 (1997) ................................................................ 49

*Elgebaly v. Garland,*
   109 F.4th 426 (6th Cir. 2024) .......................................... 29, 30

*Ex parte Bakelite Corp.,*
   279 U.S. 438 (1929) ................................................................ 41

*Fleming v. U.S. Department of Agriculture,*
   987 F.3d 1093 (D.C. Cir. 2021) .............................................. 48

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
   561 U.S. 477 (2010) ........................................ 19, 20, 51, 52, 55

*Hispanic Affairs Project v. Acosta,*
   901 F.3d 378 (D.C. Cir. 2018) .................................................. 4

*In re Tribune Media Co.*,
902 F.3d 384 (3d Cir. 2018) ..................................................... 18

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022) .................................... 44, 45, 53, 55

*K&R Contractors, LLC v. Keene*,
86 F.4th 135 (4th Cir. 2023) ......................................... 47, 56

*Kaufmann v. Kijakazi*,
32 F.4th 843 (9th Cir. 2022) ................................................ 57

*Leachco, Inc. v. Consumer Product Safety Commission*,
103 F.4th 748 (10th Cir. 2024) ................................ 47, 53, 57

*Lloyd Sabaudo Societa Anonima Per Azioni v. Elting*,
287 U.S. 329 (1932) .............................................................. 28

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) .......................................................... 42

*Louisiana Forestry Association Inc. v. Secretary, U.S. Department of Labor*,
745 F.3d 653 (3d Cir. 2014) ........................................ 3, 4, 30

*Malik v. Attorney General*,
659 F.3d 253 (3d Cir. 2011) ................................................ 36

*Mayfield v. U.S. Department of Labor*,
117 F.4th 611 (5th Cir. 2024) .............................................. 45

*Morrison v. Olson*,
487 U.S. 654 (1988) .................................................. 50, 52, 54

*Necula v. Conroy*,
13 F. App'x 24 (2d Cir. 2001) .............................................. 58

*Noriega-Perez v. United States*,
179 F.3d 1166 (9th Cir. 1999) ........................................ 30, 35

*NVE, Inc. v. HHS*,
436 F.3d 182 (3d Cir. 2006) ................................................ 44

*Oceanic Steam Navigation Co. v. Stranahan,*
214 U.S. 320 (1909) ............................................... 20, 27, 28, 34

*Oil States Energy Services, LLC v. Greene's Energy Group, LLC,*
584 U.S. 325 (2018) .......................................................... 25, 26

*Paredes v. Attorney General,*
528 F.3d 196 (3d Cir. 2008) ..................................................... 23

*Remileh v. INS,*
101 F.3d 66 (8th Cir. 1996) (per curiam) ................................... 38

*Rodriguez v. SSA,*
118 F.4th 1302 (11th Cir. 2024) ........................................ 47, 57

*SEC v. Jarkesy,*
144 S. Ct. 2117 (2024) ................................... 20, 26, 28, 29, 34, 35, 36, 45

*Seila Law LLC v. CFPB,*
591 U.S. 197 (2020) ................................................................ 51

*Stern v. Marshall,*
564 U.S. 462 (2011) ................................................................ 25

*Thomas v. Union Carbide Agricultural Products Co.,*
473 U.S. 568 (1985) ................................................................ 37

*Trump v. United States,*
603 U.S. 593 (2024) ............................................................... 30

*United States v. Alabama Great Southern Railroad Co.,*
142 U.S. 615 (1892) ................................................................ 42

*United States v. Arthrex, Inc.,*
594 U.S. 1 (2021) ................................................................... 51

*United States v. Bajakajian,*
524 U.S. 321 (1998) ................................................................ 59

*United States v. Cheeseman,*
600 F.3d 270 (3d Cir. 2010) ..................................................... 61

*United States v. Lessner*,
  498 F.3d 185 (3d Cir. 2007) ..................................................... 59

*United States v. Perkins*,
  116 U.S. 483 (1886) .................................................... 49, 50, 54

*Van Waters & Rogers, Inc. v. International Brotherhood of Teamsters*,
  56 F.3d 1132 (9th Cir. 1995) .................................................. 46

*Velasquez-Tabir v. INS*,
  127 F.3d 456 (5th Cir. 1997) (per curiam) ............................. 38

*Villegas-Valenzuela v. INS*,
  103 F.3d 805 (9th Cir. 1996) ................................................. 38

*Wellness International Network Ltd. v. Sharif*,
  575 U.S. 665 (2015) ............................................................. 41

*Willy v. Administrative Review Board*,
  423 F.3d 483 (5th Cir. 2005) ............................................... 7-8

**Statutes:**

Act of July 31, 1789, ch. 5, 1 Stat. 29 .......................................... 24

Act of Feb. 24, 1855, ch. 122, 10 Stat. 612 ................................. 52

Act of June 17, 1930, ch. 497, 46 Stat. 590 ................................. 52

Immigration Reform and Control Act of 1986,
  Pub. L. No. 99-603, 100 Stat. 3359 ............................. 3, 4, 7, 42

5 U.S.C. § 557(b) .......................................................................... 52

5 U.S.C. § 702 ................................................................................ 1

5 U.S.C. § 706 ............................................................................... 23

5 U.S.C. § 1202(d) ....................................................................... 54

5 U.S.C. § 3105 ............................................................................ 49

5 U.S.C. § 7521 ................................................ 3, 19, 21, 47, 48, 52, 54, 55

5 U.S.C. § 7521(a) .............................................................. 47, 49, 54

8 U.S.C. § 1101(a)(15) ...................................................................... 4

8 U.S.C. § 1101(a)(15)(H)(ii)(a) ........................................................ 4

8 U.S.C. § 1182(n)(2)(C) ................................................................. 39

8 U.S.C. § 1184(c)(14)(A)(i) ............................................................ 39

8 U.S.C. § 1188 ....................................................................... 44, 45

8 U.S.C. § 1188(a)(1) ................................................................. 5, 46

8 U.S.C. § 1188(a)(1)(A) ............................................................ 60, 61

8 U.S.C. § 1188(a)(1)(B) ................................................................ 31

8 U.S.C. § 1188(b)-(c) ..................................................................... 5

8 U.S.C. § 1188(c)(3)(A)-(B) ............................................................. 5

8 U.S.C. § 1188(c)(3)(A)(i) ............................................................. 31

8 U.S.C. § 1188(c)(3)(B)(i) ............................................................. 31

8 U.S.C. § 1188(c)(4) .................................................................... 31

8 U.S.C. § 1188(f) ........................................................................ 6

8 U.S.C. § 1188(g)(2) ............................................ 2, 7, 17, 18, 21, 41, 43, 46

8 U.S.C. § 1227(a)(1)(G)(i) ............................................................. 36

8 U.S.C. § 1288(c)(4)(E) ................................................................ 39

8 U.S.C. § 1324a ........................................................................ 30

8 U.S.C. § 1324a(a)(1)-(2), (e)(4) ..................................................... 39

8 U.S.C. § 1324a(e)(4)(A), (e)(5) (f) (1) (g) (2) .................................... 59-60

8 U.S.C. § 1324c ............................................................... 35

8 U.S.C. § 1375a(d)(1) ................................................. 39-40

8 U.S.C. §§ 1183, 1183a(d) ............................................. 39

26 U.S.C. § 6672 ............................................................. 40

28 U.S.C. § 1291 ............................................................... 1

28 U.S.C. § 2461(a) ........................................................ 44

28 U.S.C. §§ 1331, 2201-2202 ......................................... 1

50 U.S.C. §§ 4812(a), 4819(c) ........................................ 40

**Rules and Regulations:**

Fed. R. App. P. 4(a)(1)(B)(ii) .......................................... 1

46 Fed. Reg. 57031 (Nov. 20, 1981) ............................... 60

52 Fed. Reg. 16770 (May 5, 1987) .................................. 46

52 Fed. Reg. 20524 (June 1, 1987) .................. 5, 7, 21, 42

52 Fed. Reg. 20496 (June 1, 1987) .................................. 61

73 Fed. Reg. 76891 (Dec. 18, 2008) ................................ 31

73 Fed. Reg. 77110 (Dec. 18, 2008) .................................. 4

74 Fed. Reg. 45906 (Sept. 4, 2009) ................................. 32

75 Fed. Reg. 6884 (Feb. 12, 2010) .................................. 32

83 Fed. Reg. 2646 (Jan. 18, 2018) ................................... 33

85 Fed. Reg. 13186 (Mar. 6, 2020) .................................... 8

86 Fed. Reg. 2689 (Jan. 13, 2021) ................................... 33

86 Fed. Reg. 62559 (Nov. 10, 2021) ................................ 33

88 Fed. Reg. 77343 (Nov. 9, 2023) .................................................. 8

8 C.F.R. § 214.2(h)(5)(i)(F)(1) ....................................................... 8

8 C.F.R. § 214.2(h)(5)(i)(F)(1)(i)-(ii) ........................................... 33

8 C.F.R. § 214.2(h)(5)(vi)(B) ...................................................... 32

20 C.F.R. § 655.122 .................................................................... 31

20 C.F.R. § 655.122(a) ................................................................. 5

20 C.F.R. § 655.122(d) ................................................................. 6

20 C.F.R. § 655.122(d)(1) ........................................................... 15

20 C.F.R. § 655.122(g) ................................................................. 6

20 C.F.R. § 655.122(g), (p) ........................................................ 58

20 C.F.R. § 655.122(g), (p), (q) ................................................. 13

20 C.F.R. § 655.122(h)(4) ............................................................. 6

20 C.F.R. § 655.122(i)(1) .............................................................. 6

20 C.F.R. § 655.122(i)(1) ............................................................ 15

20 C.F.R. § 655.122(*l*) ................................................................ 6

20 C.F.R. § 655.122(p) ............................................................... 14

20 C.F.R. § 655.122(p)(2) ............................................................. 6

20 C.F.R. § 655.135(d) ........................................................... 5, 31

20 C.F.R. § 655.135(i) ................................................................ 32

20 C.F.R. § 655.181 ..................................................................... 6

20 C.F.R. § 655.182 ..................................................................... 6

29 C.F.R. § 501.5 .................................................................. 6, 15

29 C.F.R. § 501.16 ........................................................ 7

29 C.F.R. § 501.19 ........................................................ 7

29 C.F.R. § 501.19(c) (2015) ........................................ 7

29 C.F.R. § 501.41 ........................................................ 7

29 C.F.R. § 501.42 ........................................................ 7

29 C.F.R. § 501.42(a) .................................................. 48

29 C.F.R. §§ 501.31, 501.32 .............................. 7, 42, 48

**Other:**

Andorra Bruno, Congressional Research Service,
*H-2A and H-2B Temporary Worker Visas: Policy and
Related Issues* (2023) ............................................... 8

*Hammock v. Commissioner*,
2022 WL 1686557 (U.S. Tax Court Apr. 29, 2022) ................. 40

Harold J. Krent, *Presidential Control of Adjudication Within
the Executive Branch*,
65 Case W. Res. L. Rev. 1083 (2015) ....................... 24

*HHS v. Jarboe*,
2023 M.S.P.B. 22 (2023) ....................................... 55

Restatement (Second) of Contracts (1981) ............... 46

*SSA v. Levinson*,
2023 M.S.P.B. 20 (2023) ....................................... 55

Statement On Signing the Immigration Reform and Control Act of 1986,
2 Pub. Papers 1522,
1986 WL 1372331 (Nov. 6, 1986) ........................... 38

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 2201-2202, and 5 U.S.C. § 702. Appx112.[1] The district court dismissed the complaint for failure to state a claim on July 27, 2023. Appx003. Plaintiff filed a timely notice of appeal on September 1, 2023. Appx001-002; Fed. R. App. P. 4(a)(1)(B)(ii)-(iii). This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] "Appx" citations refer to the appendix, and "AR" citations refer to portions of the administrative record available on the Department of Labor's website, https://www.dol.gov/sites/dolgov/files/SOL/FOIA/Final-Administrative-Record-Sun-Valley-Orchards-v-DOL.pdf. *See* Appx142.

## STATEMENT OF THE ISSUES

Exercising its plenary authority to regulate immigration, Congress created the H-2A visa program, which permits foreign nationals to perform temporary agricultural work within the United States. U.S. employers may petition the federal government to import and hire foreign nationals to perform this work, subject to federal oversight to ensure compliance with the program's statutory and regulatory requirements.

Plaintiff Sun Valley Orchards participated in the program, hired foreign workers, and then repeatedly violated the applicable requirements of the H-2A program. The Department of Labor assessed civil penalties and ordered the payment of back wages, which the district court upheld. The issues presented are:

**1.** Whether Article III of the Constitution and the Seventh Amendment preclude the Executive Branch from adjudicating violations of the immigration laws.

**2.** Whether the statutory authority "to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations," to ensure compliance with H-2A program requirements, 8 U.S.C. § 1188(g)(2), authorizes the

Secretary of Labor to adjudicate whether money penalties and back wages are appropriate.

**3.** Whether Sun Valley is entitled to relief based on its challenge to a statutory restriction on the removal of administrative law judges, 5 U.S.C. § 7521.

**4.** Whether the civil penalties and back pay violate the Eighth Amendment.

## STATEMENT OF THE CASE

## I.  Statutory and Regulatory Background

**A.**  In the Immigration and Nationality Act, Congress "established the modern framework for regulation of immigration in the United States, including provisions for the admission of permanent and temporary foreign workers." *Louisiana Forestry Association Inc. v. Secretary, U.S. Department of Labor*, 745 F.3d 653, 659 (3d Cir. 2014).  As part of the Act, Congress created the H-2 visa program, "which governed the recruitment of unskilled foreign workers for agricultural and non-agricultural jobs." *Id.*

Congress then amended the program as part of the Immigration Reform and Control Act of 1986, to establish separate requirements for agricultural and nonagricultural foreign workers.  Pub. L. No. 99-603, title III, part A, § 301, 100 Stat. 3359, 3411.  In Title III of that Act, concerning

the "Reform of Legal Immigration," Congress provided a "new 'H-2A' nonimmigrant classification for temporary agricultural labor." 100 Stat. at 3411 (capitalization altered). The new H-2A visa regime allowed for the controlled "admission of temporary H-2A workers," and created a framework whereby prospective employers would "petition to import an alien" subject to certain conditions and approval by the Executive Branch. *Id.* (capitalization altered).

Workers eligible for an H-2A visa must have "no intention of abandoning" their permanent residence in a foreign country. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Thus, H-2A workers "have no independent route to apply for permanent residency or legal citizenship," but instead are "dependent on their [employer] visa sponsors to lawfully stay in and return to the United States for work." *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 382 (D.C. Cir. 2018). Because of that continuing intention to return to their country of origin, H-2A workers are defined to be "nonimmigrant aliens." 8 U.S.C. § 1101(a)(15).

"[F]oreign agricultural labor has contributed to the growth and success of America's agricultural sector since the 19th century," 73 Fed. Reg. 77110, 77111 (Dec. 18, 2008), but Congress did not want H-2A workers to displace the domestic labor force. Thus, Congress required sponsoring

employers to demonstrate that "there are not sufficient workers who are able, willing, and qualified" to perform the agricultural work and that employing H-2A workers "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1). For each employer's petition to import H-2A workers, the Secretary of Labor may certify that such conditions have been met but may also deny certification for a variety of reasons. *See id.* § 1188(b)-(c).

After a certification issues, Congress directed that the employer must hire qualified U.S. workers who apply for the job during the first half of the "period of the [seasonal] work contract." 8 U.S.C. § 1188(c)(3)(B)(i); *accord* 20 C.F.R. § 655.135(d). And Congress required the sponsoring employer to "provide benefits, wages and working conditions required pursuant to this section and regulations," and to comply with other certification requirements. 8 U.S.C. § 1188(c)(3)(A)-(B). Thus, an employer's job offer must give U.S. workers "no less than the same benefits, wages, and working conditions" that will be available to H-2A workers, 20 C.F.R. § 655.122(a), and the regulations set forth various requirements to protect similarly employed workers from adverse effects to their "wages and working conditions." 52 Fed. Reg. 20524, 20524 (June 1, 1987).

Consistent with those requirements, employers must provide H-2A workers with suitable housing, 20 C.F.R. § 655.122(d), three meals a day or a "free and convenient" kitchen for cooking, *id.* § 655.122(g), safe transportation to and from the worksite, *id.* § 655.122(h)(4), guaranteed employment for "at least three-fourths" of the contract's workdays, *id.* § 655.122(i)(1), and an hourly wage that is the highest of six potential rates, *id.* § 655.122(*l*).  Employers may make certain reasonable deductions from workers' pay, but deductions may not "include[] a profit to the employer or to any affiliated person."  *Id.* § 655.122(p)(2).  And when an employer provides meals to its workers, the "job offer must state the charge, if any, to the worker for such meals."  *Id.* § 655.122(g).  An employer may not attempt to have any H-2A worker waive rights conferred by the H-2A statute or regulations.  29 C.F.R. § 501.5.

**B.**  Violations of the H-2A program can cause the employer's certification to be revoked, 20 C.F.R. § 655.181, and can cause the employer to be barred from future participation in the program, *id.* § 655.182.  And foreign workers who violate terms of the program can be disqualified from admittance to the United States for five years.  8 U.S.C. § 1188(f).

In passing the Immigration Reform and Control Act of 1986, Congress authorized the Secretary of Labor "to take such actions, including

imposing appropriate penalties" as "may be necessary to assure employer compliance with terms and conditions of employment under this section." 100 Stat. at 3416 (codified at 8 U.S.C. § 1188(g)(2)).  Within months of receiving that statutory directive, the Secretary promulgated regulations authorizing administrative proceedings to recover back wages, enforce program obligations, and assess civil money penalties for violations of the Act or its implementing regulations.  52 Fed. Reg. at 20524, 20527, 20531 (promulgating 29 C.F.R. § 501.16).  That included potential penalties of up to $1,000 "for each violation committed against each worker."  *Id.* at 20531 (promulgating 29 C.F.R. § 501.19).[2]

If the Labor Department determines that an employer violated the statute or its implementing regulations, it notifies the employer of its findings as well as the remedies sought.  29 C.F.R. §§ 501.31, 501.32.  The employer can request a hearing before an administrative law judge (ALJ), *id.* §§ 501.33-501.35, who will preside over an adversarial hearing and issue a decision, *id.* § 501.41.  The ALJ's decision can be appealed to the Administrative Review Board, *id.* § 501.42, a multimember board of adjudicators appointed by the Secretary of Labor, *Willy v. Administrative*

---

[2] During the relevant time here, penalties for each violation "will not exceed $1,500."  29 C.F.R. § 501.19(c) (2015).

*Review Board*, 423 F.3d 483, 491 (5th Cir. 2005).  The Secretary may also review the Board's decision.  85 Fed. Reg. 13186, 13188 (Mar. 6, 2020).

**C.**  More than 298,000 visas were issued to temporary workers under the H-2A program in fiscal year 2022.  Andorra Bruno, Congressional Research Service, *H-2A and H-2B Temporary Worker Visas: Policy and Related Issues* 29 (2023).  Because of the important role that the H-2A program plays in immigration, the H-2A program is carefully monitored by the Secretary of Homeland Security and the Secretary of State, who determine which countries are eligible to participate in the program.  *See* 88 Fed. Reg. 77343, 77343-44 (Nov. 9, 2023).  In making these determinations, the Secretaries consider how a foreign country cooperates with the United States when its nationals are subject to removal, how many removal orders concern that country's nationals, and "other factors as may serve the U.S. interest."  8 C.F.R. § 214.2(h)(5)(i)(F)(1).  Consistent with those immigration and foreign policy concerns, H-2A visas generally may not be issued to foreign workers from Cuba, Iran, and Russia, but may be issued to workers (for example) from Chile, Italy, and New Zealand.  *See* 88 Fed. Reg. at 77345-46.

## II.  Factual Background and Prior Proceedings

### A.  Sun Valley's Participation in the H-2A Visa Program

Plaintiff Sun Valley Orchards, LLC is a New Jersey farm that sought to hire foreign workers under the H-2A program to pick asparagus and peppers from April to October 2015.  Appx029-030.  As part of its job postings for the position, Sun Valley represented that it would "furnish free cooking and kitchen facilities to those workers who are entitled to live in the employer housing so that workers may prepare their own meals." Appx30; Appx193, 234 (job postings).  Sun Valley also informed prospective workers that it would provide "free transportation to assure workers" that they could buy groceries at a nearby store.  Appx038; *see also* Appx193, 234.  Sun Valley eventually hired 51 U.S. workers and 96 foreign workers to pick its crops.  Appx052.

"The workers' shifts lasted for twelve hours each day with only a single, one-hour break."  Appx030.  The workers lacked consistent access to drinking water and clean bathrooms while they worked in the fields. Appx030-031.  To transport the workers to and from the fields, Sun Valley used buses that were "driven by workers who were not licensed drivers," and had "worn, unsafe tires," and a broken tail light.  Appx031.  *See* AR3725 (pictures of the bus); AR3726-3731 (worn tires).

Sun Valley provided housing that consisted of six bedrooms with 20 bunkbeds in each room. AR1933. The bathrooms lacked sufficient hot water and the sinks were broken. Appx030-031; AR3411-3412. There were no screens on the windows or doors, and the lidless garbage cans attracted pests. Appx031. *See also* AR3714 (pictures of the bathroom window); AR3718-3720 (doors); AR3722-3723 (garbage cans).

Sun Valley's job posting promised that the workers would have a kitchen to "prepare their own meals." Appx030. But when the workers arrived at Sun Valley's housing, they "were greeted with news that [Sun Valley] planned to feed them not with free kitchen access, but through a meal plan costing each worker $75 to $80 per week." Appx083. And if workers wanted transportation to buy groceries, Sun Valley would charge them $10 for each shopping trip. Appx066 & n.123.

Although Sun Valley's housing did have a kitchen, it was not "large enough for 'many workers to cook simultaneously,'" and "workers did not have access" to it. Appx060. Instead, the kitchen was used to store appliances and provide space for Sun Valley's supervisor, Agustin Hernandez, to sell the workers "soft drinks, beer, and general provisions." Appx060 & n.65. Hernandez did not have a New Jersey license to sell alcohol and "did not maintain records of the drink sales." Appx031. To pay

for meals and drinks, Hernandez "would take workers' checks to the bank to cash them and then return the money to the workers, minus any money owed for meals and beverages." Appx056.[3]

About a month after the work started, 19 workers met with Hernandez and Sun Valley's owners, Russell Marino, Jr. and Joseph Marino, to discuss their working and living conditions. Appx062. Russell Marino, Jr., "became angry," "scream[ed] and yell[ed]," and concluded that "we're [either] going to let these guys go, or we're going to send them on their way." Appx062 n.93. One worker testified that Marino "said that we had been fired. That we only had to wait so we got our paychecks and they were going to bring some papers we had to sign so we didn't have any problems whenever we wanted to work in the USA." AR2820. Another worker testified that after Marino decided "to send us back to Mexico," the worker asked Marino to pay for the transportation "because he was the one

---

[3] Hernandez testified:

> Q: And workers cannot cook their own meals in the kitchen? Is that correct?
> A: That's correct.

AR1910.

> Another worker testified that he "talked to Agustin [Hernandez], I asked him for permission to see if I was able to cook there. He said that he could not authorize that, that I should buy a stove from Wal-Mart, one of those small stoves, so that I could cook in my room." AR1997-1998; *see also* AR3770-3773 (pictures of the hot plate in the workers' bedroom).

that fired us not because we quit." AR2956. Sun Valley then gave the 19 workers departure forms to sign—forms that had already been filled out by Marino and "stated that the workers were voluntarily leaving due to personal issues, like a sick or dying loved one." Appx067; Appx279-298 (list of the 19 workers and the signed forms). Sun Valley then provided the signed forms to the Department of Labor. Appx031.

Later in August 2015, the farm's pepper crop failed and Sun Valley laid off 44 workers. Appx032. Hernandez testified that "nobody wanted to leave" so he selected "troublemakers" to lay off. AR1942. Sun Valley instructed the laid-off workers to sign departure forms indicating "[w]ork has slowed down, and I would like to return home." Appx299-342. Russell Marino, Jr. explained that Sun Valley asked the workers to sign these forms "to protect against this, this lawsuit," AR3203, while also agreeing that the workers had been terminated because he had not given them a choice to stay and continue working, AR2484.

### B. Enforcement Proceedings

After an investigation, the Department of Labor notified Sun Valley that it had violated the requirements of the H-2A program and would be required to pay back wages and monetary penalties. Appx149. Sun Valley requested a hearing before an ALJ. Appx029.

After a multi-day hearing, the ALJ issued an opinion in which she concluded that Sun Valley had committed multiple violations and that back pay and civil penalties were appropriate, Appx049-103, and the Administrative Review Board affirmed. Appx028-048. The ALJ and the Board explained that the evidence established the following violations and appropriate remedies:

**1.** Sun Valley made false promises about access to a kitchen and unlawfully deducted costs for meals, in violation of 20 C.F.R. § 655.122(g), (p), and (q). Appx038-042, 048. As part of its job posting, Sun Valley told prospective workers that they would have access to a kitchen and free transportation to buy groceries, but Sun Valley provided neither. Appx038-039. Under § 655.122(p), Sun Valley's job posting was required to "specify all deductions not required by law which the employer will make from the worker's paycheck." Here, Sun Valley charged $75-80 a week for meals, Appx083, but did not disclose that charge in its job postings, Appx193, 234, and took that money from the workers' cashed paychecks before it paid the workers, Appx056.[4] Thus, Sun Valley violated its obligations for "each

_____

[4] The Board also noted that the exact manner of the deduction was immaterial, Appx040, citing *Arriaga v. Florida Pacific Farms, LLC*, 305 F.3d 1228, 1236 (11th Cir. 2002) ("[T]here is no legal difference between deducting a cost directly from the worker's wages and shifting a cost * * * for the employee to bear.").

worker [it] employed," Appx040, and a $1,350 penalty for each worker was appropriate, Appx041.

The Board also affirmed the payment of back wages "for the unlawful meal plan deductions," which "reduced the workers' wages below the required wages (*i.e.* the wages specified in the job orders)." Appx041. These undisclosed deductions "changed a material term of the job order," after some workers had already traveled "thousands of miles from home," and "the equities of the case require back pay at the meal plan's full amount." Appx088. The ALJ found that Sun Valley owed $68,155 to foreign workers and $60,130 to U.S. workers for these unlawful deductions. Appx088; *see* AR2721-2780 (supporting calculations).

**2.** Sun Valley sold the workers non-alcoholic drinks and beer at a profit, in violation of 20 C.F.R. § 655.122(p), which requires deductions to "be reasonable," and explains that "[a] deduction is not reasonable if it includes a profit to the employer or to any affiliated person." Appx042-045. The Board explained that the evidence showed that Hernandez, Sun Valley's agent, sold these drinks at a profit. Appx043-044. Thus, the Board concluded that it was appropriate to remit the $8,972.61 in profits from selling beer to the workers as back pay. Appx044-045. The Board also affirmed the award of back pay for the full price of the non-alcoholic drinks

($64,960), as the "farmworkers' access to clean water was sporadic," particularly when working in the fields, "and the farmworkers had no other access to drinks aside from" Sun Valley. Appx043-044, 088-089.

**3.** Sun Valley terminated 24 workers before they had worked for at least three-fourths of the contract's workdays, in violation of 20 C.F.R. § 655.122(i)(1). Appx034-035. This included the 19 fired workers, four of the workers laid off in August, and one other worker for whom there was no evidence that he had been fired for cause or abandoned his job. Appx091-095. The Board concluded that these workers were due $142,728.22 in back pay for Sun Valley's refusal to pay them for the guaranteed term of employment. Appx045; AR2720 (supporting calculation). Sun Valley also had the fired and laid off workers sign departure forms falsely indicating that the workers were leaving voluntarily, thereby violating 29 C.F.R. § 501.5 by attempting to have those improperly terminated workers waive their rights under the H-2A program. Appx046-047, 097-098. The Board upheld $2,700 in penalties for these violations. Appx045-047 & n.111.

**4.** Sun Valley's housing for the workers did not have screens over the doors and windows (or the screens were broken), did not have covered trash cans, and lacked sufficient hot water, in violation of 20 C.F.R. § 655.122(d)(1). Appx098-099. Sun Valley's transportation for the workers

used buses with bald tires and a broken tail light, driven by workers without acceptable drivers' licenses.  Appx100-101.  The Board upheld $3,150 in penalties for the housing violations and $7,500 in penalties for the transportation violations.  Appx047-048, 098-101.

## C.    District Court Proceedings

Sun Valley sued in district court seeking to vacate the Board's decision and enjoin enforcement of it.  Appx138-139.  Sun Valley asserted that the Board's decision was unsupported by substantial evidence and arbitrary and capricious.  Appx136-38.  Sun Valley also asserted that enforcement actions under the H-2A program must be brought in an Article III court, that the ALJ is an officer who was not properly appointed under the Appointments Clause of the Constitution and whose removal is subject to unconstitutional restrictions, that the civil penalties and back pay award violates the Eighth Amendment, and that Congress has not statutorily authorized the Secretary of Labor to carry out administrative enforcement of the H-2A program.  Appx130-136.

**1.**  The district court dismissed the complaint for failure to state a claim.  Appx010-012, 027.  The court explained that the agency reasonably ordered back pay and imposed civil penalties for Sun Valley's various violations of the H-2A program.  Appx022-024.  Here, the Department "had

the discretion to assess the meal and drink penalties separately," *i.e.*, penalties for each time Sun Valley made unlawful deductions for meals and drinks from each workers' paycheck. Appx023. But the court held that the Department reasonably chose to assess a single penalty for each worker. Appx023. The court emphasized that these unlawful deductions "reduced the workers' wages below the required wages specified in the job order," and "changed a material term of the job order, which harmed [] the workers' reliance on the H-2A program." Appx023. Moreover, Sun Valley unlawfully "profited from the[se] sales," which was "clearly prohibited." Appx023-024. The court further held that substantial evidence supports the conclusion that Sun Valley improperly fired 19 workers. Appx024-025. Based on these violations, the court upheld the back pay award. Appx023-025.

The court also rejected Sun Valley's contention that Congress had not authorized the Secretary to conduct administrative enforcement or order back pay. The statute "authorized" the Secretary "to take such actions, including imposing appropriate penalties * * *, as may be necessary to assure employer compliance with terms and conditions of employment under" the statute. Appx017 (quoting 8 U.S.C. § 1188(g)(2)). The court held that through this "clear language," Congress authorized the

Department to adjudicate whether to impose money penalties, *id.*, and order back wages, Appx025-026.

**2.** The district court held that Congress constitutionally assigned adjudication of the H-2A immigration program to the Executive Branch. Appx014-016.  Congress was not required to assign that matter to an Article III court in the first instance, the court explained, because "[u]nder the Constitution, 'control of the admission of aliens is committed exclusively to Congress, and * * * [it] may lawfully impose appropriate obligations, sanction their enforcement by reasonable money penalties, and invest in administrative officials the power to impose and enforce them.'" Appx015. Sun Valley asserted this this was "a private right case" that could only be adjudicated by a district court, but the court explained that the case arose "from a federal regulatory scheme under the federal government's immigration related powers, and is integrally related to a particular Federal Government action," and so enforcement may constitutionally be adjudicated "outside Article III."  Appx016.  Moreover, Sun Valley "never objected to the agency's non-Article III status" during the administrative proceedings, and "impliedly consented to a non-Article III adjudication." Appx016 n.6 (citing *In re Tribune Media Co.*, 902 F.3d 384, 394 (3d Cir. 2018)).

**3.** The court further held that while Sun Valley now challenged the ALJ's involvement in the case, Sun Valley never raised those objections at any point in the administrative proceedings. Appx017-018. Because this was "an adversarial administrative proceeding," and the Department's regulations required Sun Valley to raise timely objections, Sun Valley's failure to do so meant that those "claims are deemed forfeited and are hereby dismissed." Appx018.

In any event, the court held that that the statutory "good cause" tenure protection for ALJs, 5 U.S.C. § 7521, is constitutional. Appx020-022. The court explained that the Supreme Court has consistently "upheld limited restrictions on the President's removal power where 'only one level of protected tenure separated the President from an officer exercising executive power.'" Appx021 (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 495 (2010)). Here, there is "only one level of protected tenure separating the President" from the ALJ "since the Secretary of Labor"—who can remove the ALJ for good cause—"is removable by the President" at will. Appx021. And in all events, the Secretary does "not need to use ALJs at all." Appx021.[5]

---

[5] The district court also rejected Sun Valley's Appointment Clause challenge to the ALJ, Appx019-020, and Sun Valley does not renew that argument on appeal.

**4.** The court likewise dismissed Sun Valley's claim that the money penalties violate the Eighth Amendment's prohibition on excessive fines. Appx26-27. The court noted that the Department chose not to impose money penalties for every time Sun Valley committed a violation as to each of its workers, but rather imposed a single "penalty of $1,350 per worker for Sun Valley's combined violations." *Id.* Looking at the various instances in which the Department has imposed money penalties over the last sixteen years, the court determined that there is "nothing out of the ordinary" with respect to Sun Valley's penalties, Appx27, particularly because "Sun Valley's violations harmed the workers' reliance and overall integrity of the H-2A program," Appx26.

## SUMMARY OF ARGUMENT

**I.** The Supreme Court has long held and recently reiterated that Congress' "plenary power over immigration" concerns matters of public rights that can be constitutionally adjudicated within the Executive Branch. *SEC v. Jarkesy*, 144 S. Ct. 2117, 2132 (2024) (citing *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320 (1909)). Thus, Congress acted well within its constitutional bounds by enacting the H-2A visa program to regulate the entry of foreign nationals into the United States for limited purposes, for limited times, under certain conditions. Sun Valley

voluntarily availed itself of the benefits of this scheme by importing and hiring foreign laborers to work on its behalf. And when Sun Valley violated its obligations under the H-2A program, Congress constitutionally directed "executive officers" to adjudicate those violations. *Crowell v. Benson*, 285 U.S. 22, 50 (1932).

**II.** Congress authorized the Secretary of Labor "to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations as may be necessary to assure employer compliance" with the H-2A program. 8 U.S.C. § 1188(g)(2). As the district court held, the statutory language plainly authorizes the Secretary to determine whether a violation has occurred and whether civil penalties are appropriate. Appx017. And Congress' broad grant of authority to "take such actions" includes the ability to order back pay, a form of relief encompassed within specific performance, and the statute has been consistently interpreted since its enactment to authorize back pay. 52 Fed. Reg. 20524, 20526-27 (June 1, 1987).

**III.** Sun Valley never raised its challenge to the "good cause" removal restrictions for ALJs, 5 U.S.C. § 7521, during the administrative adjudication, and the district court correctly held that this issue had not

been preserved for judicial review. In any event, the challenge fails on its merits. The Supreme Court and courts of appeals have consistently upheld similar "good cause" removal restrictions for inferior officers like ALJs who can be removed by someone like the Secretary of Labor—herself removable at will by the President. Moreover, Sun Valley fails to demonstrate how the contested removal restriction "affected the complained-of decision," and without such a showing of prejudice, Sun Valley is not entitled to "a rewinding of agency action." *CFPB v. National Collegiate Master Student Loan Trust*, 96 F.4th 599, 607 (3d Cir. 2024).

**IV.** The district court correctly held that the civil penalty and back pay order comported with the Eighth Amendment because it was not "grossly disproportional" to Sun Valley's violations. Appx026-027. Sun Valley fails to explain how an order to pay back wages it illegally took from workers constitutes an excessive fine, when the order exactly matches Sun Valley's wrongful taking. Sun Valley attempts to minimize the harm it caused by promising that workers could make their own meals in a kitchen provided by Sun Valley, but then denying those workers a kitchen and charging $75-$80 a week for meals when the workers were being paid $451.60 a week. The Department acted reasonably in imposing a penalty of

$1,350 for each worker harmed by Sun Valley's violation, which is comparable to penalties for other violations of the immigration laws.

## STANDARD OF REVIEW

The Court reviews the agency's decision to determine if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," and whether it is supported "by substantial evidence." 5 U.S.C. § 706. The Court reviews questions of law de novo. *Paredes v. Attorney General*, 528 F.3d 196, 198 (3d Cir. 2008).

## ARGUMENT

## I. Congress Constitutionally Regulated Agricultural Work by Foreign Nationals and Authorized the Secretary to Adjudicate Violations

Sun Valley petitioned the United States for permission to bring nearly a hundred foreign nationals into the United States to perform agricultural work. That importation of foreign labor is subject to a reticulated statutory and regulatory scheme, consistent with Congress' plenary authority to regulate immigration and to oversee work performed by foreign nationals in conjunction with the domestic labor force. On appeal, Sun Valley does not contest that it violated the statutory and regulatory requirements for the H-2A visa program.

Nonetheless, Sun Valley mistakenly asserts that its conduct involves private rights that must be adjudicated only in an Article III court with a

jury.  Sun Valley fundamentally misunderstands Congress' "broad, undoubted power over the subject of immigration," arising from the Constitution and Congress' "inherent power as sovereign to control and conduct relations with foreign nations."  *Arizona v. United States*, 567 U.S. 387, 394-95 (2012).  Those are quintessential matters of public rights that have historically and constitutionally been determined by Congress and the Executive Branch in the first instance, with limited judicial review.

### A.    Article III and Seventh Amendment Framework

The Constitution vests Article III courts with the judicial power of the United States, while simultaneously authorizing adjudications of non-Article III matters by the Executive Branch.  Thus, the first Congresses tasked the Secretary of War with adjudicating whether veterans of the Revolutionary War were entitled to military pensions, *see* Harold J. Krent, *Presidential Control of Adjudication Within the Executive Branch*, 65 Case W. Res. L. Rev. 1083, 1089-90 (2015), and directed federal collection officers to adjudicate and enforce payment of customs duties, Act of July 31, 1789, ch. 5, §§ 3-5, 1 Stat. 29, 36-37.  "[S]ince the beginning of the Republic," executive officials have "conduct[ed] adjudications," which may take "'judicial' forms" but are ultimately "exercises of * * * the 'executive Power.'"  *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013).

In delineating which matters may be determined by the Executive, the Supreme Court has distinguished between "public rights" and "private rights." *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 584 U.S. 325, 334 (2018). Private rights, "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," are generally reserved to Article III courts. *Stern v. Marshall*, 564 U.S. 462, 484 (2011).[6] But for public rights, "the mode of determining matters * * * is completely within congressional control," and Congress may decide the matter itself, "delegate that power to executive officers, or may commit it to judicial tribunals." *Crowell v. Benson*, 285 U.S. 22, 50 (1932).

The Supreme Court has not "definitively explained" the difference between public and private rights, but its "precedents have recognized that the [public-rights] doctrine covers matters 'which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.'" *Oil States*, 584 U.S. at 334 (quoting *Crowell,* 285 U.S. at

---

[6] The Supreme Court has elsewhere held that Congress can authorize executive adjudication "over a narrow class of common law claims as an incident to the [agency's] primary, and unchallenged, adjudicative function," *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 854 (1986), but it is not necessary to determine the scope of that holding for this appeal.

50). That includes Congress' "plenary power over immigration," which falls squarely within the public-rights doctrine. *SEC v. Jarkesy*, 144 S. Ct. 2117, 2132 (2024). Decisions concerning the admittance and removal of noncitizens and the regulation of noncitizens' work within the United States may be carried out by "the executive or legislative departments" without "judicial determination." *Crowell*, 285 U.S. at 50-51 (identifying immigration decisions as a "[f]amiliar illustration[]" of public rights").

So long as "Congress properly assigns a matter to adjudication in a non-Article III tribunal, the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." *Oil States*, 584 U.S. at 345 (quotation marks omitted).

### B. Receiving Federal Permission to Hire and Import Foreign Nationals to Work Within the United States Is a Matter of Public Rights

**1.** The United States "has broad, undoubted power over the subject of immigration and the status of aliens," derived from both the Constitution and "its inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 394-95. Immigration policy affects "trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Id.* at 395. And "mistreatment of aliens

in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id.*

The Supreme Court has long recognized that the Executive Branch may administer immigration laws like the H-2A program and may—within the statutory bounds authorized by Congress—impose money fines for violations of those laws. In *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 330 (1909), the Supreme Court considered an Act that prohibited immigration of people with "a dangerous contagious disease," or who had previously agreed "to perform labor or service of any kind, skilled or unskilled." Pursuant to the Act's authority, the Secretary of Commerce and Labor assessed a money penalty against a steamship company that had brought infected immigrants into the country. *Id.* at 329. The company then sued to regain the money it had paid, arguing that the statute was unconstitutional because it allowed the Secretary to impose a money penalty without "resorting to the judicial power." *Id.* at 338.

The Supreme Court rejected that argument, explaining that Congress may "legislat[e] as to matters exclusively within its control," may "impose appropriate obligations," and "sanction their enforcement by reasonable money penalties," granting "executive officers the power to enforce such penalties without the necessity of invoking the judicial power." *Oceanic*

*Steam Navigation*, 214 U.S. at 339.  Because Congress' authority over immigration "embraces every conceivable aspect of that subject," Congress may constitutionally "impose particular restrictions" and authorize "penalties enforceable by administrative authority."  *Id.* at 340.  In light of that "plenary power" to control "the admission of aliens," there was "no room for doubt as to [Congress'] authority to impose the penalty."  *Id.* at 343.[7]

The Supreme Court reiterated that conclusion recently in *Jarkesy*, 144 S. Ct. 2117.  There, the Court held that the Securities and Exchange Commission could not administratively impose money penalties for certain securities-fraud violations because the relevant statutes "replicate common law fraud," and those essentially "common law claims must be heard by a jury."  *Id.* at 2127.  And the securities-laws claims did "not fall within any of the distinctive areas involving governmental prerogatives" that allow for administratively imposed money penalties.  *Id.*  As part of that analysis, the Court explicitly distinguished the securities laws from "Congress's power

---

[7] The Secretary's imposition of penalties is still, of course, subject to judicial review to determine whether it is authorized by statute, supported by substantial evidence, and consistent with due process.  *Lloyd Sabaudo Societa Anonima Per Azioni v. Elting*, 287 U.S. 329, 335 (1932) (identifying these limitations while upholding the constitutionality of administrative penalties for immigration violations).

over foreign commerce" that it considered in *Oceanic Steam Navigation*, which "was so total that no party had a vested right to import anything into the country." *Jarkesy*, 144 S. Ct. at 2132 (quotation marks omitted). And under that reasoning, "Congress could also prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without a jury." *Id.* at 2132-33.

While the outer bounds of the public-rights doctrine are still not sharply delineated, *Jarkesy*, 144 S. Ct. at 2133, the power "over immigration" is "inherently in the exclusive domain of the Federal Government and critical to its very existence," *Atlas Roofing Co. v. Occupational Safety and Health Review Commission*, 430 U.S. 442, 456 (1977) (explaining that adjudications involving immigration are "public rights [that] may be assigned to administrative agencies"); *accord Jarkesy*, 144 S. Ct. at 2132-33. Thus, while the Supreme Court's recent decision in *Jarkesy* identified civil penalties for securities-law fraud as an issue that did not concern public rights, "*Jarkesy* clearly does not implicate immigration adjudication." *Elgebaly v. Garland*, 109 F.4th 426, 434, 437-38 (6th Cir. 2024). That is true even when Executive adjudication might seem to touch upon common-law issues, such as whether a noncitizen "did not enter her marriage in good faith," *id.* at 434—such issues still concern

adjudications of "public rights" that can "be conducted by the executive branch." *Id.* at 437; *cf. Trump v. United States*, 603 U.S. 593, 607 (2024) (describing "matters related to * * * immigration" as among the President's "important foreign relations responsibilities").

**2.** The H-2A visa program is an undisputed exercise of Congress' constitutional authority to regulate the entry of foreign nationals into the United States and to control the method by which those noncitizens perform work within the Nation's borders. Congress codified the program as part of the Immigration and Nationality Act of 1952 and refined it further in the Immigration Reform and Control Act of 1986. *See Louisiana Forestry Association v. Secretary, U.S. Department of Labor*, 745 F.3d 653, 659 (3d Cir. 2014). The purpose of the 1986 Act was to "close the back door on illegal immigration so that the front door on legal immigration may remain open." *Noriega-Perez v. United States*, 179 F.3d 1166, 1170 (9th Cir. 1999) (quoting H.R. Rep. No. 99-682, at 46 (1986)). Because Congress "believed that '[e]mployment is the magnet that attracts aliens here illegally,'" it prohibited employers from knowingly hiring "an unauthorized alien to work in the United States," *id.* (citing 8 U.S.C. § 1324a), while simultaneously re-codifying and refining the H-2A visa program to ensure lawful avenues for foreign nationals to work in U.S. agriculture.

The H-2A program thus "provide[s] agricultural employers with an orderly and timely flow of legal workers," which "decreas[es] their reliance on unauthorized workers." 73 Fed. Reg. 76891, 76891 (Dec. 18, 2008). In administering the program, Congress entrusted the Executive Branch to "maintain the careful balance between preserving jobs for U.S. workers" while appropriately "invit[ing] foreign workers to the United States" to perform much-needed work. *Id.* at 76895. Consistent with those goals for the H-2A program, Congress required employers to ensure that the pay and work conditions offered to foreign workers would not "adversely affect * * * workers in the United States," 8 U.S.C. § 1188(a)(1)(B); that employers "furnish housing in accordance with regulations," *id.* § 1188(c)(4); that employers hire qualified U.S. workers for the first half of the work contract, *id.* § 1188(c)(3)(B)(i); 20 C.F.R. § 655.135(d); that employers "offer to provide benefits, wages and working conditions" as established by regulation, 8 U.S.C. § 1188(c)(3)(B)(i), and comply with "the criteria for certification" including the Secretary's regulations, *id.* § 1188(c)(3)(A)(i), which include minimum standards for pay, housing, transportation, and meals, 20 C.F.R. § 655.122.

These requirements "play[] a crucial role in the reservation of these jobs for U.S. workers," and ensure that "employers [] make serious

attempts to recruit U.S. workers as a condition of H-2A certification." 75 Fed. Reg. 6884, 6921 (Feb. 12, 2010). The scheme reflects Congress' deliberate effort "to balance the competing goals of the statute" by "protecting the jobs of domestic workers" on one hand while also increasing the supply of "documented foreign workers" on the other. *AFL-CIO v. Dole*, 923 F.2d 182, 186-87 (D.C. Cir. 1991).

Other aspects of the H-2A program ensure that foreign nationals remain in the United States only for their approved period of agricultural work. Employers must notify workers of their duty to leave the United States after completing the work period, 20 C.F.R. § 655.135(i), and they must notify the United States if a foreign worker fails to report to work, absconds from the worksite, or is fired, or if the work is completed substantially earlier than anticipated, 8 C.F.R. § 214.2(h)(5)(vi)(B). These requirements "ensure that the workers timely depart the U.S. without risking negative immigration consequences for overstays of their" visas and that "employers are aware that they may not offer employment to foreign workers which exceeds the period certified" under the H-2A work period. 74 Fed. Reg. 45906, 45918 (Sept. 4, 2009).

The United States uses the H-2A program as one way to conduct international relations with other sovereigns, authorizing participation by

countries when it "may serve the U.S. interest" and admitting nationals from non-eligible countries when "it is in the U.S. interest for that alien to be a beneficiary of" the program. 8 C.F.R. § 214.2(h)(5)(i)(F)(1)(i)-(ii). For example, the government considers a variety of foreign-policy concerns in excluding other nations from participation in the H-2A program—for, among other things, failing to adequately prevent human trafficking, abusing the H-2A program, or insufficiently cooperating "in accepting back their nationals that have been ordered removed from the United States." 83 Fed. Reg. 2646, 2647 (Jan. 18, 2018); *see also* 86 Fed. Reg. 2689, 2690-91 (Jan. 13, 2021) (similar); 86 Fed. Reg. 62559, 62561 (Nov. 10, 2021) (similar). Likewise, the United States has authorized participation in the H-2A program by countries that were previously excluded when doing so advances U.S. foreign policy interests. For example, Haiti was reauthorized to participate in the program, in part, because Haitians would "not only [] contribute to the U.S. economy, but [would] also apply their earnings and technical experience to advance Haiti's reconstruction and stabilization," which "is vital to the interests of the United States as a close partner and neighbor." 86 Fed. Reg. at 62562.

In all these ways, the H-2A visa program is critical to the United States' sovereign interests in regulating the importation of foreign labor,

overseeing domestic work performed by foreign nationals, and managing diplomatic relations with foreign sovereigns. For that reason, all the opinions in *Jarkesy* separately reaffirmed that Congress exercises complete control over immigration and that, within that area, "administrative officers should have the authority to enforce designated penalties without resort to the courts." *Jarkesy*, 144 S. Ct. at 2133 n.1 (quoting *Oceanic Steam Navigation*, 214 U.S. at 339); *id.* ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over that with which the act we are now considering deals."). Given "Congress's long-recognized and extensive authority over the field of immigration," regulation of immigration has thus been "traditionally included" within the core of public rights, *id.* at 2146, 2151 (Gorsuch, J., concurring), and a "civil-penalty statutory scheme" for immigration violations is "beyond all question constitutional," *id.* at 2160 (Sotomayor, J., dissenting).

**3.** Sun Valley's contrary arguments rest on mistaken premises. Sun Valley erroneously asserts that the Court can rule in its favor on the Article III claim because this case involves civil penalties. Br. 22 ("The Court can end the analysis there."). That misreads *Jarkesy*. There, the Court explained that the presence of punitive civil penalties is "all but dispositive" of whether a matter concerns legal claims that implicate the Seventh

Amendment in the first place. 144 S. Ct. at 2129. But as the Court's subsequent analysis demonstrates, that does not answer the question of whether the case involves public rights. *Id.* at 2132-33. When public rights are at issue, including the quintessential public right to regulate immigration and to impose civil penalties for violations of the immigration laws, Congress may constitutionally assign the matter to the Executive for adjudication.

Sun Valley fares no better by attempting to analogize its violations to a breach of contract. Br. 23. The mere fact that a violation of immigration laws might be compared to a common-law claim does not place it outside of Congress' authority to regulate immigration or require Article III jurisdiction in the first instance. Forgery may be likened to common-law claims—but forging documents to demonstrate that a foreign national may legally work within the United States concerns "the public right to regulate immigration." *Noriega-Perez*, 179 F.3d at 1177 (upholding civil penalties under 8 U.S.C. § 1324c). Regulating the "unlawful employment of" noncitizens is "an important aspect of U.S. immigration law," and the courts have "long recognized that the power to exclude alien laborers" is a matter of "public rights." *Id.*

Likewise, entering into a fraudulent marriage to deceive another might share aspects of common-law fraud, but it still concerns the United States' distinctly sovereign interests in admitting noncitizens based on a marriage "not contracted for the purpose of evading" the immigration laws. 8 U.S.C. § 1227(a)(1)(G)(i). A surface-level comparison to common-law claims does not transform immigration matters into private rights. *Malik v. Attorney General*, 659 F.3d 253, 257-58 (3d Cir. 2011) (upholding order of removal based on executive determination that noncitizen "entered into a fraudulent marriage").

More fundamentally, Sun Valley has no private right to bring foreign nationals into the United States for any reason. This is not "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Jarkesy*, 144 S. Ct. at 2132. Sun Valley is allowed to import and hire foreign laborers solely because Congress has enacted a statutory scheme to permit such immigration under strictly controlled circumstances (consistent with Congress' plenary authority to control immigration). Within that administration of public rights, Congress has directed the Executive to "administer[] a complex regulatory scheme to allocate costs and benefits among voluntary participants in the program without

providing an Article III adjudication." *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 589 (1985).

In the H-2A visa program, Congress chose to admit certain foreign nationals, on certain terms, to engage in certain work, for a limited time, subject to specified requirements for wages, benefits, and work conditions to preserve the domestic labor force and to further U.S. foreign policy interests. Sun Valley chose to avail itself of that program and to access foreign workers it could not hire otherwise, and the workers themselves could not otherwise enter the United States absent an independent basis for admission. When Sun Valley repeatedly violated the terms of that scheme, it undermined the choices—made by the politically accountable branches—about how foreign laborers may be permitted to work within the United States.

The H-2A program is fundamentally an exercise of "the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens." *Department of State v. Muñoz*, 144 S. Ct. 1812, 1823 (2024). That is why President Reagan—in signing the 1986 amendments that codified the current H-2A visa program—explained that the Act "preserves and enhances the Nation's heritage of legal immigration" while simultaneously taking "a major step toward meeting th[e] challenge" of

unlawful immigration that affects "our sovereignty." Statement On Signing the Immigration Reform and Control Act of 1986, 2 Pub. Papers 1522, 1522, 1986 WL 1372331, at *1 (Nov. 6, 1986).

Sun Valley is mistaken in suggesting that somehow the United States' sovereign interests in regulating immigration lessen or cease at the border. Br. 31-34. To the contrary, it is a "fundamental proposition[]" that the United States' "plenary authority" over immigration includes the "concomitant" authority "to set the procedures to be followed" governing admission, regardless of whether the person is already "on U.S. soil." *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 139 (2020). Sun Valley does not seriously dispute that the United States may impose civil penalties on noncitizens already within the country for immigration violations. *See, e.g.*, *Velasquez-Tabir v. INS*, 127 F.3d 456, 457-58 (5th Cir. 1997) (per curiam) (upholding civil penalty against foreign national who presented his employer with a falsified green card); *Remileh v. INS*, 101 F.3d 66, 67 (8th Cir. 1996) (per curiam) (similar). And the immigration laws apply equally to those who employ foreign nationals within the Nation's borders. *Villegas-Valenzuela v. INS*, 103 F.3d 805, 808 (9th Cir. 1996).

Consistent with that understanding, Congress has enacted many statutes that enforce compliance with the immigration laws (based on activities occurring within the Nation's borders) through Executive adjudication and, where necessary, civil penalties. Those include:

- An employer may not make willful misrepresentations or substantially fail to comply with the terms of a petition to import foreign nationals under the H-2B visa program. 8 U.S.C. § 1184(c)(14)(A)(i).

- Employers petitioning the government to allow foreign nationals to work under an H-1B visa may not substantially fail to meet the required conditions, and penalties will be increased for willful misrepresentations. 8 U.S.C. § 1182(n)(2)(C).

- Employers may not knowingly hire or continue to employ a noncitizen who is not authorized to work in the United States. 8 U.S.C. § 1324a(a)(1)-(2), (e)(4).

- Sponsors who support the admittance of foreign nationals under a "suitable and proper bond" must inform the Attorney General if they change address. 8 U.S.C. §§ 1183, 1183a(d).

See also 8 U.S.C. § 1288(c)(4)(E) (civil penalties for failure to meet or misrepresent requirements for noncitizens to perform longshore work at U.S. ports); id. § 1375a(d)(1), (5) (civil penalties for international marriage

brokers who market to children).  These enforcement measures are all exercises of the United States' sovereign authority to regulate lawful admission into the country and lawful work by noncitizens.  They are public rights that Congress can constitutionally assign "to executive officers," *Crowell*, 285 U.S. at 50, regardless of whether immigration violations occur at the border or within it, by noncitizens or by domestic employers of foreign workers.

As a last effort, Sun Valley suggests that because it committed a number of violations that resulted in a substantial civil penalty, its case necessarily "affect[s] the core right to private property."  Br. 25.  Sun Valley cites no precedent for this remarkable proposition—that if a person fails to pay millions in federal taxes,[8] or defrauds Social Security of tens of thousands of dollars,[9] or arms foreign militaries in violation of the export control laws,[10] then these violations of public rights transform into a private-rights case because the penalties may be substantial.  That is not the law.  Congress has constitutional authority to regulate public rights and to provide for money penalties when its regulations are violated, with

---

[8] 26 U.S.C. § 6672; *Hammock v. Commissioner*, 2022 WL 1686557, at *3 (U.S. Tax Court Apr. 29, 2022) (upholding $579,043 tax penalty).

[9] *Austin v. Shalala*, 994 F.2d 1170, 1174-78 (5th Cir. 1993).

[10] 50 U.S.C. §§ 4812(a), 4819(c).

adjudication in the Executive or the Judiciary as Congress deems appropriate.  *Ex parte Bakelite Corp.*, 279 U.S. 438, 451 (1929).

**4.**  Given this broad and historic Executive enforcement of the immigration laws, it is unsurprising that Sun Valley "never objected to the agency's non-Article III status" during the four years of administrative adjudication.  Appx016 n.6.  Instead, Sun Valley requested a hearing before an ALJ and later requested review by the Administrative Review Board.  Appx009.  Because Sun Valley failed to object and—indeed—affirmatively invoked the mechanisms for Executive adjudication, the Court may properly hold that Sun Valley either waived any Article III claim, *Wellness International Network Ltd. v. Sharif*, 575 U.S. 665, 683-85 (2015), or failed to exhaust it, *infra* pp.47-49.

## II.  Congress Authorized the Secretary to Adjudicate Violations of the H-2A Program and to Order Civil Penalties and Back Wages

**A.**  In codifying the H-2A visa program, Congress provided that the Secretary of Labor "is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under this section."  8 U.S.C. § 1188(g)(2).  The statute, on its face, authorizes the

Secretary to impose civil penalties and take other necessary actions, and Congress instructed the government to promulgate implementing regulations within seven months.  Pub. L. No. 99-603, title III, part A, § 301(d)-(e), 100 Stat. 3359, 3416 (1986).  Accordingly, the Secretary promptly issued regulations to provide for a hearing and secretarial review of actions to "assess civil money penalties" and "recover unpaid wages."  52 Fed. Reg. 20524, 20526-27 (June 1, 1987), and the substance of those regulations have remained in place since then, 29 C.F.R. §§ 501.15-501.47.

These implementing regulations represent the "Executive Branch interpretation" that was issued "roughly contemporaneously with enactment of the statute" and has "remained consistent over time."  *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2258 (2024).  The "longstanding practice of the government" deserves "the most respectful consideration" and properly informs the "determination of 'what the law is.'"  *Id.* (quotation marks omitted).  *Accord United States v. Alabama Great Southern Railroad Co.*, 142 U.S. 615, 621 (1892) (holding that the "contemporaneous construction thus given by the executive department of the government, and continued for nine years * * * should be considered as decisive").  The statute has always been understood to authorize Secretarial adjudication and the imposition of penalties and back wages.

Sun Valley contends, however, that Congress' general authorization to impose civil penalties is insufficient. Instead, Sun Valley would require Congress to use additional statutory language to affirmatively require certain administrative procedures before the Executive Branch could actually adjudicate and order penalties and other relief as Congress directed. Br. 42. The district court rightly rejected that argument, which ignores the "clear language of the statute." Appx017.

In authorizing the Secretary to "take such actions, including imposing appropriate penalties," 8 U.S.C. § 1188(g)(2), Congress obviously anticipated that the Secretary would make such decisions based on evidence, reasoned decision-making, and the opportunity for the respondent to be heard. This kind of individualized, fact-based decision requires adjudication that will be "subject to judicial review under the Administrative Procedure Act," even if Congress did not require the Secretary "to hold a hearing or to make formal findings on the hearing record." *Camp v. Pitts*, 411 U.S. 138, 140-41 (1973) (per curiam). Nevertheless, the Secretary acted well within statutory authority by providing respondents with a hearing and an opportunity to present their evidence and arguments. Although Sun Valley urges that it is entitled to "de novo review" of the facts in court, such review "is appropriate only

where there are inadequate factfinding procedures in an adjudicatory proceeding," *id.* at 141-42; *accord NVE, Inc. v. HHS*, 436 F.3d 182, 189 (3d Cir. 2006). Sun Valley makes no argument that it was impaired in its ability to develop the record—to the contrary, Sun Valley does not contest its factual liability at all. *See* Br. 17-57.

Sun Valley notes that "a civil fine, penalty or pecuniary forfeiture * * * may be recovered in a civil action" by the United States when the statute does not "specify[] the mode of recovery or enforcement thereof." 28 U.S.C. § 2461(a); Br. 44. Thus, if the Secretary held a hearing and imposed a civil penalty, and Sun Valley simply refused to pay, then the United States could bring a district court suit to enforce the civil penalty order. But nothing in § 2461(a)—which grants a permissive cause of action—requires initial district court adjudication to the exclusion of Executive adjudication. Instead, Congress granted the Secretary authority to determine violations and impose civil penalties. 8 U.S.C. § 1188.

Sun Valley is similarly wide of the mark in asserting that the Fifth Circuit's split decision in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), forecloses adjudication by the Secretary here. The Fifth Circuit did not make any holding regarding a "requirement for clear authorization" of Executive adjudication, and thus the decision has no relevance to Sun

Valley's argument.  Br. 45.  Instead, the panel majority held that the SEC unconstitutionally exercised legislative authority because it could decide to bring an enforcement action either in an agency proceeding or in a district court suit.  *Jarkesy*, 34 F.4th at 459-63.  That holding is not only inapposite, but fundamentally misunderstands the distinction between legislative power (enacting substantive laws) and executive power (enforcing those laws), as Judge Davis explained in dissent, *id.* at 473-75.  The Supreme Court then declined to endorse the panel majority's reasoning.  *Jarkesy*, 144 S. Ct. at 2127-28.

Finally, Sun Valley suggests that Executive adjudication here implicates the major-questions doctrine.  Br. 46-47.  But that doctrine concerns "novel" assertions of authority "in a long-extant statute," not a consistent interpretation of statutory authority (8 U.S.C. § 1188) that the Secretary has "has asserted continuously" for decades.  *Mayfield v. U.S. Department of Labor*, 117 F.4th 611, 617 (5th Cir. 2024) (collecting cases).

**B.**  Sun Valley also mistakenly asserts that the Secretary lacks authority to seek back wages.  Br. 43.  As the district court noted, Congress vested the Secretary with authority "to take such actions * * * as may be necessary to assure employer compliance," and then included relevant examples of such actions, including civil penalties and specific

performance.  Appx025-026 (quoting 8 U.S.C. § 1188(g)(2)).  Nothing within that affirmative authorization excludes back pay.  Indeed, the authorization to seek specific performance includes authority to award back pay and reinstatement.  *Van Waters & Rogers, Inc. v. International Brotherhood of Teamsters*, 56 F.3d 1132, 1134 (9th Cir. 1995) (noting that an arbitrator could "order specific performance []that is, order back pay plus" reinstatement); *see also* Restatement (Second) of Contracts, § 358 cmt. c (Am. Law Inst. 1981) (specific performance includes the ability to grant equitable relief and restitution).

The ability to hold employers accountable for owed wages is a key tool to "assure employer compliance" with the H-2A program's requirements.  8 U.S.C. § 1188(g)(2).  "A basic congressional premise for temporary foreign worker programs under" the Immigration Reform and Control Act "is that the unregulated use of aliens in agriculture would have an adverse impact on the wages of U.S. workers, absent protection."  52 Fed. Reg. 16770, 16776 (May 5, 1987).  That is why employers are required to grant the same level of wages and benefits to U.S. workers and to hire U.S. workers first and why importing foreign workers under the H-2A program must not "adversely affect the wages and working conditions" of domestic workers.  8 U.S.C. § 1188(a)(1).  Without an enforcement mechanism to assure back

pay wrongfully withheld, employers could circumvent the H-2A program's reticulated scheme and effectively hire foreign workers at depressed wages, in defiance of Congress' judgment about how and when foreign nationals may work in the United States.

### III. Sun Valley Failed to Preserve Its Removal Challenge, Which Fails on the Merits

Sun Valley objects to the fact that the ALJ who conducted its hearing, like all ALJs, was removable only for "good cause."  5 U.S.C. § 7521(a).  All five circuits to have considered such a claim have rejected those challenges, concluding either that Section 7521(a) is constitutional or, even if not, that the plaintiff would not be entitled to enjoin or invalidate the challenged agency action on that basis.  *See K&R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023); *Calcutt v. FDIC*, 37 F.4th 293, 317-20 (6th Cir. 2022), *rev'd on other grounds per curiam*, 598 U.S. 623 (2023); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1129-38 (9th Cir. 2021); *Leachco, Inc. v. Consumer Product Safety Commission*, 103 F.4th 748, 763-64 (10th Cir. 2024), *cert. pet. filed* No. 24-156 (U.S.); *Rodriguez v. SSA*, 118 F.4th 1302, 1315 (11th Cir. 2024).

At the outset, however, Sun Valley has failed to preserve its challenge for review because it never raised it during the enforcement proceeding.  As the district court explained, the Department of Labor's regulations require

respondents to specifically identify the legal issues they wish to raise in the "formal adversarial adjudication[]." Appx018 (citing 29 C.F.R. §§ 18.80(c)(2), 18.101, 501.33(a)-(b)(3)). If dissatisfied with that ALJ decision, respondents may request review by the Administrative Review Board, 29 C.F.R. § 501.42(a), which Sun Valley did, while never arguing that the ALJ's tenure protections were unconstitutional. *See* AR4384-4408.

As part of those adversarial proceedings, Sun Valley was "expected to develop the issues" and to exhaust all issues to preserve them for judicial review. *Carr v. Saul*, 593 U.S. 83, 88-90 (2021). The D.C. Circuit declined to excuse a failure to preserve a removal challenge in similar circumstances. *Fleming v. U.S. Department of Agriculture*, 987 F.3d 1093, 1102-03 (D.C. Cir. 2021); *cf. Cirko ex rel. Cirko v. Commissioner*, 948 F.3d 148, 155-56 (3d Cir. 2020) (distinguishing adversarial hearings with regulatory exhaustion requirements from inquisitorial hearings without such requirements). There is no reason why Sun Valley could not have raised a removal challenge in the adjudication. Indeed, this Court is considering a similar removal challenge to 5 U.S.C. § 7521 that was presented and preserved in a Department of Transportation enforcement proceeding. Answering Br. 12-13, 40-49, *Axalta Coating Systems LLC v. FAA*, No. 23-

2376 (3d Cir. Sept. 30, 2024).  Sun Valley offers no reason why it could not have similarly raised the same challenge here, and in any event the claim fails on its merits.

### A.  Congress Constitutionally Provided that ALJs May Be Removed for "Good Cause"

**1.**  The Constitution provides for the appointment of principal officers (like the Secretary of Labor) by the President with confirmation by the Senate, and for the appointment of inferior officers (like ALJs) by the President alone, by the Courts of Law, or by the Heads of Executive Departments.  U.S. Const. art. II, § 2, cl. 2; *Edmond v. United States*, 520 U.S. 651, 658-60 (1997).  By statute, Congress has vested the appointment of ALJs in Department Heads, 5 U.S.C. § 3105, and the Secretary of Labor appointed the agency's ALJs.  Appx009.  The Secretary can remove ALJs "for good cause."  5 U.S.C. § 7521(a).

For more than 130 years, the Supreme Court has recognized that the Constitution does not require a Department Head who has been granted appointment authority by Congress to have unfettered discretion to remove his appointees.  In *United States v. Perkins*, 116 U.S. 483 (1886), an inferior officer in the Navy challenged his removal without cause as unlawful, as Congress had provided that such inferior officers could be removed in peacetime only pursuant to a court-martial sentence.  *Id.* at 483-84.  The

Supreme Court agreed, holding that it "ha[d] no doubt" that Congress "may limit and restrict the power of removal" for inferior officers. *Id.* at 485.

The Supreme Court has since reaffirmed that Congress may impose limitations on a Department Head's exercise of the removal power. In *Morrison v. Olson*, 487 U.S. 654 (1988), the Court upheld a "good cause" removal restriction for an independent counsel appointed to investigate and prosecute serious crimes committed by certain high-ranking executive officers. *Id.* at 685-93. *Morrison* did not decide "exactly what is encompassed within the term 'good cause,'" but stressed its understanding that "the Attorney General may remove an independent counsel for 'misconduct.'" *Id.* at 692. Through that removal authority, the Court stated, the President "retains ample authority to assure that the counsel is competently performing his or her statutory responsibilities." *Id.* Although the independent counsel exercised "discretion and judgment" in carrying out her responsibilities, the Court concluded that "the President's need to control the exercise of that discretion [was not] so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President." *Id.* at 691-92. And even Justice Scalia's dissent rejected the idea that inferior officers must be removable at will—as he explained, that "has never been the law." *Id.* at

724 n.4 (Scalia, J., dissenting) (arguing that the President must have "plenary power to remove principal officers" like the Attorney General, but that the Constitution "does not require that [the President] have plenary power to remove inferior officers").

Other recent Supreme Court decisions have likewise acknowledged Congress' power to regulate Department Heads' removal of inferior officers. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020) (acknowledging *Perkins* and *Morrison*); *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 493 (2010) (confirming that the Court "has upheld for-cause limitations" on removal of inferior officers). And in *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021), the Supreme Court affirmatively restored removal protections of executive adjudicators who perform functions similar to those of ALJs.  Although the court of appeals had invalidated those officers' removal restrictions to remedy an Appointments Clause violation, *id.* at 25-26 (plurality opinion), the Supreme Court severed a different portion of the statutory scheme, thereby preserving the adjudicators' removal protections, *id.*; *see also id.* at 44 (Breyer, J., concurring in the judgment in part and dissenting in part) (agreeing with plurality's choice of severance).

Of course, Congress does not have unlimited authority to shield officials wielding executive power from removal.  Under Article II, Congress may not impose any restriction that prevents the President from ensuring that the laws are faithfully executed or "deprive[s] the President of adequate control" over the official's exercise of executive power.  *Free Enterprise*, 561 U.S. at 508; *see also Morrison*, 487 U.S. at 689-90.  Within those bounds, Congress may regulate the conditions for removal of inferior officers.

**2.**  Under these precedents, the statute providing that ALJs can be removed "for good cause" readily satisfies constitutional requirements, particularly where the ALJ can be removed by the Secretary, who is removable at will by the President.  The "good cause" standard in 5 U.S.C. § 7521 mirrors other longstanding statutory removal restrictions for adjudicators not afforded the protections of Article III judges.  *See, e.g.*, Act of Feb. 24, 1855, ch. 122, 10 Stat. 612 (Court of Claims); Act of June 17, 1930, ch. 497, §§ 518, 646, 46 Stat. 590, 737-39, 762 (Customs Court and Court of Customs and Patent Appeals).

Additionally, agencies have plenary power to review and reverse ALJ decisions, 5 U.S.C. § 557(b), and the statutory "good cause" standard permits the Secretary to remove an ALJ for refusing to follow binding legal

or policy judgments announced by the agency, as well as for misconduct or substantially deficient job performance.

This design comports with constitutional requirements. As the Ninth Circuit explained in rejecting a materially identical challenge to the removal restrictions for ALJs within the Department of Labor, "ALJs are judges who make decisions that are subject to vacatur by people without tenure protection." *Decker Coal*, 8 F.4th at 1135. They also perform an "adjudicatory" function rather than "policymaking and enforcement functions" and "cannot sua sponte initiate investigations." *Id.* at 1133. Under that structure, the President "continues to enjoy an 'ability to execute the laws—by holding his subordinates accountable for their conduct.'" *Id.* at 1135; *see also Leachco*, 103 F.4th at 764 (rejecting similar ALJ removal challenge and "find[ing] the Ninth Circuit's analysis in *Decker Coal* persuasive"); *Calcutt*, 37 F.4th at 319 (similar); *but see Jarkesy*, 34 F.4th at 464 (concluding in a divided panel opinion that ALJ removal protections are unconstitutional, at least when applied to an agency where the Department Head is understood to also have removal protections), *aff'd on other grounds*, 144 S. Ct. 2117.

**3.** Sun Valley errs in claiming that ALJs are unconstitutionally insulated from Presidential control on the theory that they have two levels

of removal protection.  Br. 49.  There is a single layer of removal restriction between the ALJ and the President:  The President may remove the Secretary at will, and the Secretary may remove the ALJ for good cause.  5 U.S.C. § 7521.

Sun Valley emphasizes that the Merit Systems Protection Board (MSPB) is charged with reviewing whether there is good cause for removal of an ALJ.  *See* 5 U.S.C. § 7521(a).  MSPB members are removable by the President "for inefficiency, neglect of duty, or malfeasance in office."  *Id.* § 1202(d).  But MSPB's role simply mirrors the role that courts traditionally play in reviewing claims of improper removal.  Thus, in *Morrison*, the Supreme Court saw "no constitutional problem" in "judicial review of the removal decision" because the "possibility of judicial review does not inject the Judicial Branch into the removal decision, nor does it, by itself, put any additional burden on the President's exercise of executive authority." *Morrison*, 487 U.S. at 693 n.33.  The same was true in *Perkins*, where it was solely for the federal courts to determine if the Navy officer had been properly removed.  116 U.S. at 485.  And if it is constitutional for a court— wholly beyond the control of the President—to adjudicate whether cause for

removal has been demonstrated, it is necessarily constitutional for the more accountable MSPB to conduct the same adjudication.[11]

Even if the MSPB were thought to provide a second layer of removal protection, Sun Valley's argument would still lack merit. It rests on the erroneous Fifth Circuit panel decision in *Jarkesy*, which in turn rests on a misreading of *Free Enterprise*, 561 U.S. 477, as categorically prohibiting two layers of removal restrictions, *Jarkesy*, 34 F.4th at 463-64. But *Free Enterprise* "did not broadly declare all two-level for-cause protections for inferior officers unconstitutional." *Decker Coal*, 8 F.4th at 1132. On the contrary, *Free Enterprise* emphasized that it was not making a "general pronouncement[]" that "two levels of good-cause tenure" are always unconstitutional and should not "cast doubt on the use of what is colloquially known as the civil service system within independent agencies." 561 U.S. at 505-07. And the Supreme Court was explicit that its holding did not encompass "administrative law judges," who "perform adjudicative rather than enforcement or policymaking functions." *Id*. at 507 n.10.

---

[11] Under 5 U.S.C. § 7521, MSPB does not make a policy judgment as to whether an ALJ should be removed, but instead limits its review to the agency's determination that good cause for removal exists. *See HHS v. Jarboe*, 2023 M.S.P.B. 22, ¶ 6 (2023); *SSA v. Levinson*, 2023 M.S.P.B. 20, ¶¶ 37-38 (2023).

**B.     Sun Valley Fails to Demonstrate Any Prejudice from the Challenged Removal Restrictions**

Sun Valley summarily asserts that invalidation of the challenged removal restrictions would "require[] vacatur."  Br. 52.  That is not correct.  As the Supreme Court and this Court have explained, "actions taken by an improperly insulated" officer "are not 'void' and do not need to be 'ratified' unless a plaintiff can show that the removal provision harmed him."  *CFPB v. National Collegiate Master Student Loan Trust*, 96 F.4th 599, 607 (3d Cir. 2024) (citing *Collins v. Yellen*, 594 U.S. 220, 259-60 (2021)).  In other words, plaintiffs raising a removal challenge "are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire an agency head affected the complained-of decision."  *Id.*  Simply pointing to an allegedly unconstitutional removal restriction is not enough.  *Id.* at 614-15.  Sun Valley makes no attempt to demonstrate compensable harm attributable to the ALJ's removal protection.  *Id.* at 615.

This Court's decision in *National Collegiate* is consistent with decisions of every other court of appeals to consider the question, all of which declined to enjoin or reverse agency action based on a removal challenge where there is no evidence that the removal restriction actually prejudiced the plaintiff.  *Accord CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 180 (2d Cir. 2023); *K&R Contractors*, 86 F.4th at 149;

*Community Financial Services Association of America, Ltd. v. CFPB*, 51 F.4th 616, 632-33 (5th Cir. 2022), *rev'd on other grounds*, 601 U.S. 416 (2024); *Calcutt*, 37 F.4th at 318-20; *Kaufmann v. Kijakazi*, 32 F.4th 843, 849-50 (9th Cir. 2022); *Leachco*, 103 F.4th at 756-57; *Rodriguez*, 118 F.4th at 1314-15.

## IV. The Civil Penalties and Back Pay Orders Were Commensurate with Sun Valley's Violations

The district court correctly held that the Department's order to pay civil penalties and back wages comports with the Eighth Amendment. Appx026-027. On appeal, Sun Valley argues that the portion of the order concerning the workers' ability to prepare their own meals constitutes an excessive fine. Br. 53-55. Accordingly, Sun Valley does not contest that the rest of the order totaling more than $230,000 complies with the Eighth Amendment.[12]

When Sun Valley posted its job offer, it was required to "specify all deductions not required by law which the employer will make from the

---

[12] That total includes $142,728.22 in back wages and $1,350 in penalties for unlawfully firing workers; $64,960 in back wages for unlawfully deducting wages for non-alcoholic drinks; $8,972.61 in back wages for profiting from sales of beer; $1,350 in penalties for unlawfully attempting to have workers waive their right to a guaranteed work period; $3,150 in penalties for providing inadequate and substandard housing; and $7,500 for providing unsafe transportation to the worksite. AR4508.

worker's paycheck," including "the charge, if any, to the worker for" employer-provided meals. 20 C.F.R. § 655.122(g), (p). Sun Valley violated that requirement. Its job offer stated that workers could prepare their own meals in a common kitchen without any mention of employer-provided meals (Appx193, 234), but Sun Valley did not provide access to a kitchen and instead charged workers $75-80 a week for meals, Appx083. Sun Valley reduced the workers' paychecks for these costs before it paid the workers their wages. Appx056. The Department accordingly ordered Sun Valley to pay back those unlawfully deducted wages. Appx039-040.

As Sun Valley recognizes, the Eighth Amendment's prohibition on excessive fines "[t]ypically, of course, * * * would not apply to back wages." Br. 54. That is because back wages are a form of restitution that "correlate[s] to the scope of wrongdoing" and represent "money to which" Sun Valley was "never entitled." *CFTC v. Escobio*, 833 F. App'x 768, 773 (11th Cir. 2020) (per curiam) (holding that such an Eighth Amendment challenge was "wholly without merit" and "doubt[ing] that" restitution "should be considered a punishment for purposes of the Excessive Fines Clause"); *accord Necula v. Conroy*, 13 F. App'x 24, 26 (2d Cir. 2001) (similar). But even if the restitution order here could be considered a fine for purposes of the Eighth Amendment, "there clearly was not, by any

58

reasonable measure, a constitutional violation" where the back pay order was equal to "the amount of the uncontested actual loss that the [workers] sustained as a direct result of" Sun Valley's unlawful deductions. *United States v. Lessner*, 498 F.3d 185, 205 (3d Cir. 2007). And Sun Valley does not dispute that it unlawfully deducted $128,185 from the workers' pay, Appx088; AR2721-2780 (supporting calculations), which is equal to the back pay order.

As to the civil penalty order, the Supreme Court has explained that a punitive fine is constitutional so long as it "bear[s] some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). The Eighth Amendment prohibits fines only when they are "grossly disproportional to the gravity of a defendant's offense." *Id.* Here, the Department imposed a civil penalty of $1,350 (less than the regulatory maximum of $1,500) "for each worker that was misled by [Sun Valley's] job order," which "falsely represented than an adequate kitchen would be provided." Appx040-041. That is comparable to other similar penalties, such as the civil penalties for unlawfully employing foreign nationals within the United States, which range from $1,000 to $10,000 "for each unauthorized alien" employed, 8 U.S.C.

§ 1324a(e)(4)(A), (e)(5), (f)(1), (g)(2), and in line with other penalties for violations of the H-2A program, Appx27.

Sun Valley does not contest that its violation affected each of the 147 workers it employed under the job offer, Appx272-275, resulting in a total penalty of $198,450.  Instead, it contends that the penalty is unconstitutional because its violations caused "negligible[] harm to the workers." Br. 53.  That assertion fails to appreciate Congress' purposes in enacting the H-2A program, and the real harm caused to Sun Valley's employees.

By failing to disclose that workers must pay for their meals rather than make their own in a kitchen, Sun Valley's job posting changed the pool of workers who would apply to perform the work.  Indeed, U.S. workers had commented on an earlier version of the regulatory requirements that providing "facilities in lieu of meals would discourage youth from entering" the pool of prospective workers.  46 Fed. Reg. 57031, 57031 (Nov. 20, 1981). An H-2A employer who promises kitchen facilities but not meals attracts certain workers while discouraging others, affecting the balance of how many U.S. workers and foreign workers apply for the job, undermining the Secretary's ability to certify that there are insufficient U.S. workers available.  *See* 8 U.S.C. § 1188(a)(1)(A).  That is why—since the Reagan

Administration—the Secretary of Labor has required that all deductions, including deductions for required meals, must be included in the initial job posting.  52 Fed. Reg. at 20514 ("Where the employer provides the meals, the job offer shall state the charge, if any, to the worker for such meals."); *id.* at 20515-16 ("The job offer shall specify all deductions not required by law which the employer will make from the worker's paycheck.  All deductions shall be reasonable.").  Sun Valley's failure to comply with those requirements makes it "exactly the type of individual for whom" the penalties were designed.  *United States v. Cheeseman*, 600 F.3d 270, 284 (3d Cir. 2010) (rejecting an Eighth Amendment challenge).

Moreover, Sun Valley's failure to provide a kitchen as promised caused substantial harm.  Sun Valley enticed foreign workers who traveled "thousands of miles from home," Appx088, to perform strenuous agricultural work for long hours, and under such conditions that there were not enough willing U.S. workers to perform the needed labor, 8 U.S.C. § 1188(a)(1)(A).  When those workers arrived, they discovered that they could not make their own meals as intended—instead, they would have to spend $75-$80 of their $451.60 weekly pay to buy meals from their employer (plus $10 per trip to buy groceries).  Appx066 & n. 123, Appx088; AR2720.  When workers asked to use the existing kitchen, they were denied

access and Sun Valley's representative instructed the workers to purchase their own hot plates to try to cook in their own rooms. Appx060; AR1997-1998. This forced workers to create makeshift facilities in their bedrooms, without easy access to countertops, storage, or a kitchen sink for the duration of the contract, from April through October:



AR3370-3373.

Imposing a $1,350 fine for each of the workers affected is not "grossly disproportionate" to Sun Valley's offense, which misled workers, altered the pool of prospective employees, and deprived the workers of basic access to make their own food.

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

JOSHUA M. SALZMAN
*/s/ Daniel Aguilar*
DANIEL AGUILAR
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5432*
Daniel.J.Aguilar@usdoj.gov

November 2024

## COMBINED CERTIFICATIONS

1. Government counsel are not required to be members of the bar of this Court.

2. This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,895 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Georgia 14-point font, a proportionally spaced typeface.

3. On November 6, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.

4. The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

5. This document was scanned for viruses using CrowdStrike Falcon Sensor, and no virus was detected.


 */s/ Daniel Aguilar*
Daniel Aguilar

**ADDENDUM**

# TABLE OF CONTENTS

5 U.S.C. § 7521 ................................................................... Add. 1

8 U.S.C. § 1101(a)(15)(h) .................................................... Add. 1

8 U.S.C. § 1188 .................................................................. Add. 3

20 C.F.R. § 655.122 ........................................................... Add. 11

**5 U.S.C. § 7521. Actions against administrative law judges.**

(a) An action may be taken against an administrative law judge appointed under section 3105 of this title by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board.

(b) The actions covered by this section are--

(1) a removal;
(2) a suspension;
(3) a reduction in grade;
(4) a reduction in pay; and
(5) a furlough of 30 days or less;

but do not include--

(A) a suspension or removal under section 7532 of this title;
(B) a reduction-in-force action under section 3502 of this title; or
(C) any action initiated under section 1215 of this title.

**8 U.S.C. § 1101. Definitions.**

(a) As used in this chapter—

* * *

(15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

* * *

(H) an alien

(i) (a) [Repealed. Pub.L. 106-95, § 2(c), Nov. 12, 1999, 113 Stat. 1316]

(b) subject to section 1182(j)(2) of this title, who is coming temporarily to the United States to perform services (other than services described in subclause (a) during the period in which such subclause applies and other than services described in

subclause (ii)(a) or in subparagraph (O) or (P)) in a specialty occupation described in section 1184(i)(1) of this title or as a fashion model, who meets the requirements for the occupation specified in section 1184(i)(2) of this title or, in the case of a fashion model, is of distinguished merit and ability, and with respect to whom the Secretary of Labor determines and certifies to the Attorney General that the intending employer has filed with the Secretary an application under section 1182(n)(1) of this title, or (b1) who is entitled to enter the United States under and in pursuance of the provisions of an agreement listed in section 1184(g)(8)(A) of this title, who is engaged in a specialty occupation described in section 1184(i)(3) of this title, and with respect to whom the Secretary of Labor determines and certifies to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 1182(t)(1) of this title, or

(c) who is coming temporarily to the United States to perform services as a registered nurse, who meets the qualifications described in section 1182(m)(1) of this title, and with respect to whom the Secretary of Labor determines and certifies to the Attorney General that an unexpired attestation is on file and in effect under section 1182(m)(2) of this title for the facility (as defined in section 1182(m)(6) of this title) for which the alien will perform the services; or

(ii) (a) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services, as defined by the Secretary of Labor in regulations and including agricultural labor defined in section 3121(g) of Title 26, agriculture as defined in section 203(f) of Title 29, and the pressing of apples for cider on a farm, of a temporary or seasonal nature, or

(b) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country, but this clause shall not apply to graduates of medical schools coming to the United

States to perform services as members of the medical profession; or

(iii) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States as a trainee, other than to receive graduate medical education or training, in a training program that is not designed primarily to provide productive employment; and the alien spouse and minor children of any such alien specified in this paragraph if accompanying him or following to join him;

\* \* \*

## 8 U.S.C. § 1188.  Admission of temporary H-2A workers.

### (a) Conditions for approval of H-2A petitions

(1) A petition to import an alien as an H-2A worker (as defined in subsection (i)(2)) may not be approved by the Attorney General unless the petitioner has applied to the Secretary of Labor for a certification that--

(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

(B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

(2) The Secretary of Labor may require by regulation, as a condition of issuing the certification, the payment of a fee to recover the reasonable costs of processing applications for certification.

### (b) Conditions for denial of labor certification

The Secretary of Labor may not issue a certification under subsection (a) with respect to an employer if the conditions described in that subsection are not met or if any of the following conditions are met:

(1) There is a strike or lockout in the course of a labor dispute which, under the regulations, precludes such certification.

(2)(A) The employer during the previous two-year period employed H-2A workers and the Secretary of Labor has determined, after notice and opportunity for a hearing, that the employer at any time during that period substantially violated a material term or condition of the labor certification with respect to the employment of domestic or nonimmigrant workers.

(B) No employer may be denied certification under subparagraph (A) for more than three years for any violation described in such subparagraph.

(3) The employer has not provided the Secretary with satisfactory assurances that if the employment for which the certification is sought is not covered by State workers' compensation law, the employer will provide, at no cost to the worker, insurance covering injury and disease arising out of and in the course of the worker's employment which will provide benefits at least equal to those provided under the State workers' compensation law for comparable employment.

(4) The Secretary determines that the employer has not made positive recruitment efforts within a multi-state region of traditional or expected labor supply where the Secretary finds that there are a significant number of qualified United States workers who, if recruited, would be willing to make themselves available for work at the time and place needed. Positive recruitment under this paragraph is in addition to, and shall be conducted within the same time period as, the circulation through the interstate employment service system of the employer's job offer. The obligation to engage in positive recruitment under this paragraph shall terminate on the date the H-2A workers depart for the employer's place of employment.

## (c) Special rules for consideration of applications

The following rules shall apply in the case of the filing and consideration of an application for a labor certification under this section:

### (1) Deadline for filing applications

The Secretary of Labor may not require that the application be filed more than 45 days before the first date the employer requires the labor or services of the H-2A worker.

**(2) Notice within seven days of deficiencies**

(A) The employer shall be notified in writing within seven days of the date of filing if the application does not meet the standards (other than that described in subsection (a)(1)(A)) for approval.

(B) If the application does not meet such standards, the notice shall include the reasons therefor and the Secretary shall provide an opportunity for the prompt resubmission of a modified application.

**(3) Issuance of certification**

(A) The Secretary of Labor shall make, not later than 30 days before the date such labor or services are first required to be performed, the certification described in subsection (a)(1) if--

(i) the employer has complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary), and

(ii) the employer does not actually have, or has not been provided with referrals of, qualified eligible individuals who have indicated their availability to perform such labor or services on the terms and conditions of a job offer which meets the requirements of the Secretary.

In considering the question of whether a specific qualification is appropriate in a job offer, the Secretary shall apply the normal and accepted qualifications required by non-H-2A-employers in the same or comparable occupations and crops.

(B) (i) For a period of 3 years subsequent to the effective date of this section, labor certifications shall remain effective only if, from the time the foreign worker departs for the employer's place of employment, the employer will provide employment to any qualified United States worker who applies to the employer until 50 percent of the period of the work contract, under which the foreign worker who is in the job was hired, has elapsed. In addition, the employer will offer to provide benefits, wages and working conditions required pursuant to this section and regulations.

(ii) The requirement of clause (i) shall not apply to any employer who--

(I) did not, during any calendar quarter during the preceding calendar year, use more than 500 man-days of agricultural labor, as defined in section 203(u) of Title 29,

(II) is not a member of an association which has petitioned for certification under this section for its members, and

(III) has not otherwise associated with other employers who are petitioning for temporary foreign workers under this section.

(iii) Six months before the end of the 3-year period described in clause (i), the Secretary of Labor shall consider the findings of the report mandated by section 403(a)(4)(D) of the Immigration Reform and Control Act of 1986 as well as other relevant materials, including evidence of benefits to United States workers and costs to employers, addressing the advisability of continuing a policy which requires an employer, as a condition for certification under this section, to continue to accept qualified, eligible United States workers for employment after the date the H-2A workers depart for work with the employer. The Secretary's review of such findings and materials shall lead to the issuance of findings in furtherance of the Congressional policy that aliens not be admitted under this section unless there are not sufficient workers in the United States who are able, willing, and qualified to perform the labor or service needed and that the employment of the aliens in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed. In the absence of the enactment of Federal legislation prior to three months before the end of the 3-year period described in clause (i) which addresses the subject matter of this subparagraph, the Secretary shall immediately publish the findings required by this clause, and shall promulgate, on an interim or final basis, regulations based on his findings which shall be effective no later than three years from the effective date of this section.

(iv) In complying with clause (i) of this subparagraph, an association shall be allowed to refer or transfer workers among its

members: Provided, That for purposes of this section an association acting as an agent for its members shall not be considered a joint employer merely because of such referral or transfer.

(v) United States workers referred or transferred pursuant to clause (iv) of this subparagraph shall not be treated disparately.

(vi) An employer shall not be liable for payments under section 655.202(b)(6) of title 20, Code of Federal Regulations (or any successor regulation) with respect to an H-2A worker who is displaced due to compliance with the requirement of this subparagraph, if the Secretary of Labor certifies that the H-2A worker was displaced because of the employer's compliance with clause (i) of this subparagraph.

(vii) (I) No person or entity shall willfully and knowingly withhold domestic workers prior to the arrival of H-2A workers in order to force the hiring of domestic workers under clause (i).

(II) Upon the receipt of a complaint by an employer that a violation of subclause (I) has occurred the Secretary shall immediately investigate. He shall within 36 hours of the receipt of the complaint issue findings concerning the alleged violation. Where the Secretary finds that a violation has occurred, he shall immediately suspend the application of clause (i) of this subparagraph with respect to that certification for that date of need.

## (4) Housing

Employers shall furnish housing in accordance with regulations. The employer shall be permitted at the employer's option to provide housing meeting applicable Federal standards for temporary labor camps or to secure housing which meets the local standards for rental and/or public accommodations or other substantially similar class of habitation: Provided, That in the absence of applicable local standards, State standards for rental and/or public accommodations or other substantially similar class of habitation shall be met: Provided further, That in the absence of applicable local or State standards, Federal temporary labor camp standards shall apply: Provided further, That the Secretary of Labor shall issue regulations which address the specific

requirements of housing for employees principally engaged in the range production of livestock: Provided further, That when it is the prevailing practice in the area and occupation of intended employment to provide family housing, family housing shall be provided to workers with families who request it: And provided further, That nothing in this paragraph shall require an employer to provide or secure housing for workers who are not entitled to it under the temporary labor certification regulations in effect on June 1, 1986. The determination as to whether the housing furnished by an employer for an H-2A worker meets the requirements imposed by this paragraph must be made prior to the date specified in paragraph (3)(A) by which the Secretary of Labor is required to make a certification described in subsection (a)(1) with respect to a petition for the importation of such worker.

## (d) Roles of agricultural associations

### (1) Permitting filing by agricultural associations

A petition to import an alien as a temporary agricultural worker, and an application for a labor certification with respect to such a worker, may be filed by an association of agricultural producers which use agricultural services.

### (2) Treatment of associations acting as employers

If an association is a joint or sole employer of temporary agricultural workers, the certifications granted under this section to the association may be used for the certified job opportunities of any of its producer members and such workers may be transferred among its producer members to perform agricultural services of a temporary or seasonal nature for which the certifications were granted.

### (3) Treatment of violations

#### (A) Member's violation does not necessarily disqualify association or other members

If an individual producer member of a joint employer association is determined to have committed an act that under subsection (b)(2) results in the denial of certification with respect to the member, the denial shall apply only to that member of the association unless the

Secretary determines that the association or other member participated in, had knowledge of, or reason to know of, the violation.

**(B) Association's violation does not necessarily disqualify members**

(i) If an association representing agricultural producers as a joint employer is determined to have committed an act that under subsection (b)(2) results in the denial of certification with respect to the association, the denial shall apply only to the association and does not apply to any individual producer member of the association unless the Secretary determines that the member participated in, had knowledge of, or reason to know of, the violation.

(ii) If an association of agricultural producers certified as a sole employer is determined to have committed an act that under subsection (b)(2) results in the denial of certification with respect to the association, no individual producer member of such association may be the beneficiary of the services of temporary alien agricultural workers admitted under this section in the commodity and occupation in which such aliens were employed by the association which was denied certification during the period such denial is in force, unless such producer member employs such aliens in the commodity and occupation in question directly or through an association which is a joint employer of such workers with the producer member.

**(e) Expedited administrative appeals of certain determinations**

(1) Regulations shall provide for an expedited procedure for the review of a denial of certification under subsection (a)(1) or a revocation of such a certification or, at the applicant's request, for a de novo administrative hearing respecting the denial or revocation.

(2) The Secretary of Labor shall expeditiously, but in no case later than 72 hours after the time a new determination is requested, make a new determination on the request for certification in the case of an H-2A worker if able, willing, and qualified eligible individuals are not actually available at the time such labor or services are required and a certification was denied in whole or in part because of the availability of qualified workers. If the employer asserts that any eligible individual

who has been referred is not able, willing, or qualified, the burden of proof is on the employer to establish that the individual referred is not able, willing, or qualified because of employment-related reasons.

## (f) Violators disqualified for 5 years

An alien may not be admitted to the United States as a temporary agricultural worker if the alien was admitted to the United States as such a worker within the previous five-year period and the alien during that period violated a term or condition of such previous admission.

## (g) Authorization of appropriations

(1) There are authorized to be appropriated for each fiscal year, beginning with fiscal year 1987, $10,000,000 for the purposes--

(A) of recruiting domestic workers for temporary labor and services which might otherwise be performed by nonimmigrants described in section 1101(a)(15)(H)(ii)(a) of this title, and

(B) of monitoring terms and conditions under which such nonimmigrants (and domestic workers employed by the same employers) are employed in the United States.

(2) The Secretary of Labor is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under this section.

(3) There are authorized to be appropriated for each fiscal year, beginning with fiscal year 1987, such sums as may be necessary for the purpose of enabling the Secretary of Labor to make determinations and certifications under this section and under section 1182(a)(5)(A)(i) of this title.

(4) There are authorized to be appropriated for each fiscal year, beginning with fiscal year 1987, such sums as may be necessary for the purposes of enabling the Secretary of Agriculture to carry out the Secretary's duties and responsibilities under this section.

## (h) Miscellaneous provisions

(1) The Attorney General shall provide for such endorsement of entry and exit documents of nonimmigrants described in section 1101(a)(15)(H)(ii) of this title as may be necessary to carry out this section and to provide notice for purposes of section 1324a of this title.

(2) The provisions of subsections (a) and (c) of section 1184 of this title and the provisions of this section preempt any State or local law regulating admissibility of nonimmigrant workers.

## (i) Definitions

For purposes of this section:

(1) The term "eligible individual" means, with respect to employment, an individual who is not an unauthorized alien (as defined in section 1324a(h)(3) of this title) with respect to that employment.

(2) The term "H-2A worker" means a nonimmigrant described in section 1101(a)(15)(H)(ii)(a) of this title.

## 20 C.F.R. § 655.122.  Contents of job offers.

(a) *Prohibition against preferential treatment of H–2A workers.* The employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H–2A workers. Job offers may not impose on U.S. workers any restrictions or obligations that will not be imposed on the employer's H–2A workers. This does not relieve the employer from providing to H–2A workers at least the same level of minimum benefits, wages, and working conditions that must be offered to U.S. workers consistent with this section.

(b) *Job qualifications and requirements.* Each job qualification and requirement listed in the job offer must be bona fide and consistent with the normal and accepted qualifications required by employers that do not use H–2A workers in the same or comparable occupations and crops. Either the CO or the SWA may require the employer to submit documentation to substantiate the appropriateness of any job qualification specified in the job offer.

(c) *Minimum benefits, wages, and working conditions.* Every job order accompanying an Application for Temporary Employment Certification must include each of the minimum benefit, wage, and working condition provisions listed in paragraphs (d) through (q) of this section.

(d) *Housing—*

(1) *Obligation to provide housing.* The employer must provide housing at no cost to the H–2A workers and those workers in corresponding employment who are not reasonably able to return to their residence within the same day. Housing must be provided through one of the following means:

(i) *Employer-provided housing.* Employer-provided housing must meet the full set of the DOL Occupational Safety and Health Administration (OSHA) standards set forth at 29 CFR 1910.142, or the full set of standards at §§ 654.404 through 654.417 of this chapter, whichever are applicable under § 654.401 of this chapter. Requests by employers whose housing does not meet the applicable standards for conditional access to the interstate clearance system will be processed under the procedures set forth at § 654.403 of this chapter; or

(ii) *Rental and/or public accommodations.* Rental or public accommodations or other substantially similar class of habitation must meet local standards for such housing. In the absence of applicable local standards addressing those health or safety concerns otherwise addressed by the DOL OSHA standards at 29 CFR 1910.142(b)(2) (minimum square footage); (b)(3) (beds, cots, or bunks, and suitable storage facilities); (b)(9) (minimum square footage in a room where workers cook, live, and sleep); (b)(10) (where the employer chooses to meet its meal obligations under paragraph (g) of this section by furnishing free and convenient cooking and kitchen facilities to the workers, the provision of stoves, sanitary kitchen facilities); (b)(11) (heating, cooking, and water heating equipment installed properly); (c) (water supply); (d)(1) (adequate toilet facilities); (d)(9) (adequate toilet paper); (d)(10) (toilets kept in sanitary condition); (f) (laundry, handwashing, and bathing facilities); (g) (lighting); (h)(2) (garbage containers kept clean); (h)(3) (garbage containers emptied when full, but at least twice a week); and (j) (insect and rodent control), State standards addressing such

concerns will apply. In the absence of applicable local or State standards addressing such concerns, the relevant DOL OSHA standards at 29 CFR 1910.142(b)(2), (3), (9), (10), and (11), (c), (d)(1), (9), and (10), (f), (g), (h)(2) and (3), and (j) will apply. Any charges for rental housing must be paid directly by the employer to the owner or operator of the housing.

(2) *Standards for range and mobile housing.* An employer employing workers under §§ 655.200 through 655.235 must comply with the housing requirements in §§ 655.230 and 655.235. An employer employing workers under §§ 655.300 through 655.304 must comply with the housing standards in § 655.304.

(3*) Deposit charges.* Charges in the form of deposits for bedding or other similar incidentals related to housing must not be levied upon workers. However, employers may require workers to reimburse them for damage caused to housing by the individual worker(s) found to have been responsible for damage that is not the result of normal wear and tear related to habitation.

(4) *Charges for public housing.* If public housing provided for migrant agricultural workers under the auspices of a local, county, or State government is secured by the employer, the employer must pay any charges normally required for use of the public housing units directly to the housing's management.

(5) *Family housing.* When it is the prevailing practice in the area of intended employment and the occupation to provide family housing, it must be provided to workers with families who request it.

(6) *Compliance with applicable standards—*

(i) *Timeliness.* The determination as to whether housing provided to workers under this section meets the applicable standards must be made not later than 30 calendar days before the first date of need identified in the Application for Temporary Employment Certification.

(ii) *Certification of employer-provided housing.* The SWA (or another local, State, or Federal authority acting on behalf of the SWA) with jurisdiction over the location of the employer-provided housing must inspect and provide to the employer and CO documentation

certifying that the employer-provided housing is sufficient to accommodate the number of workers requested and meets all applicable standards under paragraph (d)(1)(i) of this section.

(iii) *Certification of rental and/or public accommodations.* The employer must provide to the CO a written statement, signed and dated, that attests that the accommodations are compliant with the applicable standards under paragraph (d)(1)(ii) of this section and are sufficient to accommodate the number of workers requested. This statement must include the number of bed(s) and room(s) that the employer will secure for the worker(s). If applicable local or State rental or public accommodation standards under paragraph (d)(1)(ii) of this section require an inspection, the employer also must submit to the CO a copy of the inspection report or other official documentation from the relevant authority. If the applicable standards do not require an inspection, the employer's written statement must confirm that no inspection is required.

(iv) *Certified housing that becomes unavailable.* If after a request to certify housing, such housing becomes unavailable for reasons outside the employer's control, the employer may substitute other rental or public accommodation housing that is in compliance with the local, State, or Federal housing standards applicable under this section. The employer must promptly notify the SWA in writing of the change in accommodations and the reason(s) for such change and provide the SWA evidence of compliance with the applicable local, State, or Federal safety and health standards, in accordance with the requirements of this section. If, upon inspection, the SWA determines the substituted housing does not meet the applicable housing standards, the SWA must promptly provide written notification to the employer to cure the deficiencies with a copy to the CO. An employer's failure to provide housing that complies with the applicable standards will result in either a denial of a pending Application for Temporary Employment Certification or revocation of the temporary agricultural labor certification granted under this subpart.

(e) *Workers' compensation.*

(1) The employer must provide workers' compensation insurance coverage in compliance with State law covering injury and disease

arising out of and in the course of the worker's employment. If the type of employment for which the certification is sought is not covered by or is exempt from the State's workers' compensation law, the employer must provide, at no cost to the worker, insurance covering injury and disease arising out of and in the course of the worker's employment that will provide benefits at least equal to those provided under the State workers' compensation law for other comparable employment.

(2) Prior to issuance of the temporary agricultural labor certification, the employer must provide the CO with proof of workers' compensation insurance coverage meeting the requirements of this paragraph (e), including the name of the insurance carrier, the insurance policy number, and proof of insurance for the entire period of employment, or, if appropriate, proof of State law coverage.

(f) *Employer-provided items.* The employer must provide to the worker, without charge or deposit charge, all tools, supplies, and equipment required to perform the duties assigned.

(g) *Meals.* The employer either must provide each worker with three meals a day or must furnish free and convenient cooking and kitchen facilities to the workers that will enable the workers to prepare their own meals. Where the employer provides the meals, the job offer must state the charge, if any, to the worker for such meals. The amount of meal charges is governed by § 655.173. When a charge or deduction for the cost of meals would bring the employee's wage below the minimum wage set by the FLSA at 29 U.S.C. 206, the charge or deduction must meet the requirements of the FLSA at 29 U.S.C. 203(m), including the recordkeeping requirements found at 29 CFR 516.27.

(h) *Transportation; daily subsistence—*

(1) *Transportation to place of employment.* If the employer has not previously advanced such transportation and subsistence costs to the worker or otherwise provided such transportation or subsistence directly to the worker by other means and if the worker completes 50 percent of the work contract period, the employer must pay the worker for reasonable costs incurred by the worker for transportation and daily subsistence from the place from which the worker has come to work for the employer, whether in the U.S. or abroad to the place of employment. When it is the prevailing practice of non–H–2A agricultural employers

in the occupation in the area to do so, or when the employer extends such benefits to similarly situated H−2A workers, the employer must advance the required transportation and subsistence costs (or otherwise provide them) to workers in corresponding employment who are traveling to the employer's worksite. The amount of the transportation payment must be no less (and is not required to be more) than the most economical and reasonable common carrier transportation charges for the distances involved. The amount of the daily subsistence payment must be at least as much as the employer would charge the worker for providing the worker with three meals a day during employment (if applicable), but in no event less than the amount permitted under § 655.173(a). Note that the FLSA applies independently of the H−2A requirements and imposes obligations on employers regarding payment of wages.

(2) *Transportation from place of employment.* If the worker completes the work contract period, or if the employee is terminated without cause, and the worker has no immediate subsequent H−2A employment, the employer must provide or pay for the worker's transportation and daily subsistence from the place of employment to the place from which the worker, disregarding intervening employment, departed to work for the employer. If the worker has contracted with a subsequent employer who has not agreed in such work contract to provide or pay for the worker's transportation and daily subsistence expenses from the employer's worksite to such subsequent employer's worksite, the employer must provide or pay for such expenses. If the worker has contracted with a subsequent employer who has agreed in such work contract to provide or pay for the worker's transportation and daily subsistence expenses from the employer's worksite to such subsequent employer's worksite, the subsequent employer must provide or pay for such expenses. The employer is not relieved of its obligation to provide or pay for return transportation and subsistence if an H−2A worker is displaced as a result of the employer's compliance with the 50 percent rule as described in § 655.135(d) with respect to the referrals made after the employer's date of need.

(3) *Transportation between living quarters and place of employment.* The employer must provide transportation between housing provided or secured by the employer and the employer's place of employment at no cost to the worker.

(4) *Employer-provided transportation.*

(i) All employer-provided transportation must comply with all applicable local, State, or Federal laws and regulations, and must provide, at a minimum, the same transportation safety standards, driver's licensure, and vehicle insurance required under 29 U.S.C. 1841, 29 CFR 500.104 or 500.105, and 29 CFR 500.120 through 500.128.

(ii) The employer must not operate, or allow any other person to operate, any employer-provided transportation that is required by the U.S. Department of Transportation's Federal Motor Vehicle Safety Standards, including 49 CFR 571.208, to be manufactured with seat belts, unless all passengers and the driver are properly restrained by seat belts meeting standards established by the U.S. Department of Transportation, including 49 CFR 571.209 and 571.210.

(iii) The job offer must include a description of the modes of transportation (e.g., type of vehicle) that will be used for inbound, outbound, daily, and any other transportation.

(iv) If workers' compensation is used to cover transportation in lieu of vehicle insurance, the employer must either ensure that the workers' compensation covers all travel or that vehicle insurance exists to provide coverage for travel not covered by workers' compensation and it must have property damage insurance.

(i) *Three-fourths guarantee—*

(1) *Offer to worker.* The employer must guarantee to offer the worker employment for a total number of work hours equal to at least three-fourths of the workdays of the total period beginning with the first workday after the arrival of the worker at the place of employment or the advertised contractual first date of need, whichever is later, and ending on the expiration date specified in the work contract or in its extensions, if any.

(i) For purposes of this paragraph (i)(1), a workday means the number of hours in a workday as stated in the job order and excludes the worker's Sabbath and Federal holidays. The employer must offer a total number of hours to ensure the provision of sufficient work to

reach the three-fourths guarantee. The work hours must be offered during the work period specified in the work contract.

(ii) In the event the worker begins working later than the specified beginning date of the contract, the guarantee period begins with the first workday after the arrival of the worker at the place of employment, and continues until the last day during which the work contract and all extensions thereof are in effect.

(iii) Therefore, if, for example, a work contract is for a 10–week period, during which a normal workweek is specified as 6 days a week, 8 hours per day, the worker would have to be guaranteed employment for at least 360 hours (10 weeks x 48 hours/week = 480 hours x 75 percent = 360). If a Federal holiday occurred during the 10–week span, the 8 hours would be deducted from the total hours for the work contract, before the guarantee is calculated. Continuing with the above example, the worker would have to be guaranteed employment for 354 hours (10 weeks x 48 hours/week = (480 hours– 8 hours (Federal holiday)) x 75 percent = 354 hours).

(iv) A worker may be offered more than the specified hours of work on a single workday. For purposes of meeting the guarantee, however, the worker will not be required to work for more than the number of hours specified in the job order for a workday, or on the worker's Sabbath or Federal holidays. However, all hours of work actually performed may be counted by the employer in calculating whether the period of guaranteed employment has been met. If during the total work contract period the employer affords the U.S. or H–2A worker less employment than that required under this paragraph (i)(1), the employer must pay such worker the amount the worker would have earned had the worker, in fact, worked for the guaranteed number of days. An employer will not be considered to have met the work guarantee if the employer has merely offered work on three-fourths of the workdays if each workday did not consist of a full number of hours of work time as specified in the job order.

(2) *Guarantee for piece rate paid worker*. If the worker is paid on a piece rate basis, the employer must use the worker's average hourly piece rate earnings or the required hourly wage rate, whichever is higher, to calculate the amount due under the guarantee.

(3) *Failure to work*. Any hours the worker fails to work, up to a maximum of the number of hours specified in the job order for a workday, when the worker has been offered an opportunity to work in accordance with paragraph (i)(1) of this section, and all hours of work actually performed (including voluntary work over 8 hours in a workday or on the worker's Sabbath or Federal holidays), may be counted by the employer in calculating whether the period of guaranteed employment has been met. An employer seeking to calculate whether the number of hours has been met must maintain the payroll records in accordance with this subpart.

(4) *Displaced H–2A worker*. The employer is not liable for payment of the three-fourths guarantee to an H–2A worker whom the CO certifies is displaced because of the employer's compliance with its obligation to hire U.S. workers who apply or are referred after the employer's date of need described in § 655.135(d) with respect to referrals made during that period.

(5) *Obligation to provide housing and meals*. Notwithstanding the three-fourths guarantee contained in this section, employers are obligated to provide housing and meals in accordance with paragraphs (d) and (g) of this section for each day of the contract period up until the day the workers depart for other H–2A employment, depart to the place outside of the United States from which the worker came, or, if the worker voluntarily abandons employment or is terminated for cause, the day of such abandonment or termination.

(j) *Earnings records*.

(1) An employer must keep accurate and adequate records with respect to each worker's earnings, including, but not limited to, field tally records, supporting summary payroll records, and records showing the nature and amount of the work performed; the number of hours of work offered each day by the employer (broken out by hours offered both in accordance with and over and above the three-fourths guarantee at paragraph (i)(3) of this section); the hours actually worked each day by the worker; the time the worker began and ended each workday; the rate of pay (both piece rate and hourly, if applicable); the worker's earnings per pay period; the worker's permanent address and, when available, the worker's permanent email address and phone number(s); and the amount of and reasons for any and all deductions taken from the

worker's wages. In the case of H–2A workers, the permanent address must be the worker's permanent address in the worker's home country.

(2) Each employer must keep the records required by paragraph (j) of this section, including field tally records and supporting summary payroll records, safe and accessible at the place or places of employment, or at one or more established central recordkeeping offices where such records are customarily maintained. All records must be available for inspection and transcription by the Secretary or a duly authorized and designated representative, and by the worker and representatives designated by the worker as evidenced by appropriate documentation (an Entry of Appearance as Attorney or Representative, Form G–28, signed by the worker, or an affidavit signed by the worker confirming such representation). Where the records are maintained at a central recordkeeping office, other than in the place or places of employment, such records must be made available for inspection and copying within 72 hours following notice from the Secretary, or a duly authorized and designated representative, and by the worker and designated representatives as described in this paragraph (j)(2).

(3) To assist in determining whether the three-fourths guarantee in paragraph (i) of this section has been met, if the number of hours worked by the worker on a day during the work contract period is less than the number of hours offered, as specified in the job offer, the records must state the reason or reasons therefore.

(4) The employer must retain the records for not less than 3 years after the date of the certification.

(k) *Hours and earnings statements*. The employer must furnish to the worker on or before each payday in one or more written statements the following information:

(1) The worker's total earnings for the pay period;

(2) The worker's hourly rate and/or piece rate of pay;

(3) The hours of employment offered to the worker (showing offers in accordance with the three-fourths guarantee as determined in paragraph (i) of this section, separate from any hours offered over and above the guarantee);

(4) The hours actually worked by the worker;

(5) An itemization of all deductions made from the worker's wages;

(6) If piece rates are used, the units produced daily;

(7) Beginning and ending dates of the pay period; and

(8) The employer's name, address, and FEIN.

(*l*) *Rates of pay.* Except for occupations covered by §§ 655.200 through 655.235, the employer must pay the worker at least the highest wage rate set forth in § 655.120(a)(1).

(1) The employer must calculate workers' wages using the wage rate that will result in the highest wages for each worker in each pay period. When calculating wages based on an hourly wage rate, the calculation must reflect every hour or portion thereof worked during a pay period. The wages actually paid cannot be lower than the wages that would result from the wage rate(s) guaranteed in the job order.

(2) Where the wage rates set forth in § 655.120(a)(1) include both hourly and non-hourly wage rates, the employer must calculate each worker's wages, in each pay period, using the highest wage rate for each unit of pay, and pay the worker the highest of these wages for that pay period. The wage actually paid cannot be lower than the wages that would result from the wage rate(s) guaranteed in the job offer.

(3) If the employer requires one or more minimum productivity standards of workers as a condition of job retention, such standards must be specified in the job offer and be no more than those required by the employer in 1977, unless the OFLC Administrator approves a higher minimum, or, if the employer first applied for temporary agricultural labor certification after 1977, such standards must be no more than those normally required (at the time of the first Application for Temporary Employment Certification) by other employers for the activity in the area of intended employment.

(4) If applicable, the employer must state in the job order:

(i) That overtime hours may be available;

(ii) The wage rate(s) to be paid for any such overtime hours;

(iii) The circumstances under which the wage rate(s) for overtime hours will be paid, including, but not limited to, after how many hours in a day or workweek the overtime wage rate will be paid, and whether overtime wage rates will vary between places of employment; and

(iv) Where the overtime pay is required by law, the applicable Federal, State, or local law requiring the overtime pay.

(m) *Frequency of pay.* The employer must state in the job offer the frequency with which the worker will be paid, which must be at least twice monthly or according to the prevailing practice in the area of intended employment, whichever is more frequent. Employers must pay wages when due.

(n) *Termination for cause or abandonment of employment.*

(1) If a worker is terminated for cause or voluntarily abandons employment before the end of the contract period, and the employer notifies the NPC, and DHS in the case of an H–2A worker, in writing or by any other method specified by the Department in a notice published in the Federal Register or specified by DHS not later than 2 working days after such termination for cause or abandonment occurs, the employer will not be responsible for providing or paying for the subsequent transportation and subsistence expenses of that worker under this section, and that worker is not entitled to the three-fourths guarantee described in paragraph (i) of this section, and, in the case of a U.S. worker, the employer will not be obligated to contact that worker under § 655.153.

(2) A worker is terminated for cause when the employer terminates the worker for failure to comply with employer policies or rules or to satisfactorily perform job duties in accordance with reasonable expectations based on criteria listed in the job offer.

(i) An employer may terminate a worker for cause only if all of the following conditions are satisfied:

(A) The employee has been informed (in a language understood by the worker), or reasonably should have known, of the policy, rule, or performance expectation;

(B) Compliance with the policy, rule, or performance expectation is within the worker's control;

(C) The policy, rule, or performance expectation is reasonable and applied consistently to the employer's H–2A workers and workers in corresponding employment;

(D) The employer undertakes a fair and objective investigation into the job performance or misconduct; and

(E) The employer corrects the worker's performance or behavior using progressive discipline, which is a system of graduated and reasonable responses to an employee's failure to satisfactorily perform job duties or comply with employer policies or rules. Disciplinary measures should be proportional to the misconduct or failure to meet performance expectations but may increase in severity if misconduct or failure to meet performance expectations is repeated, and may include immediate termination for egregious misconduct, meaning intentional or reckless conduct that is plainly illegal, poses imminent danger to physical safety, or that a reasonable person would understand as being outrageous. Prior to each disciplinary measure, the employer must notify the worker of the infraction and allow the worker to present evidence in their defense. Following each disciplinary measure, except where the appropriate disciplinary measure is termination, the employer must provide relevant and adequate instruction to the worker, and must afford the worker reasonable time to correct the behavior or to meet the performance expectation following such instruction. The employer must document each infraction and corresponding disciplinary measure, evidence the worker presented in their defense, and resulting instruction, and provide a copy of this documentation to the worker (in a language understood by the worker) within 1 week of the implementation of the disciplinary measure.

(ii) A worker is not terminated for cause where the termination is: contrary to a Federal, State, or local law; for an employee's refusal to work under conditions that the employee reasonably believes will expose them or other employees to an unreasonable health or safety risk; because of discrimination on the basis of race, color, national origin, age, sex (including sexual orientation or gender identity),

religion, disability, familial status or citizenship status; or, where applicable, where the employer failed to comply with its obligations under § 655.135(m) in an investigatory interview that contributed to the termination.

(iii) The employer bears the burden of demonstrating that any termination for cause meets the requirements in paragraph (n)(2).

(3) Abandonment will be deemed to begin after a worker fails to report to work at the regularly scheduled time for 5 consecutive working days without the consent of the employer.

(4) The employer is required to maintain records described in this section for not less than 3 years from the date of the certification.

(i) Records of notification to the NPC, and to DHS in the case of an H–2A worker, of termination for cause or abandonment.

(ii) Disciplinary records, including the infraction and each step of progressive discipline, any evidence the worker presented in their defense, any investigation related to the termination, and any subsequent instruction afforded the worker.

(iii) Records indicating the reason(s) for termination of any worker, including disciplinary records as described in paragraph (n)(4)(ii) of this section and § 655.167.

(o) *Contract impossibility*. If, before the expiration date specified in the work contract, the services of the worker are no longer required for reasons beyond the control of the employer due to fire, weather, or other Act of God that makes the fulfillment of the contract impossible, the employer may terminate the work contract. Whether such an event constitutes a contract impossibility will be determined by the CO. In the event of such termination of a contract, the employer must fulfill a three-fourths guarantee for the time that has elapsed from the start of the work contract to the time of its termination, as described in paragraph (i)(1) of this section. The employer must make efforts to transfer the worker to other comparable employment acceptable to the worker, consistent with existing immigration law, as applicable. If such transfer is not affected, the employer must:

(1) Return the worker, at the employer's expense, to the place from which the worker (disregarding intervening employment) came to work for the employer, or transport the worker to the worker's next certified H–2A employer, whichever the worker prefers;

(2) Reimburse the worker the full amount of any deductions made from the worker's pay by the employer for transportation and subsistence expenses to the place of employment; and

(3) Pay the worker for any costs incurred by the worker for transportation and daily subsistence to that employer's place of employment. Daily subsistence must be computed as set forth in paragraph (h) of this section. The amount of the transportation payment must not be less (and is not required to be more) than the most economical and reasonable common carrier transportation charges for the distances involved.

(p) *Deductions.*

(1) The employer must make all deductions from the worker's paycheck required by law. The job offer must specify all deductions not required by law which the employer will make from the worker's paycheck. All deductions must be reasonable. The employer may deduct the cost of the worker's transportation and daily subsistence expenses to the place of employment which were borne directly by the employer. In such circumstances, the job offer must state that the worker will be reimbursed the full amount of such deduction upon the worker's completion of 50 percent of the work contract period. However, an employer subject to the FLSA may not make deductions that would violate the FLSA.

(2) A deduction is not reasonable if it includes a profit to the employer or to any affiliated person. A deduction that is primarily for the benefit or convenience of the employer will not be recognized as reasonable and therefore the cost of such an item may not be included in computing wages. The wage requirements of § 655.120 will not be met where undisclosed or unauthorized deductions, rebates, or refunds reduce the wage payment made to the employee below the minimum amounts required under this subpart, or where the employee fails to receive such amounts free and clear because the employee kicks back directly or indirectly to the employer or to another person for the employer's

benefit the whole or part of the wage delivered to the employee. The principles applied in determining whether deductions are reasonable and payments are received free and clear, and the permissibility of deductions for payments to third persons are explained in more detail in 29 CFR part 531.

(q) *Disclosure of work contract.* The employer must provide to an H–2A worker not later than the time at which the worker applies for the visa, or to a worker in corresponding employment not later than on the day work commences, a copy of the work contract between the employer and the worker in a language understood by the worker as necessary or reasonable. For an H–2A worker going from an H–2A employer to a subsequent H–2A employer, the copy must be provided not later than the time an offer of employment is made by the subsequent H–2A employer. For an H–2A worker that does not require a visa for entry, the copy must be provided not later than the time of an offer of employment. At a minimum, the work contract must contain all of the provisions required by this section. In the absence of a separate, written work contract entered into between the employer and the worker, the work contract at a minimum will be the terms of the job order and any obligations required under 8 U.S.C. 1188, 29 CFR part 501, or this subpart.