Record No. 23-2608

_____

**UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

_____

SUN VALLEY ORCHARDS, LLC,

*Appellant*

v.

U.S. DEPARTMENT OF LABOR; UNITED STATES
SECRETARY OF LABOR

*Appellees.*

On Appeal from an Order of the United States District Court
for the District of New Jersey in Case No. 21-cv-16625
Honorable Joseph H. Rodriguez

_____

APPELLANT'S REPLY BRIEF

_____

Robert M. Belden                    Robert E. Johnson
INSTITUTE FOR JUSTICE               INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900          16781 Chagrin Blvd. #256
Arlington, VA 22203                 Shaker Heights, OH 44120
Tel: (703) 682-9320                 Tel: (703) 682-9320
Fax: (703) 682-9321                 Fax: (703) 682-9321

*Counsel for Appellant*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................ 3

   I.  The Agency Adjudication Violated Article III And, By Extension, The Seventh Amendment. ............................................................... 3

     A.  The Government Fundamentally Inverts The *Jarkesy* Analysis. ..................................................................................... 4

     B.  This Case Does Not Fit Within The Immigration-Related Exception. ................................................................................ 11

     C.  The Government Largely Abandons The District Court's Alternate Holding on Consent And Waived Any Exhaustion Argument. ............................................................................... 17

   II.  The Agency Acted Without Sufficient Congressional Authorization. ................................................................................ 18

     A.  The Agency Points To No Statute Clearly Authorizing Agency Adjudication. .......................................................... 19

     B.  Agency Adjudication Requires Clear Congressional Authorization. ................................................................... 20

   III. The Agency Proceedings Separately Violated Article II. ............................. 23

     A.  The ALJ Enjoyed Impermissible Protection From Removal. ................................................................................... 24

     B.  Sun Valley Was Not Required To Exhaust This Removal Challenge. ................................................................................ 25

     C.  This Article II Violation Requires Vacatur. ........................... 26

   IV. The Award Is An Excessive Fine. .................................................. 28

CONCLUSION ....................................................................................... 29

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Alexander v. Fritch,*
    396 F. App'x 867 (3d Cir. 2010) ......................................................... 18

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ..................................................................... 22

*CFPB v. Nat'l Collegiate Master Student Loan Tr.,*
    96 F.4th 599 (3d Cir. 2024) ............................................................ 27

*Cirko ex rel. Cirko v. Comm'r of Soc. Sec.,*
    948 F.3d 148 (3d Cir. 2020) ................................................. 18, 25, 26

*Corner Post, Inc. v. Bd. of Governors,*
    144 S. Ct. 2440 (2024) ..................................................................... 26

*Crowell v. Benson,*
    285 U.S. 22 (1932) ........................................................................... 15

*Elgebaly v. Garland,*
    109 F.4th 426 (6th Cir. 2024) ............................................................. 6

*Fleming v. USDA,*
    987 F.3d 1093 (D.C. Cir. 2021) ....................................................... 26

*Free Enter. Fund v. PCAOB,*
    561 U.S. 477 (2010) ........................................................ 18, 23, 24, 25

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) ......................................................... 7, 25

*Kaufmann v. Kijakazi,*
    32 F.4th 843 (9th Cir. 2022) ........................................................... 27

*Lloyd Sabaudo v. Elting,*
    287 U.S. 329 (1932) ......................................................................... 15

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024) ........................................................20

*Lucia v. SEC*,
    585 U.S. 237 (2018)............................................................25

*Malik v. Attorney General*,
    659 F.3d 253 (3d Cir. 2011) .................................................8

*Noriega-Perez v. United States*,
    179 F.3d 1166 (9th Cir. 1999)..............................................8

*Oceanic Steam Navigation Co. v. Stranahan*,
    214 U.S. 320 (1909) ....................................................14, 15

*Porter v. Califano*,
    592 F.2d 770 (5th Cir. 1979) ..............................................28

*Rodriguez v. SSA*,
    118 F.4th 1302 (11th Cir. 2024) ..........................................27

*SEC v. Jarkesy*,
    144 S. Ct. 2117 (2024) ...............................................passim

*Texas v. Biden*,
    No. 2:21-CV-067-Z, 2021 WL 4552547 (N.D. Tex. July 19, 2021) ...................28

*United States v. Sabhnani*,
    599 F.3d 215 (2d Cir. 2010) ...............................................13

*von Hofe v. United States*,
    492 F.3d 175 (2d Cir. 2007).................................................28

*Wellness International Network, Ltd. v. Sharif*,
    575 U.S. 665 (2015) ........................................................17

*Wong Wing v. United States*,
    163 U.S. 228 (1896).......................................................6, 12

**Statutes and Regulations**

5 U.S.C. § 706(2) ................................................................26

5 U.S.C. § 1202(d) .................................................................... 25

5 U.S.C. § 7521(a) .................................................................... 24

5 U.S.C. § 7521(b) .................................................................... 24

7 U.S.C. § 6912(e) .................................................................... 26

8 U.S.C. § 1188(e) ...................................................................... 6

8 U.S.C. § 1188(g)(2) ........................................................ 19, 21

28 U.S.C. § 2461 ...................................................................... 22

29 C.F.R. Part 501 ...................................................................... 8

# INTRODUCTION

The principal question in this case is whether Article III allows a federal agency to impose over half a million dollars in penalties and back wages on a family farm, based on a breach-of-contract theory, through proceedings before an agency judge. The government wants to make this case about immigration, but, while some of the Award pertains to employees on H-2A visas, another portion pertains to domestic employees who were not. Appx088. More broadly, the relevant question is *not* whether the government can use agency judges to adjudicate immigration status. *Contra* Resp. Br. 26-29. Nor is the question whether agency judges can decide whether an employer can participate in an employment-visa program. *Contra id.* at 36-37. Rather, this case is about penalties and back wages.

Similarly, the question in this case is *not* whether those penalties and back wages are justified—but, rather, whether they could be imposed by an agency judge. The agency judge here resolved all manner of disputed questions, including: whether workers had kitchen access; whether free water was available in the fields, when the manager offered beverages for sale; whether some workers were fired or quit; and whether conditions on the farm justified penalties. The Government recites the facts as if the agency judge's resolution of these questions was final and unassailable, but

a fundamental question on appeal is whether the agency judge could make those decisions in the first place.[1]

As the Opening Brief explained, she could not. Under a straightforward application of *SEC v. Jarkesy*, "civil penalties are a type of remedy at common law that could only be enforced in courts of law," 144 S. Ct. 2117, 2129 (2024) (cleaned up), and the penalties and back wages here could therefore only be imposed (if at all) in an Article III court with a Seventh Amendment jury. Op. Br. 17-39. That conclusion is confirmed by the fact that Congress has not authorized agency adjudication in this type of case, *id.* at 40-47; the fact that the agency judge violated additional structural provisions under Article II, *see id.* at 47-53; and the fact that the agency judge imposed an excessive fine—an issue that should have been resolved after an evidentiary hearing in an Article III court, not on a cold agency record, *see id.* at 53-56. The decision below should be reversed.

---

[1] For this reason, the Government is wrong to say that Sun Valley "does not contest that it violated the statutory and regulatory requirements for the H-2A visa program." Resp. Br. 23. Sun Valley denies the government's allegations and is seeking the chance to contest that and other issues in an appropriate forum.

## ARGUMENT

### I.    The Agency Adjudication Violated Article III And, By Extension, The Seventh Amendment.

In *Jarkesy*, the Supreme Court held that the imposition of civil penalties was a matter of private right—requiring an Article III judge and Seventh Amendment jury—because "civil penalties are a type of remedy at common law that could only be enforced in courts of law." 144 S. Ct. at 2129 (cleaned up). The Court underscored that "the remedy," *i.e.*, the fact that the government sought to impose civil penalties, "is all but dispositive." *Id.* That same reasoning applies here, where an agency judge imposed significant penalties on a family farm. Op. Br. 18-20. Yet, tellingly, this "all but dispositive" aspect of *Jarkesy* all but disappears from the Government's brief.

The Government proposes a different rule, under which agency judges can adjudicate penalties so long as they relate to Congress's authority over immigration. Resp. Br. 38-40. But the Government's view finds no support in *Jarkesy*. To be sure, *Jarkesy* recognized a narrow, historically-rooted exception allowing agency adjudication where Congress "prohibit[ed] immigration by certain classes of persons and enforce[d] those prohibitions with administrative penalties." *Id.* at 2132-33. But by its plain terms, that exception does not encompass fines (or back wages) imposed on American businesses for things like kitchen access, early termination of workers,

window screens, beverage sales, or bald tires—even if some (but not all) of the workers were on employment visas. Nor does the Government satisfy its burden under *Jarkesy* to produce historical precedent for agency adjudication of such employment-related issues. The Government seemingly believes no historical precedent is required, but *Jarkesy* holds the opposite.

Below, Part I.A begins with the parts of *Jarkesy* the Government ignores—including the "all but dispositive" question of remedy—and explains that the Government's approach is fundamentally at odds with *Jarkesy*. Part I.B explains why the narrow immigration-related exception in *Jarkesy* does not apply. Finally, Part I.C responds to the Government's inadequate attempt to raise procedural barriers.

A.    The Government Fundamentally Inverts The *Jarkesy* Analysis.

The Opening Brief tracks *Jarkesy*—demonstrating, step by step, that the same rationale applies. The Court in *Jarkesy* started by asking whether the case involved private rights (requiring adjudication in Article III courts); the Court concluded that private rights were at issue because the government sought penalties. 144 S. Ct. at 2127-29. Following that approach, Sun Valley explained that this case involves private rights because the government sought penalties and back wages. Op. Br. 18-22. The Court in *Jarkesy* also found support in the fact that the claims were analogous to common-law claims (there, common-law fraud). 144 S. Ct. at 2130. So,

Sun Valley explained that the claims here are analogous to common-law breach of contract. Op. Br. 22-24. Only then did *Jarkesy* address the public-rights exception, explaining that the exception must be narrowly construed because it "is, after all, an ***exception***." 144 S. Ct. at 2134. The government bears the burden to prove the exception applies, as the "presumption is in favor of Article III courts." *Id.* (citation omitted). So, Sun Valley closed its analysis by explaining that none of the discrete public-rights exceptions in *Jarkesy* applies. Op. Br. 27-35.

The Government inverts this analysis. It skips the private-rights analysis and starts at the end—with the public-rights exception. This is more than a methodological foible: By skipping the critical issue of remedy, the Government conflates this case with ones involving entirely different remedies—like adjustment of immigration status. Worse, the government does not treat the public-rights exception as an exception at all. Whereas *Jarkesy* describes a narrow exception with careful attention to history, the Government insists that (at least when it comes to immigration) the executive's adjudicative power is equally broad as Congress's legislative power. But *Jarkesy* rejected that view.

**1.** Because the Government skips the first two-thirds of the *Jarkesy* analysis, it largely ignores the most critical fact in this case—the nature of the remedy the government is seeking. *See Jarkesy*, 144 S. Ct. at 2129. Sun Valley explained that back

wages and penalties are both matters of private right, Op. Br. 18-22, and the Government does not attempt to argue otherwise.

The Government conflates this case with ones involving different remedies. Most notably, the Government cites *Elgebaly v. Garland*, 109 F.4th 426 (6th Cir. 2024), which rejected an Article III challenge to agency adjudication of immigration status, without acknowledging that *Elgebaly* involved a different remedy. Resp. Br. 29. There is no question that determining immigration status is an issue of public right. Executive officials historically controlled border crossings, and, in recognition of that history, the Supreme Court has long held that executive officials may decide whether to admit, exclude, or expel aliens. *See Wong Wing v. United States*, 163 U.S. 228, 237 (1896); *see also Jarkesy*, 144 S. Ct. at 2132 (agencies can adjudicate only matters historically within the political branches' exclusive control). But that history is irrelevant here, as this is a case about employment-related penalties and back wages, not immigration status.

Because the Government ignores the "all but dispositive" question of remedy, it also overstates the significance of the fact that "Sun Valley has no private right to bring foreign nationals into the United States." Resp. Br. 36. That argument would be on-point if the Government sought to bar Sun Valley from the H-2A program, a remedy available to the Government, *see* 8 U.S.C. § 1188(e). Sun Valley

does not dispute that a decision to impose disbarment would fit within the public-rights exception. But while participation in the H-2A program may implicate public rights, penalties and back wages do not.

*Jarkesy* makes clear that penalties do not become less "private" simply because the government could *also* seek remedies related to public rights. In addition to imposing civil penalties on Jarkesy, the SEC barred him from engaging in "various securities industry activities." 34 F.4th 446, 450 (5th Cir. 2022). Nobody disputed that Jarkesy's disbarment involved public rights, *see id.* at 454, just as Sun Valley does not dispute that barring it from the H-2A program would involve public rights. But enforcement still had to proceed in Article III courts because the SEC also sought civil penalties. Here, too, the remedy makes all the difference.

**2.** The Government also downplays another critical aspect of this case—the analogy between the claims at issue and common-law breach-of-contract.

The Supreme Court's analogy of the claims in *Jarkesy* to common-law fraud was an important factor in its decision. 144 S. Ct. at 2130. And there can be no real dispute that there is a similar analogy here: The Agency openly acknowledged that its claims were based on a breach-of-contract theory. Op. Br. 23 (quoting agency record). The Government, in response, grudgingly acknowledges that its claims "might be compared to a common-law claim." Resp. Br. 35. But that concession

undersells the point. The Agency previously admitted that its Award was intended to give the workers "their contractual right to the wage promised in the job orders," Appx033, and enforcement proceeded under regulations for the "Enforcement of Contractual Obligations," 29 C.F.R. Part 501. The Government cannot seriously dispute that its claims are, at their core, breach-of-contract claims.

In response, the Government once again plays fast and loose with the critical issue of remedy. The Government notes that in *Malik v. Attorney General*, 659 F.3d 253 (3d Cir. 2011), agency judges adjudicated issues (specifically, whether a marriage was fraudulent) that might also have been adjudicated at common law. Resp. Br. 36. But the remedy at issue in that case was removal. Given the executive's historical power over immigration status, there is no real question that the decision to remove an immigrant for fraud relating to their immigration status is a matter of public right. It does not remotely follow that agency judges can impose classic common-law remedies (penalties and back wages) on a breach-of-contract theory.[2]

---

[2] The Government also cites *Noriega-Perez v. United States*, 179 F.3d 1166, 1174 (9th Cir. 1999), which involved penalties for forging immigration-related documents. Resp. Br. 35. But *Noriega-Perez* predates *Jarkesy* and is therefore of little use in determining its scope. Moreover, the Ninth Circuit emphasized that the penalties were limited to "fraud committed 'for the purpose of satisfying requirements of the Immigration and Nationality Act.'" 179 F.3d at 1177 (brackets omitted). The penalty in *Noriega-Perez*, therefore, was at least somewhat more closely tied to the historical exception related to crossing the border. *See Jarkesy*, 144 S. Ct. at 2132-33.

In *Jarkesy*, the Supreme Court grounded its decision in the nature of both the remedy and the claims:

> The object of this SEC action is to regulate transactions between private individuals interacting in a pre-existing market. To do so, the Government has created claims whose causes of action are modeled on common law fraud and that provide a type of remedy available only in law courts. This is a common law suit in all but name. And such suits typically must be adjudicated in Article III courts.

144 S. Ct. at 2136. Sun Valley articulated that same logic: "The Agency regulates interactions between private employers and employees; it has created claims modeled on common law breach of contract; and it has awarded remedies traditionally available in common law courts." Op. Br. 29. And the Government offers no meaningful response.

**3.** When it comes to the public-rights exception—the one part of the *Jarkesy* analysis that the Government at least tries to address—the Government again inverts the analysis. Rather than treat the exception as an ***exception***, as *Jarkesy* requires, the Government offers a broad view under which agencies can adjudicate coextensively with Congress's legislative power. Resp. Br. 30 (arguing public rights include any "exercise of Congress' constitutional authority to regulate the entry of foreign nationals"). But *Jarkesy* rejected that position.

In *Jarkesy*, the Court expressly rejected the argument that "the public rights exception applies to any exercise of power granted to Congress." *Id*. at 2133 n.1; *cf.*

*id.* at 2162-65 (Sotomayor, J., dissenting) (arguing for the Government's position here). Instead, the Court adopted a much narrower, contextual approach, under which public rights are tied to specific actions that "historically could have been determined exclusively by the executive and legislative branches." *Id.* at 2132 (cleaned up). In other words, congressional power to legislate does not equal executive power to adjudicate. Courts must take "pains to justify the application of the [public rights] exception in [a] particular instance by explaining that it flowed from centuries-old rules." *Id.* at 2134. The Government's broad "immigration is public" approach cannot be squared with *Jarkesy*.

To paper over the disconnect between its theory and *Jarkesy*, the Government quotes misleadingly from the decision. The Government asserts that *Jarkesy* "reaffirmed that Congress exercises complete control over immigration and that, within that area, 'administrative officers should have the authority to enforce designated penalties without resort to the courts.'" Resp. Br. 34 (quoting *Jarkesy*, 144 S. Ct. at 2133 n.1 ). The full quotation, however, makes clear that the language on which the Government relies was an advocate's position. *See Jarkesy*, 144 S. Ct. at 2133 n.1 (quote beginning "[i]t is insisted that ..."). Worse, the quotation comes from a footnote that expressly rejected the dissent's argument that "the public rights exception applies to any exercise of power granted to Congress." *Id.* The

Government's twisting of the Supreme Court's words confirms the disconnect between its position here and *Jarkesy*.

B.  This Case Does Not Fit Within The Immigration-Related Exception.

To be sure, *Jarkesy* did recognize a narrow, historically rooted exception for some immigration-related penalties. But the Opening Brief explained why that exception does not apply. Op. Br. 31-35. The Court in *Jarkesy* recognized a historical tradition under which "Congress could also prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without a jury." 144 S. Ct. at 2132-33. Those penalties were imposed at the border, based on the movement of people across the border, to enforce a prohibition on "immigration by certain classes of persons." Op. Br. 32-33. The Government's attempt to expand this exception to encompass anything tangentially related to immigration finds no support in history, precedent, or reason.

**1.** Begin with history, as *Jarkesy* instructs. The public-rights doctrine must be rooted in "historic categories of adjudications" in areas where there was "an unbroken tradition—long predating the founding—of using these kinds of proceedings." *Jarkesy*, 144 S. Ct. at 2132-33. In these areas, courts must take "pains" to tie the doctrine to "centuries-old rules." *Id.* at 2134. By contrast, the Government does not ground its argument in any practice before the 1980s.

As the Opening Brief explained, the relevant historical practice was limited. Although executive officials decided whether to admit immigrants at the border, the Supreme Court held that when Congress promotes its immigration policy through different punishments, such as "infamous punishment at hard labor, or by confiscating their property," then it "must provide for a judicial trial to establish the guilt of the accused." *Wong Wing*, 163 U.S. at 237. While there are later examples of border officials imposing penalties, they did so at the border, based on the movement of persons across the border, as a condition of crossing the border. Op. Br. 32-33.

The Government makes no effort to show that its proposed exception for all immigration-related cases is historically rooted. Instead, the Government's discussion of history consists of little more than misdirection. The Government invokes the breadth of Congress's power over immigration, Resp. Br. 26, 30, but that precedent does not establish that such matters were fit for ***agency adjudication***. It also cites the historical practice of executive officials determining immigration status, *id.* at 29, 34, but that does not establish that ***penalties*** were also adjudicated by agencies—let alone penalties unrelated to immigration status.

When it comes to the specific employment-related matters at issue here, the Government offers no historical precedent whatsoever. The Government points to no precedent for executive officials adjudicating anything involving a business's

working conditions, employment, or contracts simply because some of the workers were on employment visas. Nor does the Government point to any precedent to support its suggestion that agencies can adjudicate cases involving "mistreatment of aliens." Resp. Br. 26-27; *cf. United States v. Sabhnani*, 599 F.3d 215 (2d Cir. 2010) (jury trial for mistreatment of aliens). Indeed, the Government does not point to any historical precedent for executive officials adjudicating anything other than penalties based on the movement of persons across the border. Under *Jarkesy*, that failure should be dispositive.

Nor is that the only gap in the Government's argument. The Government also ignores that the penalties here were imposed by DOL, an agency focused on the domestic labor market, while the immigration-related parts of the H-2A program are run by the Department of Homeland Security. *See* Op. Br. 32. Likewise, the Government ignores that penalties were imposed not just for H-2A workers but also for domestic workers. *See id.*

Finally, the Government fails to grapple with the fact that the decision here also imposed ***back wages***. The Government does not even attempt to identify any historical precedent for agency judges adjudicating back wages simply because some

(though not all) of the workers owed back wages are on employment visas. That failure, too, is fatal to the Government's position.[3]

Critically, the Government bears the burden to overcome the "presumption" in favor of Article III. If the Government believes this case follows a "centuries-old" tradition of executive adjudication, then it must provide evidence to that effect. But the Government cannot do so. The record here is devoid of any hint of a "centuries-old" tradition of agencies imposing penalties and back wages for employment-related issues related to a business's working conditions. Absent such historical evidence, the presumption in favor of Article III must hold.

**2.** Next, precedent. The Government cites cases in support of its view of the public-rights doctrine, but none stand for the proposition it asserts.

The Government relies on *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320 (1909), but the Opening Brief addressed that decision at length and explained that it involved penalties imposed at the border, based on the movement of people across the border, as a condition of re-crossing the border. Op. Br. 32-33. The Government does not really argue otherwise: Summarizing *Oceanic Steam*, the

---

[3] Sun Valley explained that if ***either*** the penalties or back wages involve private rights, then the entire Award must be vacated—as both are based on the same facts. Op. Br. 39-40. The Government does not address this issue.

Government acknowledges that the penalty there was imposed on a steamship that brought people into the country with a contagious disease. Resp. Br. 27. That decision says nothing about the employment-related penalties at issue here.[4]

Meanwhile, *Jarkesy* itself is no help to the Government. The Court in *Jarkesy* described the rule adopted in *Oceanic Steam* in narrow terms, stating that it stands for the proposition that Congress could "prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without a jury." 144 S. Ct. at 2132-33. In doing so, the Court rejected a broad reading of *Oceanic Steam*, observing that *Oceanic Steam* nowhere "say[s] that the public rights exception applies to cases concerning the securities markets." *See id.* at 2133 n.1. The same is true of a business's working conditions.[5]

The Government also cites *Crowell v. Benson* in support of its position, *see* Resp. Br. 26, but the cited passage merely lists "immigration" alongside "interstate and foreign commerce" and "public health" as categories of issues that may in some circumstances be suitable for administrative adjudication. 285 U.S. 22, 51 (1932).

---

[4] *Lloyd Sabaudo v. Elting*, 287 U.S. 329 (1932), cited by the Government in a footnote, *see* Resp. Br. 28 n.7, is distinguishable on the same ground. *See* Op. Br. 33.

[5] Meanwhile, the Government gives up any pretext that it is trying to apply the *Jarkesy* decision, as opposed to undermine it, when it relies on the *Jarkesy* dissent. Resp. Br. 34.

That list of categories does not support the Government's attempt to conflate the movement of people across the border with the separate topic of "noncitizens' work within the United States." Resp. Br. 26

**3.** Finally, the Government's argument is unreasonable. *Jarkesy* teaches that public rights must be narrowly construed—as an ***exception*** to the general presumption in favor of Article III. *See* 144 S. Ct. at 2134. But the Government's theory has no limit.

Sun Valley pointed out that, just as almost anything relates to the regulation of "interstate commerce," the power over immigration could be stretched to all manner of activities. Op. Br. 34-35. Rather than contest this point, the Government confirms it: It asserts plenary power to use agency judges to fine anyone who "employ[s] foreign nationals within the Nation's borders," including when issues involve the employment of permanent residents. Resp. Br. 38. Moreover, under the Government's theory, no employment nexus is even required. The Government asserts an interest in preventing "mistreatment of aliens," *id.* at 26-27, which seemingly would empower agencies to adjudicate any case that negatively impacts non-citizens. Such a sweeping view of the public-rights doctrine cannot be squared with *Jarkesy*'s instruction that the "public rights exception is … an ***exception***." 144 S. Ct. at 2134.

C.  The Government Largely Abandons The District Court's Alternate Holding on Consent And Waived Any Exhaustion Argument.

The District Court, in a footnote, held in the alternative that Sun Valley consented to agency adjudication by contesting DOL's imposition of penalties in agency court. Sun Valley explained why this is wrong: A party does not "consent" to agency adjudication by defending itself against the imposition of penalties in the forum that the agency itself designates. Op. Br. 35-39.

The Government, for its part, offers no real defense of the District Court's footnote on consent. *See* Resp. Br. 41. The Government briefly cites a case about consent, *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665 (2015), but does not discuss its applicability or respond to Sun Valley's explanation (Op. Br. 37-38) of why it is irrelevant. The Government's bare case cite cannot preserve this argument.

The Government tries to shift ground instead, now arguing that Sun Valley "failed to exhaust" its Article III claims.[6] Resp. Br. 41. The Government, however, failed to preserve this argument below; it raised exhaustion for Sun Valley's *Article*

---

[6] The Government also asserts cursorily that Sun Valley "waived" its Article III claim before the agency. Resp. Br. 41. In the administrative context, however, waiver is addressed through exhaustion. To the extent that the Government suggests there is some separate, freestanding "waiver" doctrine, the argument is not adequately developed and fails for the same reason as exhaustion.

*II* claims, *see* Doc. 22-1 at 19-21, but not with respect to ***Article III***, instead framing its Article III argument in terms of consent, *see id.* at 17-18. Thus, the Government has forfeited the issue. Op. Br. 41; *see Alexander v. Fritch*, 396 F. App'x 867, 873 (3d Cir. 2010) ("Failure to exhaust administrative remedies is an affirmative defense, which may be waived[.]"). Moreover, even on appeal the Government does not develop the argument—merely gesturing at it with a few words.

In any event, Sun Valley was not required to exhaust its Article III claim. As this Court has recognized, "exhaustion is generally inappropriate where a claim serves to vindicate structural constitutional claims." *Cirko ex rel. Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 153 (3d Cir. 2020). That's because an agency judge has no discretionary authority—indeed, no authority whatsoever—to rule that its administrative adjudications violate Article III. *See id.* Constitutional challenges like this one "are 'outside the [agency's] competence and expertise.'" *Id.* at 158 (quoting *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 (2010)). The Agency here, therefore, "has no legitimate basis to argue that agency expertise requires that those claims be exhausted before the agency." *Id.*

## II.     The Agency Acted Without Sufficient Congressional Authorization.

The Opening Brief explained that this agency adjudication was unlawful because it was not clearly authorized by Congress. Op. Br. 40-47. Rather than offer

any clear statutory language to refute that point, the Government argues that no clear authorization should be required. Resp. Br. 42-43.

A.    The Agency Points To No Statute Clearly Authorizing Agency Adjudication.

The Government identifies no statute clearly authorizing agency adjudication of cases like these. Instead, the Government merely infers from 8 U.S.C. § 1188(g)(2) that Congress "obviously anticipated" agency adjudications. Resp. Br. 43. That statute states that DOL can "seek[ ]" "appropriate injunctive relief and specific performance of contractual obligations," but—even if that language can be read to include back wages—the natural reading of "seek" suggests that the Agency must pursue relief externally, from Article III courts. Meanwhile, that same provision states that DOL can "impos[e] appropriate penalties," but, as Sun Valley explained, an agency "imposes" penalties when its enforcement staff assesses them. Op. Br. 42-43. Sun Valley cited DOL's own documents showing that the Agency's position is that penalties are "imposed" when they are assessed by enforcement staff. *See id.* The Government totally ignores that portion of the Opening Brief and offers no real textual reading of Section 1188(g)(2) that could expressly authorize administrative adjudication.

Rather than identifying a clear statutory authorization, the Government argues that its interpretation of the statute should be entitled to deference because it

is longstanding. Resp. Br. 42. But that is not the law—especially after *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). Missing from the Government's patchwork of quotes is *Loper Bright*'s conclusion that any "[r]espect" the judiciary affords the executive's interpretation of laws "was just that"—respect, not deference. *Id.* at 2258. This Court "certainly would not be bound to adopt the construction given by the head of a department. Otherwise, judicial judgment would not be independent at all." *Id.* (cleaned up).

While a contemporaneous and longstanding interpretation of a statute may inform a court's interpretation, "settled institutional understandings of the branches" are "far weaker when the rights of individuals are directly at stake." *Jarkesy*, 144 S. Ct. at 2134 n.2. Courts are "not at liberty to surrender, or to waive," their independent judgment of what a law means. *Loper Bright*, 144 S. Ct. at 2258. (citation omitted). That is particularly true in cases like this one, where the Government's interpretation would deprive targeted individuals and businesses of all the rights accompanying a trial in an Article III court.

B.    <u>Agency Adjudication Requires Clear Congressional Authorization.</u>

Sun Valley explained that—far from deferring to the Agency's interpretation—courts must require a clear congressional statement authorizing agency adjudication. Op. Br. 44-47. The Government cannot refute this point.

The Fifth Circuit required definite congressional authorization in *Jarkesy*—a holding undisturbed by the Supreme Court's opinion. Op. Br. 45-46.[7] In response, the Government says *Jarkesy* was distinct because it invalidated a statute that allowed the SEC to "bring an enforcement action either in an agency proceeding or in a district court suit." Resp. Br. 45. But the Government's interpretation of Section 1188(g)(2) in this case would lead to the same result: If that ambiguous statutory language could authorize agency adjudication, then it could also authorize the Agency to "seek[]" penalties through Article III adjudication, or both. The problem is the same, as the choice rests with the Agency rather than Congress.

The Opening Brief also drew support for this requirement from *Atlas Roofing*, explaining that even that opinion, which represents the high-water mark for judicial acquiescence to agency adjudication of penalties, makes clear that agency adjudication requires congressional authorization. Op. Br. 46. Yet the Government cites *Atlas Roofing* without grappling with this aspect of the decision. Resp. Br. 29. Of course, after *Jarkesy* the more expansive aspects of *Atlas Roofing* are no longer good law. Op. Br. 29-30. But the fact that even *Atlas Roofing*, for all its faults, treated

---

[7] The Government misleadingly says the Supreme Court "declined to endorse the [Fifth Circuit] panel majority's reasoning." Resp. Br. 45. The truth is the Court did not reach the issue because it affirmed on other grounds, *Jarkesy*, 144 S. Ct. at 2127-28, and therefore left the Fifth Circuit's holding undisturbed.

congressional authorization as a prerequisite for agency adjudication provides powerful support for requiring clear authorization here.

The Opening Brief also relied upon the rule that Congress must provide a "clear statement" when agency action implicates significant issues that, in all fairness, ought to be decided by Congress. *See*, *e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023). The Government does not really dispute that the decision to allow agency adjudication is a significant one; as *Jarkesy* says, the right to an independent judge and jury "is of such importance and occupies such a firm place in our history and jurisprudence that any seeming curtailment of the right has always been and should be scrutinized with the utmost care." 144 S. Ct. at 2128 (cleaned up). Instead, the Government contends that this rule should not apply because its procedures have been in place since the 1980s. Resp. Br. 45. But *Jarkesy* refutes that suggestion; any appeal to the "settled institutional understandings of the branches" is "far weaker when the rights of individuals are directly at stake." 144 S. Ct. at 2134 n.2. The "absence of legal challenges brought by one generation [should not] waive the individual rights of the next." *Id.*

Finally, the Opening Brief explained that this clear-statement rule finds support in 28 U.S.C. § 2461, which provides that when Congress authorizes a penalty "without specifying the mode of recovery or enforcement thereof, it may be

recovered in a civil action." The Government responds that this statute "grants a permissive cause of action" but does not "require[ ] initial district court adjudication to the exclusion of Executive adjudication." Resp. Br. 44. In other words, the Government adds the following underlined words to the statute: "Whenever a civil ... penalty ... is prescribed for the violation of an Act of Congress without specifying the mode of recovery or enforcement thereof, it may be recovered in a civil action <u>or in agency adjudication or any other procedure the agency prefers</u>." (underlined text added). But of course, that's not what the statute says. When a penalty provision does not state otherwise, enforcement must proceed in district court.

## III.    The Agency Proceedings Separately Violated Article II.

The Opening Brief explained that the Agency's proceedings violated Article II because no officer directly answerable to the President can remove the ALJ who adjudicated the action. The ALJ enjoys an impermissible double layer of removal protection: she can be removed only for cause, as determined by the Merits Systems Protection Board ("MSPB"), the members of which also enjoy for-cause removal protection. This double layer of removal protection violates Article II, as the Court made clear in *Free Enterprise Fund*, 561 U.S. at 496.

The Government responds by defending a different system than the one that actually exists. In the Government's telling, the Secretary of Labor (removable at the

President's will) "can remove ALJs 'for good cause.'" Resp. Br. 49. But it is not true that the Secretary of Labor can unilaterally remove ALJs; that decision requires MSPB approval. Accordingly, Part III.A explains that it is beside the point whether one layer of "good cause" removal protection would be constitutional because the ALJ here enjoys two. Part III.B addresses the Government's second fleeting attempt to impose an exhaustion requirement on structural constitutional challenges. Finally, Part III.C addresses the question of remedy.

A. <u>The ALJ Enjoyed Impermissible Protection From Removal.</u>

The Government's brief is replete with assertions that the ALJ has only one level of tenure protection because "[t]he President may remove the Secretary [of Labor] at will, and the Secretary may remove the ALJ for good cause." Resp. Br. 54; *see id.* at 49, 52, 52. This fallacy props up the Government's entire merits argument on the removal issue.

A system like the one the Government imagines, in which the Labor Secretary is removable at will and can remove inferior officers for cause would, in fact, adhere to current precedent. *See Free Enter. Fund*, 561 U.S. at 493-94. But that is not the system at issue. Rather, the system here "does something quite different." *Id.* at 495. In addition to the Secretary's good-cause determination, the MSPB must find good cause. 5 U.S.C. § 7521(a), (b). And the MSPB members, in turn, enjoy good-cause

protection. 5 U.S.C. § 1202(d). That makes this system just like the one in *Free Enterprise Fund*, where the Court held that the "second level of tenure protection changes the nature of the President's review" and "is contrary to Article II's vesting of the executive power in the President." 561 U.S. at 496.

That the ALJs exercise adjudicative power does not change this analysis. *See Lucia v. SEC*, 585 U.S. 237, 244-45 (2018) (ALJs are "Officers of the United States" within the meaning of the Appointments Clause); *Jarkesy*, 34 F.4th at 465 (as officers, ALJs cannot enjoy multi-level tenure protection). Even though ALJs adjudicate, they are still executive officials. And if the type of adjudication here requires greater protection from removal than is normally available for executive officials, the solution is for adjudication to happen in the Article III courts.

B.    Sun Valley Was Not Required To Exhaust This Removal Challenge.

As discussed in Part I.C, Sun Valley did not need to exhaust its structural constitutional challenges. This Court has already decided as much in *Cirko*, holding that "exhaustion is generally inappropriate where a claim serves to vindicate structural constitutional claims like Appointments Clause challenges, which implicate both individual constitutional rights and the structural imperative of separation of powers." 948 F.3d at 153.

25

Unhappy with the decision in *Cirko*, the Government offers a single parenthetical to suggest that *Cirko* is inapposite because the administrative hearing here was adversarial rather than inquisitorial. Resp. Br. 48.[8] But the lack of adversity in Cirko's Social Security hearings was, at most, one third of this Court's rationale. *See Cirko*, 948 F.3d at 153-59 (assessing three factors). *Cirko*'s other two bases still cut against an exhaustion requirement: structural constitutional challenges are ill-suited for exhaustion "given their importance to separation of powers and, ultimately, individual liberty," *id.* at 155, and neither governmental interest in favor of exhaustion ("deference to agency expertise and opportunity for agency error correction") is present because the Agency cannot decide the issue, *id.* at 157-58.

C.    This Article II Violation Requires Vacatur.

This constitutional violation requires the Court to set aside the agency's entire action, findings, and conclusions. *See* Op. Br. 52 (citing 5 U.S.C. § 706(2)). The relevant statutory language is unambiguous. *Cf. Corner Post, Inc. v. Bd. of Governors*, 144 S. Ct. 2440, 2462 (2024) (Kavanaugh, J., concurring).

---

[8] The Government would have this Court abandon *Cirko* in favor of the D.C. Circuit's split decision in *Fleming v. USDA*, 987 F.3d 1093 (D.C. Cir. 2021). But *Fleming* dealt with a *statutory* exhaustion requirement. *Id.* at 1098 (citing 7 U.S.C. § 6912(e)). An agency rule cannot limit a court's jurisdiction. Because no statute requires exhaustion here, exhaustion is prudential—not mandatory.

The Government, in response, contends that vacatur is not required because actions taken by an "improperly insulated officer are not 'void.'" Resp. Br. 56 (marks omitted). However, as the Opening Brief pointed out, whether that is true depends on whether the removal restriction is severable from other provisions giving the officer power to act; if the removal provision is ***not*** severable, then the removal violation necessarily does strip the officer's authority. *See* Op. Br. 52. The Government's own cases confirm the point, as they rely on a conclusion that the invalid removal restriction is severable. *See*, *e.g.*, *Rodriguez v. SSA*, 118 F.4th 1302, 1314 (11th Cir. 2024); *Kaufmann v. Kijakazi*, 32 F.4th 843, 848 (9th Cir. 2022). To the extent that some of the Government's cases do not conduct a severability analysis, those decisions are from outside the Third Circuit; meanwhile, the sole Third Circuit opinion cited by the Government in this portion of its brief expressly notes that "the constitutional defect was cured via severing." *CFPB v. Nat'l Collegiate Master Student Loan Tr.*, 96 F.4th 599, 616 (3d Cir. 2024); *see also id.* at 605, 614 (noting role of severability in past decisions). The Opening Brief pointed out there is no reason to believe that Congress would want ALJs to adjudicate without removal protection, *see* Op. Br. 52, and the Government does not seriously argue otherwise. Vacatur is therefore required.

## IV.  The Award Is An Excessive Fine.

The Opening Brief also argued that the award of $198,450 in penalties and $128,285 in back wages based on the farm's meal plan was an excessive fine. Op. Br. 53-55. Sun Valley specifically argued that this claim required an evidentiary hearing in an Article III court, rather than a decision on a cold agency record, as agencies cannot decide factual questions for constitutional claims. *Id.* at 55-56.

The Government does not even acknowledge—much less address—Sun Valley's demand for an evidentiary hearing. There is no question of preservation: Sun Valley sought an evidentiary hearing in its Complaint and preserved the argument in its dispositive motion below. Op. Br. 56 n.30 (citing Doc. 19-1 at 2 n.1). Yet, at every turn, the Government has ignored this argument, and the District Court ignored it, too. Perhaps because there is no good response.

As the Opening Brief explained, a cold agency record cannot suffice for challenges under the Excessive Fines Clause. Op. Br. 55-56. Constitutional issues are within the unique province of Article III courts, and, in resolving constitutional questions, courts must hear and consider the facts to make an "independent assessment of a citizen's claim." *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552547, at *3 (N.D. Tex. July 19, 2021) (quoting *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979)); *see also von Hofe v. United States*, 492 F.3d 175, 186 (2d Cir.

2007) (describing Excessive Fines claims as "necessarily fact-intensive"). The Government offers no response whatsoever. And while the Government *does* dispute that the liability imposed here was excessive, there is—at the very least—a material factual dispute that should require an evidentiary hearing.

## CONCLUSION

The judgment below should be reversed.

Dated: December 11, 2024

Respectfully submitted,

s/ Robert E. Johnson

Robert E. Johnson
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel: (703) 682-9320
Fax: (703) 682-9321
rjohnson@ij.org

Robert M. Belden
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
rbelden@ij.org

*Counsel for Appellant*

## COMBINED CERTIFICATIONS

1.     <u>Word Count</u>: This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,484 words.

2.     <u>Typeface</u>: This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in size 14-pt Equity A.

3.     <u>Identical Briefs</u>: Pursuant to Local Rule 31.1(c), counsel certifies that the text of the electronic brief and the text of the hardcopy briefs are identical.

4.     <u>Virus Scan</u>: Pursuant to Local Rule 31.1(c), counsel certifies that a virus scan was run on the electronic copy of the brief using McAfee Antivirus software.

5.     <u>Service</u>: On December 11, 2024, this brief was served through the Court's CM/ECF system on counsel for all parties to be served.

s/ Robert E. Johnson